# EXHIBIT 6

LISA M. HOLLIDAY, Ph.D. - APRIL 13, 2018

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


SEAN SMITH and CRYSTAL SMITH,    )
                                 )
          Plaintiffs,            )
                                 )
VS.                              )No. 5:17-CV-1302D
                                 )
CSAA FIRE AND CASUALTY           )
INSURANCE COMPANY,               )
                                 )
          Defendant.             )


\* \* \* \* \*

DEPOSITION OF LISA M. HOLLIDAY, PH.D.,

TAKEN ON BEHALF OF THE PLAINTIFFS

ON APRIL 13, 2018

IN OKLAHOMA CITY, OKLAHOMA

COMMENCING AT 9:53 A.M.

\* \* \* \* \*


REPORTED BY: KORTNEY V. HOUTS, CSR

Page 26

1  STEM. And I was in a calculus class in Tuttle,
2  Oklahoma, working with students there.
3  Q  She's actually from Tuttle.
4  THE WITNESS: Are you from Tuttle?
5  THE COURT REPORTER: I am.
6  THE WITNESS: Yes. Did you take calculus?
7  THE COURT REPORTER: No.
8  THE WITNESS: No.
9  Q  (By Mr. Engel) What is STEM?
10 A  STEM is an acro -- an acronym for Science
11 Technology Engineering and Math. And the National
12 Science Foundation is worried that not enough students
13 are studying those topics.
14 Q  I didn't write this question down. But it
15 just hit me that Rimkus reached out to you when they
16 were looking for an engineer. Is that correct?
17 A  Correct.
18 Q  You weren't looking for this -- is this a
19 part-time job for you?
20 A  It's full-time now.
21 Q  Okay. So you're full-time working for
22 Rimkus?
23 A  Yes.
24 Q  Okay. But Rimkus reached out to you?
25 A  They did.

Page 27

1  Q  How did that happen?
2  A  I don't know. They sent me an e-mail. And I
3  was ready to leave the university, and I thought, well,
4  that sounds interesting. Yeah. I don't know how they
5  found me.
6  Q  Your dissertation?
7  A  I don't know.
8  Q  So when you graduate in 2009 with your Ph.D.
9  what are you doing from then on?
10 A  I was a professor.
11 Q  So full-time professor?
12 A  (Witness nods head affirmatively.)
13 Q  Until --
14 MR. FELTY: You've got to answer audibly.
15 THE WITNESS: Oh, sorry. Yes. Sorry.
16 Q  (By Mr. Engel) Until --
17 A  I'm still -- until May 15th of this year.
18 Q  Okay. And then did you have any other
19 engineering jobs besides the Rimkus job between those
20 times?
21 A  No.
22 Q  Okay. And when did you start working for
23 Rimkus?
24 A  August.
25 Q  Of --

Page 28

1  A  Of 2017, this past August.
2  Q  I was thinking about when my report was from.
3  A  Okay.
4  Q  Okay.
5  A  It might have been late July, but I'm
6  thinking August.
7  Q  Okay. When you go to work for Rimkus, did
8  they have any formal training?
9  A  Yes.
10 Q  Tell me about that.
11 A  It was a lot about their computer systems and
12 how to log your time and how to log your hours and --
13 Q  The software that they use?
14 A  Yes. It was a lot about how to write
15 reports, the formats.
16 Q  Is that a -- is that a PowerPoint slide or,
17 like, a prerecorded show you're watching or movie?
18 Video, I guess, is --
19 MR. FELTY: Object to the form.
20 Q  (By Mr. Engel) -- what people call it now.
21 A  It was some of both. So they had little
22 videos about how to -- how to go and investigate and
23 get all of the information. So they had training
24 videos, and then they also had booklets that you could
25 read. And then we had a meeting with the -- with the

Page 29

1  office manager.
2  Q  What are the topics of the training videos?
3  A  I mean, it was everything from HR, you know,
4  all the corporate typical training. And then I believe
5  there was some about, you know, working with customers
6  and being professional and all that kind of stuff that
7  you shouldn't have to tell people, but you do.
8  Q  Of course. What about -- and some of that's
9  about writing the reports. Correct?
10 A  Correct.
11 Q  What's the name of the software they use to
12 write their reports?
13 A  Microsoft Word.
14 Q  Advanced.
15 A  It comes in a Word.
16 Q  What about -- were there videos specific to
17 forensic engineering?
18 A  There was. There weren't about buildings.
19 But, for instance, the one that I saw about forensics
20 was about investigating a car crash.
21 Q  Were there any other ones that you watched
22 when you were getting the job at Rimkus?
23 A  Any other what?
24 Q  Videos -- training videos about forensic
25 engineering.

Page 78

1  Q  Earthquake?
2  A  No.
3  Q  What kind of claim was it?
4  A  It was a tree fell on it.
5  Q  Did they hire engineers on that claim?
6  A  They didn't.
7  Q  Was it CSAA?
8  A  It was not.
9  Q  Moving on. Now that you're doing this
10 forensic engineering, do you understand the importance
11 of the reports that you're writing?
12 A  I understand -- yes. I understand the
13 importance of all of my engineering work.
14 Q  Well, specific to Rimkus, ma'am.
15 A  Specific -- every -- engineering has a great
16 deal of responsibility, and I realize that.
17 Q  And you understand that your determinations
18 on cause of loss dictate coverage. Correct?
19    MR. FELTY: Object to form.
20    THE WITNESS: I focus on the engineering.
21 Q  (By Mr. Engel) But isn't it your
22 understanding that the insurance companies are hiring
23 you to determine the cause of loss and some of those
24 causes of loss are covered causes of loss and some of
25 those are not covered causes of loss?

Page 79

1  A  I focus strictly on the engineering.
2  Q  I know. But are you going to say that you
3  don't have an understanding that that's why they hired
4  an engineer?
5  A  I do. But I really focus on the engineering.
6  Q  Sure. And you focus on, you know, whatever
7  they've assigned you to do in your engineering. But
8  it's your understanding that Rimkus is hired because
9  they want -- the insurance carriers or your clients --
10 A  Want our engineering opinion.
11 Q  As to what the cause of loss is because --
12 A  As to what -- yes.
13 Q  -- because the cause of loss can dictate the
14 insurance coverage. Correct?
15 A  I'm going to take your word for it.
16 Q  Well, that's what I'm asking you. Like, you
17 don't have a feel for that at all?
18 A  I really don't.
19 Q  And so do you think that Rimkus is just hired
20 by insurance companies so they can get your engineering
21 opinion, or what do you think the purpose is behind it?
22 A  Yes. And then they -- I realize they make
23 decisions based on our engineering opinions.
24 Q  And what are those decisions? What do you
25 think those decisions are?

Page 80

1  A  I don't go there. That's not part of my job.
2  Q  Okay. So you're going to say you don't -- if
3  I was to tell you that your cause of loss
4  determinations are what they're using to dictate
5  coverage, that would be something that you are
6  unfamiliar with?
7  A  The specifics of, yes. I'm not familiar with
8  that.
9  Q  Right. So you're going to say that you don't
10 know whether or not settling or improper construction
11 is covered. Correct?
12 A  Correct.
13 Q  And you're going to stay out of all of
14 these -- my pages of insurance questions where I'm
15 asking you about insurance coverage, you don't
16 understand any of that?
17 A  I don't even want to know about it.
18 Q  Fair enough. But as far as what you're being
19 hired to do, the determination of cause of loss is
20 something that dictates coverage.
21    MR. FELTY: Object to form. Asked and --
22 Q  (By Mr. Engel) Is that your understanding?
23    MR. FELTY: Asked and answered.
24    You can answer again.
25    THE WITNESS: Okay. Do I answer again?

Page 81

1     MR. FELTY: Same answer --
2     THE WITNESS: I understand decisions are made
3  on my engineering decisions, on my engineering
4  opinions.
5  Q  (By Mr. Engel) And so you take that very
6  seriously, wouldn't you?
7  A  I take everything I do very seriously.
8  Q  Some of these are multimillion-dollar losses
9  where people have damage to their structures, and your
10 determination can dictate whether or not their
11 insurance company pays them?
12    MR. FELTY: Object to form.
13    MR. ANDREWS: Object to the form.
14 Q  (By Mr. Engel) You may answer.
15 A  Correct. Engineering has -- has a lot of
16 responsibilities. When I was a design engineer, it was
17 safety. It's people's lives. I take my engineering
18 responsibilities very seriously.
19 Q  But now it's insurance claims?
20 A  Now it's --
21    MR. FELTY: Object to form.
22    THE WITNESS: Now it's engineering opinions.
23 Q  (By Mr. Engel) Would you say that all of
24 your inspections at Rimkus have to do with insurance
25 claims whether you are hired by an insurance company or

## Page 242

1  A  Not from me, they don't.
2  Q  Is there anything else I need to know about
3  your involvement in this investigation or claim?
4  A  I can't think of anything.
5  MR. ENGEL: Let me look at my notes off the
6  record for a little bit and take a little bit of a
7  break.
8  MR. FELTY: Yeah. Take five.
9  (A break was taken.)
10 MR. FELTY: Back on the record.
11 Q  (By Mr. Engel) Ms. Doc Holliday, you're back
12 on the record, ma'am.
13 A  Okay.
14 Q  One of the things that you say in your report
15 is that things are out of plumb. Did you take any
16 measurements of this out of plumb?
17 A  Not numeric measurements. Just with a level.
18 Q  And that's a four-foot level?
19 A  Yes.
20 Q  What areas did you measure?
21 A  We measured the floors and the walls.
22 Q  Okay. Which walls?
23 A  Outsides of the walls.
24 Q  All four sides of the residence on the
25 outside?

## Page 243

1  A  Probably.
2  Q  Okay.
3  A  Tim had the level.
4  Q  Did you do those measurements or did Tim?
5  A  Tim did.
6  Q  So you're leaving OU now?
7  A  I am.
8  Q  And you're moving to a full-time position at
9  Rimkus?
10 A  I am.
11 Q  When you were going to get your Ph.D. -- and
12 it sounds like specializing in earthquake structure
13 design, if you will. Right?
14 A  Right.
15 Q  What were you planning on doing with that
16 specialty?
17 A  I did not have a plan.
18 Q  Did you have any idea of what you were going
19 to be?
20 A  I thought I'd be a professor for the rest of
21 my life.
22 Q  When did that shift?
23 A  You know, I got -- I just -- right before I
24 went to work with Rimkus, I looked at -- I had gotten
25 tenure and everything was going well, and I looked at

## Page 244

1  professors that were -- had been around for longer than
2  I had, and they didn't seem all that happy. And so I
3  decided to make a change, do something different, shake
4  it up a little bit.
5  Q  Now, is that before or --
6  A  That was an earthquake joke.
7  Q  That was good.
8  MR. ANDREWS: That was on the record. That
9  was a good one.
10 THE WITNESS: Yes.
11 Q  (By Mr. Engel) Is that -- was that before or
12 after Rimkus -- did you -- had you made this decision
13 before or after Rimkus had reached out?
14 A  I was -- about the same time. The timing was
15 right.
16 Q  Does the Rimkus gig pay more?
17 A  Oh, yes. I mean, the teachers are on strike.
18 Q  I understand.
19 A  We don't value education in this state.
20 Q  Is the Rimkus thing -- is that a -- is that a
21 stepping stone to something else that you have in mind
22 or is that like a full-time, this is where I'm going to
23 be for the next 15 years, kind of thing?
24 A  I don't -- I don't know. I'm not sure. It's
25 not -- I don't have a -- I don't have another job in

## Page 245

1  mind or another plan.
2  Q  And you've been with them for less than a
3  year?
4  A  Less than a year.
5  Q  And you understand that the majority of your
6  work is going to be writing reports for insurance
7  companies. Right?
8  MR. FELTY: Object to the form.
9  Argumentative.
10 MR. ANDREWS: Same objection.
11 THE WITNESS: There's a lot of report
12 writing, and nobody becomes an engineer because they
13 like to write.
14 Q  (By Mr. Engel) But a lot of these reports
15 you're going to be writing, they're for insurance
16 companies. Right?
17 MR. FELTY: Same objection.
18 THE WITNESS: It seems so.
19 Q  (By Mr. Engel) Rimkus is going to be
20 utilized by insurance companies to possibly deny
21 coverage to the people of Oklahoma through your
22 determinations of cause of damage.
23 MR. ANDREWS: Object to the form.
24 Q  (By Mr. Engel) Is that something that you're
25 comfortable with?

Page 246

1  A   I'm comfortable making engineering decisions,
2  and if that leads to policy decisions, I'm sorry if it
3  doesn't go the way people want. But I'm going to do my
4  fair engineering assessment.
5  Q   Do you find job satisfaction in what you do
6  for Rimkus?
7  A   I do.
8  Q   Have you understood all the questions I've
9  asked you today?
10  A   I have.
11  Q   Was I fair and polite to you?
12  A   And -- you were. And the questions I didn't
13  understand, we clarified at the time. So we have no
14  outstanding miscommunications.
15  Q   I appreciate you, ma'am. Thank you very
16  much.
17  A   Thank you.
18      MR. ANDREWS: Would you grade him about a B?
19      THE WITNESS: Oh, let's give him an A. Come
20  on. Let's give him an A.
21      MR. ANDREWS: I have no questions.
22      MR. ENGEL: That's okay. Back in my law
23  firm, they always give me Ds.
24      THE WITNESS: No, they don't.
25      MR. FELTY: One thing we wanted to -- we're

Page 247

1  going to move to seal Dr. Holliday's deposition to the
2  extent any testimony elicited from Dr. Holliday
3  pertaining to matters, one, outside the state of
4  Oklahoma; two, not involving an allegation of damage to
5  a residential structure involving seismicity; or,
6  three, training or associated questions concerning
7  non-seismicity issues.
8      Unless and until we have an opportunity to
9  review the transcript, we won't know the page and line
10  of the testimony we'd like to seal. So we'll need to
11  wait until the transcript is available. But we would,
12  again, move to seal that part -- or those parts of her
13  deposition transcript.
14      MR. ANDREWS: No objection.
15      MR. ENGEL: I'm going to object. Her --
16  strictly on the basis that when she came in to Rimkus,
17  there's very little training provided. All of my
18  questions pertaining to her training at Rimkus and the
19  materials she received has to do with her experience as
20  a forensic engineer. And not only that, but now she's
21  a full-time forensic engineer for a company called
22  Rimkus. Rimkus, as demonstrated in her testimony,
23  doesn't provide any training to their engineers in
24  regards to being a forensic engineer. It sounds like
25  something that we'll be briefing later on, but that's

Page 248

1  the gist of my disagreement.
2      MR. FELTY: Yeah. So we'll brief the issue
3  for the Court. We would move for protective order that
4  any testimony elicited from Dr. Holliday be sealed
5  unless and until the Court rules on this issue and not
6  to be used for any other purpose over and beyond the
7  Smith versus CSAA case. Again, we'll just let that --
8  have to let the Court decide.
9      Dr. Holliday, you now have to say whether
10  you're going to read and sign your deposition or waive
11  it. My recommendation to you is to say, read and sign.
12      THE WITNESS: Okay. Read and sign.
13      MR. FELTY: All right. We're done.
14      (Deposition concluded at 3:48 p.m.)
15      (Total time on the record, 4 hours, 16 minutes)