# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL SMITH,

                Plaintiffs,

v.

CSAA FIRE AND CASUALTY
INSURANCE COMPANY,

                Defendant.

Case No: 5:17-cv-1302 D

## PLAINTIFFS' RESPONSE AND OBJECTION TO
## DEFENDANT CSAA'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT AND BRIEF IN SUPPORT

**MANSELL ENGEL & COLE**
Steven S. Mansell, OBA #10584
Mark A. Engel, OBA #10796
Kenneth G. Cole, OBA #11792
M. Adam Engel, OBA #32384
204 North Robinson Avenue, 21st Floor
Oklahoma City, OK 73102-7001
T: (405) 232-4100 **F: (405) 232-4140
E-mail:  mec@meclaw.net

**ATTORNEYS FOR PLAINTIFF**

January 18, 2019

## **TABLE OF CONTENTS**

Statement Of The Facts ................................................................................................ 1

Plaintiff's Statement Of Material Facts And Response to CSAA's
   Allegedly Undisputed Facts ..................................................................... 4

    A. During The Rimkus Inspection, Rimkus Did Not Investigate The
       Damage Claimed By The Insured ........................................................ 5

    B. CSAA's Earthquake Practice Is To Hire Approved Engineering Firms,
       Like Rimkus, To Write Reports To Aid In Underpayment Of Claims ............. 9

    C. CSAA Disregarded Oklahoma Insurance Department Bulletins
       Regarding Proper Handling Of Earthquake Claims ......................................... 12

Argument And Authority ................................................................................................. 13

I.    CSAA Breached Its Duty Of Good Faith And Fair Dealing ................................. 15

    A. General Principals of Insurance Contract Construction ................................... 15

    B. CSAA Failed To Properly Investigate This Claim ........................................... 17

    C. CSAA Disregarded Oklahoma Department Bulletins Regarding
       Proper Handling Of Earthquake Claims ........................................................... 22

    D. Evidence Demonstrating The Bias Of Rimkus And Its Engineers
       Is Admissible ..................................................................................................... 25

II.   CSAA Is Not Entitled to Summary Judgment on Plaintiffs'
    Punitive Claim ..................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases:**

*Acton v. Culbertson*,
  1913 OK 160, 132 P. 812 ............................................................................. 28

*Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.*,
  2000 OK 55, 11 P.3d 162 ............................................................................. 18

*Block v. R.H. Macy & Co., Inc.*,
  712 F.2d 1241 (8th Cir. 1983) ..................................................................... 26

*Brown v. Patel*,
  2007 OK 16, 157 P.3d 117 ..................................................................... 11, 17

*Buzzard v. Farmers Ins. Co.*,
  1991 OK 127, 824 P.2d 1105 .................................................... 11, 12, 17, 18

*Buzzard v. McDanel*,
  1987 OK  28, 736 P.2d 157 ..................................................................... 12, 18

*Estes v. ConocoPhillips Co.*,
  2008 OK 21, 184 P.3d 518 ........................................................................... 23

*Evans v. Liberty Nat. Life Ins. Co.*,
  2015 WL 1650192 (N.D. Okla. Apr. 14, 2015) ........................................... 28

*Christian v. American Home Assurance Co.*,
  1977 OK 141, 577 P.2d 899 ......................................................................... 18

*Deters v. Equifax Credit Information Services, Inc.*,
  202 F.3d 1262 (10th Cir. 2000) .............................................................. 25, 26

*Estrada v. Port City Properties, Inc.*,
  2011 OK 30, 258 P.3d 495 ........................................................................... 30

*Evans v. Liberty Nat. Life Ins. Co.*,
  2015 WL 1650192 (N.D. Okla. Apr. 14, 2015) ........................................... 28

*French v. State ex rel. Okla. Dep't of Corrections*,
  2010 OK CIV APP 68, 239 P.3d 195 ........................................................... 23

*Goodman v. Pennsylvania Turnpike Commission*,
293 F.3d 655 (3rd Cir. 2002) ...................................................... 26, 27

*Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.*,
2011 WL 4507417 (E.D. Mich. Sept. 29, 2011) ........................... 25

*Hendrix v. Raybestos-Manhattan, Inc.*,
776 F.2d 1492 (11th Cir. 1985) ................................................... 26

*Hightower v. Kansas City S. Ry. Co.*,
2003 OK 45, 70 P.3d 835 ............................................................ 30

*McCorkle v. Great Atl. Ins. Co.*,
1981 OK 128, 637 P.2d 583 ........................................................ 18

*McEwen v. City of Norman, Okl.*,
926 F.2d 1539 (10th Cir. 1991) ................................................... 26

*Medcorp, Inc. v. Pinpoint Techs., Inc.*,
2009 WL 3158130 (D. Colo. Sept. 24, 2009) .............................. 28

*Newport v. USAA*,
2000 OK 59, 11 P.3d 190 ............................................................ 17

*Pitman v. Blue Cross and Blue Shield of Okla.*,
217 F.3d 1291 (10th Cir. 2000) ................................................... 15

*Powell v. Express Credit Auto, Inc.*,
2015 WL 1642137 (W.D. Okla. Apr. 13, 2015) ............................ 29

*Rodebush By & Through Rodebush v. Oklahoma Nursing Homes, Ltd.*,
1993 OK 160, 867 P.2d 1241 ...................................................... 28

*Sab One, Inc. v. Travelers Indem. Co. of Connecticut*,
2014 WL 6687310 (W.D. Okla. Nov. 26, 2014) ............................ 29

*Schledwitz v. United States*,
169 F.3d 1003 (6th Cir.1999) ...................................................... 25

*Smith v. Warehouse Mkt., Inc.*,
1978 OK 125, 586 P.2d 724 ........................................................ 28

*United States v. Abel*,
  469 U.S. 45 (1984) ............................................................................... 25

*Wagenmann v. Adams,*
  829 F.2d 196 (1st Cir.1987) ............................................................... 26

*Willis v. Midland Risk Ins. Co.*,
  42 F.3d 607, 612 (10th Cir. 1994) ..................................................... 16

**Statutes**:
23 O.S. § 9.1 ...................................................................................... 29

23 O.S. § 9.1(B)(2) ........................................................................... 29

23 O.S. § 9.1(C)(2) ........................................................................... 29

36 O.S. § 307 .................................................................................... 23

36 O.S. §§ 1250.1, *et seq.* .............................................................. 23

36 O.S. § 1250.16 ............................................................................. 23

**Rules:**
Rule 56................................................................................................ 28

Rule 56(a), Fed. R. Civ. P. ............................................................... 28

Rule 403, Fed. R. Evid. .............................................................. 26, 27

**Other Authorities:**
OAC 365:15-3-1 ................................................................................ 23

**EXHIBITS**

1. Smith Rimkus Report (CSAA_SMITH 76-106)

2. Smith Cracked Floor Joint Photograph

3. Crystal Smith Deposition Excerpts\

4. Chad Heckman Deposition Excerpts

5. Claim File Notes (CSAA_SMITH 6-7)

6. Smith Home Photograph (SMITH 27)

7. CSAA Rimkus Reports written by Tim France

8. CSAA Rimkus Reports written by Lisa Holliday

9. Lisa Holliday Deposition Excerpts

10. Tim France Deposition Excerpts

11. David Battle Expert Report

12. David Battle Deposition Excerpts

13. Earthquake Bulletin No. PC-2015-02

Plaintiffs Sean Smith and Crystal Smith ("Plaintiffs") respectfully submit the following Response and Objection to the Motion for Partial Summary Judgment filed by Defendant CSAA Fire and Casualty Insurance Company ("CSAA").

## STATEMENT OF THE FACTS

On November 9, 2016, a 5.0 earthquake violently shook the City of Cushing. Several of the buildings downtown fell over and collapsed into the street.  After the earthquake, the City of Cushing lost power for over 24 hours.

Mrs. Smith was in her living room when the earthquake occurred.  As her living room shook, she jumped off the sofa and placed her hands on the living room wall.  The wall shook and bowed as the earthquake rocked her home.  She feared it would fall on her. After it stopped, she turned and found that the middle of her living room floor had collapsed and that there was a large new depression in the floor. The wall upon which she had placed her hands was out plumb and was now leaning towards the living room

Mr. Smith works construction and framing and the Smiths initially thought he could repair the damage.  However, as they discovered further damage, they realized that the damage was far more serious than they had originally thought and that it extended throughout their home.  They then made a claim with their homeowners' insurer, CSAA.

CSAA's initial claim file notes show that, in her first communication with adjuster Heckman, Mrs. Smith informed CSAA of "substantial damage" to the living room.  The Smiths' claim was assigned to adjuster Chad Heckman ("Mr. Heckman").  CSAA's claim file notes show that during his first call to Mrs. Smith with the adjuster, Mr. Heckman was

aware the living room floor had collapsed and that, after the earthquake, the living room door would not close.  Mr. Heckman has testified he knew from the onset of the claim the insured was claiming damage to the living room.

CSAA's claim handling earthquake policy is to hire an engineer from one of the four approved engineering firms on CSAA's engineering list.  Mr. Heckman hired Rimkus Engineering ("Rimkus").  Rimkus has already conducted dozens of earthquake inspections for CSAA on other insureds' earthquake claims.  Initially, Rimkus Engineer Tim France was assigned to the claim.  Later, the claim was reassigned to Rimkus Engineer Lisa Holliday.  Mr. France and Lisa Holliday inspected the property together.  Mr. France acted as a "guide" to new hire Lisa Holliday during the inspection of the Smiths' home.

During their "inspection," Lisa Holliday, Tim France, and their Rimkus assistant walked through the front door and into the living room.  At no time did they inspect the crawlspace under the living room to look at or photograph the floor joists that the earthquake had caused to break.  Although they examined areas where ceiling tiles had fallen, they did not bother to inspect the attic above the fallen ceiling tiles.  In fact, Lisa Holliday's CSAA engineering report is totally silent as to the living room damages.  *See* Ex. 1, Smith Rimkus Report (CSAA 76-106).  Her report neither mentions the living room, the leaning interior structural wall, nor the collapsed living room floor.  *Id*. Not one of the three Rimkus representatives bothered to take even one photograph of the collapsed living room floor.  Nor did they measure the out-of-plumb wall.  Later, Plaintiffs accessed the crawlspace via holes cut in the living room floor.  That view revealed cracked floor joists.

*See* Ex. 2, Smith Cracked Floor Joists.  Measurements of the living room wall similarly indicated that the wall had significantly shifted

Predictably, like nearly every other Rimkus "inspection," the "inspection" concluded that the damage to the home was caused by long-term soil settling due to soil type and moisture content in the soil.  Not a single Rimkus photograph supports that claim. Nonetheless, as has occurred in many other earthquake claims, CSAA issued a denial letter to Plaintiffs stating that due to the Rimkus engineer's report, the damage to their home was not attributable to earthquake, but rather to non-covered soil settling.

The damage that Mrs. Smith personally saw occur was never addressed by the Rimkus report.  The moisture in the soil was *never* tested and the level of soil moisture is unknown. The type of soil beneath the home was also *never* tested and remains unknown. The Smiths were not paid one dollar in benefits and, to this day, no adjuster or anyone else from CSAA has ever seen the Smiths' home.  The only people who went to the Smith home to investigate this claim were the three Rimkus employees it hired to help it deny the claim.

CSAA has a pattern and practice of using Rimkus and other engineering firms to help it deny earthquake claims.  In this motion, it tries to separate itself from Rimkus. Indeed, in what appears to be more akin to early motions in limine than a summary judgment motion, approximately one-third of its Motion addresses various aspects of the alleged inadmissibility of other Rimkus reports at trial.  Indeed, it dedicates seven pages to prime its pre-trial arguments.  However, the evidence shows that: 1) CSAA has a continuing relationship with Rimkus; 2) CSAA denies claims based on the "conclusions"

3

of its hired engineers; and 3) most Rimkus reports are nearly identical.  No wonder CSAA fears a jury might question how "reasonable" it has been by consistently hiring Rimkus.

CSAA has now filed a Motion for Partial Summary Judgment asserting that it is entitled to judgment as a matter of law because it "reasonably relied" on the predetermined "conclusions" of the engineering firm that it routinely hired to obtain precisely the same conclusions in order to assist it in denying its insureds' claims.  For the reasons which follow, the Smiths respectfully submit that CSAA's motion should be denied.

### PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND RESPONSE TO CSAA'S ALLEGEDLY UNDISPUTED FACTS

In this section, Plaintiffs provide a chronological statement of material facts to both supplement and refute CSAA's allegedly "undisputed" facts.  These material facts give rise to genuinely disputed factual issues and inferences requiring denial of CSAA's motion. Where Plaintiffs' statement of material facts provides a basis for disputing, denying, or rendering immaterial CSAA's facts, such is noted.  Plaintiffs summarize their response to CSAA's statements of allegedly undisputed fact ("UMF") as follows:

(i)    Plaintiff admits:  UMF ¶¶ 1-4, 6, 8, 16-20, 26-29, 31-35, 37, 39;

(ii)   As set forth below, Plaintiffs dispute the materiality, accuracy, relevance and completeness of: UMF ¶¶ 5, 7, 9-15, 23-25, 30, 36, 38, 40, 49-53, and 54-58; and

(iii)  As set forth below, Plaintiffs deny UMF ¶¶ 21-22, 41-44, and 59-60.

4

### A. During the Rimkus Inspection, Rimkus Did Not Investigate the Damage Claimed by the Insured.[1]

1.      Mrs. Smith was in the living room of her home at the time of the quake. When it hit, the wall began shaking so hard that she thought it might collapse so she stood up and attempted to support it.  When she turned around, there was a dip in the living room floor that had not previously been there.  *See* Ex. 3, Crystal Smith depo., pp. 34:7-37:7. The Smiths' home was near the epicenter of the earthquake.  *Id*. at pp. 50:11-13 and 80:10–15.

2.      Initially, the Smiths did not notify CSAA because they were not sure the damage they saw was sufficient to meet their deductible and thought that Mr. Smith, who worked in framing and construction, might be able to repair it.  *See* Ex. 3, Crystal Smith depo., p. 44:14-21.  After finding additional damage that had not been there before the earthquake, they contracted CSAA and notified it of the claim.  *See* Ex. 3, Crystal Smith depo., pp. 54:18–55:9; 57:16–60:22; and 63:15–24.

3.      From the onset of the claim, Mrs. Smith told CSAA there was significant damage to the living room. *See* Ex. 4, Heckman depo., p. 157:17-20; Ex. 5 Claim File Notes, CSAA_SMITH 6-7 (Plaintiffs' counsel marked circles in exhibit).   After Mr. Heckman was assigned to the claim, Mrs. Smith again told him there was extensive damage in the living room. *See* Ex. 4, Heckman depo., p.161:1-8. Refuting CSAA's UMF No. 5.

---

1 Plaintiffs' MF 1-34 refute CSAA's UMF No. 40. This is not a legitimate dispute, and Plaintiffs' bad faith claim is not barred. Plaintiffs' Material Facts 1- 30 dispute that Holliday appropriately inspected the claimed damage and has a basis for her conclusions listed in CSAA UMF No. 36.

4.      The structural wall in the living room is shifted.  *See* Ex. 6, Smith Home Photographs (SMITH 27).  The home has multiple cracked floor joists that were the result of the earthquake collapsing the brick columns under the living room floor.  *See* Ex. 2, Photo of Cracked Floor Joist.  From the inception of this claim to present, no one from CSAA has ever investigated, viewed, or opined on this damage.

5.      Nothing about the delay in notification to CSAA of the Smiths' claim affected CSAA's ability to investigate the claim, and CSAA did not even cite delay as a reason for denying the claim in its denial letter.  *See* Ex. 4, Heckman depo., pp. 151:1-153:8.[2]

6.      CSAA has frequently used Rimkus Engineering to "investigate" its insureds' claims for earthquake.  Rimkus engineer Tim France, who was initially assigned to this claim, has written six reports regarding the claims for earthquake damage made by CSAA's insureds, none of which have ever found any earthquake damage at any insureds' home. *See* Ex. 7, CSAA Rimkus reports written by Tim France. Lisa Holliday, who was newly-hired by Rimkus at the time of the inspection at issue, has written three reports regarding the claims for earthquake damage made by CSAA's insureds, none of which have ever found any earthquake damage at any insureds' home.  *See* Ex. 8, CSAA Rimkus reports

---

[2] This supplements in part and controverts in part, CSAA's UMF Nos. 7, 9-15.  It should also be noted that CSAA's UMF No. 9 does not set forth an "exclusion" as alleged. Rather, it is expressly listed as a "Condition."

written by Lisa Holliday.[3]   Both Mr. France and Mrs. Holliday were present during the inspection of the Smith's home.  *See* Ex. 9, Holliday depo., p. 77:6-11. Refuting CSSA UMF Nos. 59-60.

7.      Adjuster Heckman admitted the Rimkus engineers never addressed what caused the damage to the living room. *See* Ex.4, Heckman depo., pp. 227:22–229:22.

8.      No one from CSAA has ever been to the Smith home. *See* Ex. 4, Heckman depo., p. 248:14-16.

9.      Adjuster Heckman testified it is important that engineers should not make determinations until the experts have viewed all the facts of a loss and it would not be fair to only look at one side of the evidence. *See* Ex. 4, Heckman depo., p. 92:5-21.

10.     CSAA's adjuster acknowledges that to investigate the structural components of the floor foundation, someone would have to access the crawlspace of a home. *See* Ex. 4, Heckman depo., p. 222:10-20.

11.     The Rimkus engineers did not investigate the roof, living room wall, living room floor (crawlspace), or wall structure during the inspection. *See* Ex. 4, Heckman depo., pp. 224:7-225:6.  Neither Mrs. Holliday nor Mr. France looked in the attic or crawlspace. *See* Ex. 10, France depo., p. 80:13-17.

---

[3] This controverts, at least in part, CSAA's UMF Nos. 21 – 25 and 30.  It is irrelevant whether Mr. Heckman had previously used Rimkus because the defendant, CSAA, had previously done so extensively.  Indeed, Rimkus is one of only four engineering firms on CSAA's list of preferred engineering firms to investigate earthquake claims.  *See* Ex. 4, Heckman depo., pp. 164:22-166:2.

12.     CSAA has performed "destructive investigation" before, including cutting holes in the floor to investigate the crawlspace. *See* Ex. 4, Heckman depo., pp. 246:-248:13. Rimkus admittedly could have gone into the crawlspace by an access hole.  At the Smith home, that investigation was never considered.  *See* Ex. 10, France depo., 81:9–19.

13.     CSAA has to prove damage is caused by an excluded loss.  *See* Ex. 4, Heckman depo., pp. 118:1-7 and 120:5-9.  He does not think it would be fair to deny a claim without proving an exclusion. *See* Ex. 4, Heckman depo., pp. 126:4-127:20.

14.     The claim was denied based on settling and improper construction. *See* Ex. 4, Heckman depo., p. 112:11-20.  Rimkus concluded the home settled due to the soil type and moisture in the soil.  *See* Ex. 1, Smith Rimkus Report (CSAA_SMITH 76-106).  CSAA does not know the type of soil that is beneath the Smiths' house or how much moisture was in the ground near the Smiths' home. *See* Ex. 4, Heckman depo., pp. 216:21-217:8 and 226:6-13.

15.     Neither Mr. France nor Mrs. Holliday measured the home's soil moisture. They never consulted rainfall or flood maps.  Rimkus has never measured soil moisture in any report concluding there is soil moisture. *See* Ex. 10, France depo., p. 79:2–80:12.

16.     Rimkus was paid $3,173.16 for the report by CSAA. *See* Ex. 4, Heckman depo., p. 175:7-9.

17.     The Rimkus report was never provided to the Smiths until after the lawsuit was filed.  CSAA does not provide insureds with the engineering reports when it denies claims. *See* Ex. 4, Heckman depo., pp. 240:21–242:11. This refutes CSAA UMF No. 38.

18.     Although CSAA claims the cracks in the Smith home are pre-existing, CSAA does not know when the cracks in the home occurred. *See* Ex. 4, Heckman depo., pp. 251:21-252:10 and 261:3-262:25.

### B. CSAA'S Earthquake Practice Is To Hire Approved Engineering Firms, Like Rimkus, To Write Reports To Aid In Underpayment Of Claims

19.     The list for CSAA engineers only has four engineering firms on it, including Rimkus.  *See* Ex. 4, Heckman depo., pp. 164:22-64:2.  CSAA also hires Rimkus for other claims like hail and fire losses. *See* Ex. 4, Heckman depo., p. 176:6-24.

20.     CSAA's claims handling guidelines dictate hiring an engineer to investigate every earthquake claim.  *See* Ex. 4, Heckman depo., p. 150:16-25 and p. 160:17-22.

21.     Mr. Heckman believes it would only be reasonable and fair to hire engineers that were unbiased; also, that it wouldn't be fair to produce reports that only favor insurers. *See* Ex. 4, Heckman depo., pp. 199:20 – 200:21.

22.     All six engineering reports by Tim France for CSAA concluded settling or improper construction was the cause of the claimed loss. *See* Ex. 7, Other France Rimkus Reports for CSAA.  So did all three engineering reports by Lisa Holliday for CSAA.  *See* Ex. 7, Other Holliday Rimkus Reports for CSAA.  Although both engineers claim soil type and moisture cause the settling in all of their reports, they did not test the soil or moisture in any of their inspections. *See* Ex. 8, Holliday depo., pp. 224:1 – 225:9 and Ex. 10, France depo., pp. 76:7–77:6.  Nor did either of them provide Mr. Heckman with soil samples or

moisture readings from the inspection of the Smith home. *See* Ex. 4, Heckman depo., p. 201:2-6.

23.     Of the six reports Mr. France wrote for CSAA, none concluded there was damage attributable to earthquake.  Every report had the same conclusion: settling due to moisture and improper construction. *See* Ex. 10, France depo., p. 124:14–25.  Mr. France even admits that the reports are "extremely similar." *Id.*, at p. 126:7-10.

24.     Tim France performed roughly 30 inspections due to the Cushing earthquake. Approximately a dozen of those concerned Cushing schools.  In the school district reports, Mr. France also concluded that the damage the school buildings in Cushing were the exact same as his conclusions in Smith: "differential foundation movement." *See* Ex. 10, France depo., p. 58: 9–25.

25.     Rimkus provides **no forensic training** its engineers. *See* Ex. 10, France depo., p. 40:22-25.  Mr. France had no exposure to earthquakes prior to working at Rimkus. *See* Ex. 10, France depo., p. 24:4-6.

26.     Rimkus Engineer Lisa Holliday admits the Rimkus Engineering reports come in a pre-generated template and she frequently copies and pastes report language across reports. *See* Ex. 9, Holliday depo., pp. 70, l. 4–71, l. 12.

27.     <u>After their claim had been denied and this suit was filed</u>, CSAA hired two additional experts, Steve Ford and David Battles, to conduct an additional inspection of the Smiths residence, likely due to its perceived need to distance itself from Rimkus, the expert engineering firm that it had purportedly "reasonably relied upon" to deny the Smith's

claim.  That additional inspection occurred on April 20, 2018.  *See* CSAA's UMF No. 41.

28.     Per CSAA expert David Battle, Mr. Ford found the earthquake damage he could visibly observe, four (4) to six (6) brick column supports, supporting the floor structure under the house, were partially dislodged.  *See* Ex. 11, Battle Expert Report, p. 2.

29.     Mr. Battle testified that Mr. Ford told him the front of the house was damaged by earthquake.  Mr. Battle wrote his "Earthquake Repair Estimate" based on what Mr. Ford told him was damaged by the earthquake.  He later changed his testimony to say that that Mr. Ford never told him that the damage was caused earthquake and that his report stating that Mr. Ford concluded a portion of the home was "earthquake damage" was "poorly worded."  It *See*ms that what Mr. Ford said over the phone, as set forth in Mr. Battles report and in his original testimony, differs from what Mr. Ford's final conclusions were at the time of the reports. *See* Ex. 11, Battle Expert Report, p. 2; Ex. 12, Battle depo., p. 70:5-25.

30.     Mr. Battle didn't read Mr. Ford's report and based his opinions on what he heard on the phone from Mr. Ford. *See* Ex. 12, Battle depo., pp. 31:24-32:6.[4]

---

[4] ¶s 27-30 controvert CSAA's UMF Nos. 41-53.  There is a clear discrepancy between what CSAA's expert David Battle initially reported (and later testified) that Mr. Ford had told him about the existence of earthquake damage at the Smith home and what Mr. Ford testified about as to that issue.  Moreover, the timing of CSAA's hiring of Mr. Ford and Mr. Battle give rise to a serious question regarding the relevance and materiality of their after-the-fact investigation.  Insurers are not entitled to rely on information which they <u>did not have</u> at the time of their claims decision to justify that decision, nor is that information even material to the adequacy of the actual Rimkus' "investigation" upon which CSAA expressly relied in denying this claim.  *E.g.*, *Brown v. Patel*, 2007 OK 16, 157 P.3d 117, 122 (noting that "a duty to *timely* and *properly* investigate an insurance claim is intrinsic to an insurer's duty to *timely* pay a valid claim"); *Buzzard v. Farmers Ins. Co.* ["*Buzzard II*"], 1991 OK 127, 824 P.2d 1105, 1109 (noting "[t]he decisive question is whether the

### C. CSAA Disregarded Oklahoma Insurance Department Bulletins Regarding Proper Handling Of Earthquake Claims

31.     CSAA adjuster Heckman acknowledges that the Commissioner of the Oklahoma Insurance Department has the authority to issue directives such as Oklahoma Earthquake Bulletin No. PC-2015-02 to ensure that insurers employ fair claim practices. *See* Ex. 4, Heckman depo., pp. 268:2-269:9.

32.     Mr. Heckman agrees it is important to know the condition of the property at inception of coverage and to remain cognizant of the damage that occur in the policy period.  However, at the time of this claim, he did not know the condition of the Smith home prior to the earthquake loss, nor is it reflected in Lisa Holliday's report.  *See* Ex. 4, Heckman depo., pp. 260:14-261:9 and 264:6–270:2.

33.     Mr. Heckman felt Rimkus was thorough and that CSAA had no reason to send another engineer out to investigate. *See* Ex. 4, Heckman depo., p. 203:3-6.

34.     Rimkus engineer Holliday called Mr. Heckman on <u>the day</u> of the inspection to tell him the home had no earthquake damage. *See* Ex. 4, Heckman depo., p. 169:7-24.

---

insurer had a 'good faith belief, **at the time its performance was requested**, that it had a justifiable reason for withholding payment under the policy.") (citing *Buzzard v. McDanel,* 1987 OK  28, 736 P.2d 157 ["*Buzzard I*"]) (emphasis added).  "The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim."  *Buzzard I,* 736 P.2d 159.  Because Mr. Ford's alleged conclusions were not available to CSAA at the time its performance was requested, they are irrelevant.

## ARGUMENT AND AUTHORITY

CSAA's Motion does not try to justify its Rimkus engineer's investigation and report. It also wholly avoids any discussion of the structural damage to the Smiths' home. Indeed, its Motion is similarly silent as to what the Smiths claim occurred during the 5.0 earthquake or what it did to fully investigate and properly determine whether there was sufficient evidence to refuse their claim. In fact, CSAA's motion is entirely devoid of any testimony whatsoever on all of those issues. Instead, it takes the position that hiring a biased engineer to reach a pre-determined "conclusion" that most of the damage to their home was from "naturally occurring settling" which, by some amazing coincidence, occurred at precisely the same time that the covered earthquake was occurring, justifies its denial of the Smiths' claim. In a nutshell, CSAA argues that because it hired a biased engineer to render prostituted opinions, it is immune from scrutiny regarding the reasonableness of its conduct. To state CSAA's argument is to refute it.

CSAA's Motion sets out the only evidence it can offer to support its assertion that it fully investigated, properly evaluated and justifiably denied this claim – the "Conclusions" of CSAA's hired Rimkus engineer Lisa Holliday. Those "Conclusions," which appear on page 2 of Mrs. Holliday's report, also appear almost verbatim in other reports from one of CSAA's four engineering firms that it utilizes, Rimkus Engineering, regarding damage to the property of other insureds with earthquake claims. *See* Ex. 7, Other France Rimkus Reports for CSAA; Ex. 7, Other Holliday Rimkus Reports for CSAA. CSAA uses those "Conclusions," which its engineer admittedly "cut and pasted" as its sole

evidence that it met its burden to prove that coverage for the obvious damage to Plaintiffs' home was excluded. *See* Ex. 9, Holliday depo., pp. 70:13-71:12.  Without ever addressing the living room foundation damage to Plaintiffs' home, CSAA contends that it is immune from a bad faith consideration merely because it procured the "Conclusions" that its engineer "cut and pasted" from a template.

While disparaging Plaintiffs' claim that the "Conclusions" of its engineer are predetermined, CSAA's Motion argues the relevance from these engineers to CSAA that would either demonstrate or refute the truth of Plaintiffs' allegations.  Every one of the other earthquake damage evaluations from these Rimkus engineers Plaintiffs' possession are attached.  *See* Ex. 7, Other France Rimkus Reports for CSAA; Ex. 8, Other Holliday Rimkus Reports for CSAA.  Each report begins with nearly verbatim "Conclusions." The conclusions of CSAA's engineers attribute the structural foundation damage to "naturally occurring settling," rather than to an earthquake.  However, in this case, the truth is that CSAA's engineer **never looked at** the damage to the beam foundation of Plaintiffs' home.

CSAA's brief does not attempt to show it conducted a proper investigation of this claim because the investigation was unquestionably improper and inadequate.  It is undisputed that Plaintiffs' home suffered severe structural damage, *e.g.,* the collapsed living room foundation in the front of the home as well as other damage.  Both Rimkus engineers and CSAA's new litigation engineer passed over this collapsed living room floor and did not inspect underneath it.  Since Plaintiffs submitted this claim to CSAA, Plaintiff

Crystal Smith described the living room to adjuster Heckman as having "significant damage."  Immediately after the earthquake, she turned around and saw the damage.

CSAA's engineer France admitted the Rimkus engineers never accessed the crawlspace. *See* Ex. 10, France depo, p. 147:19-22.  Nor did she look at the damage under the living room before reaching her "Conclusions."  In fact, her report does not even mention the living room or contain a photograph of the living room. *See* Ex. 4, Heckman depo, p. 228:15-24.  Indeed, many of the excuses and recitations in her report are admittedly form paragraphs, almost all of which she has now been forced to abandon because they make no sense given the facts of this claim.

The <u>only</u> evidence in this case is that Mrs. Smith saw the home's living room wall shift and floor collapse during the November 7, 2016 earthquake. *See* Ex. 3, Crystal Smith depo., pp. 35:24-36:7.  CSAA's engineers never looked at that damage, nor was it addressed it in the Rimkus report. *See* Ex. 10, France depo, p. 147:19-22.  An utter failure to investigate an issue which is known to exist is an insufficient basis for CSAA to have concluded that it met its burden to prove that otherwise covered and obvious structural damage to this home is excluded.

## I.   CSAA BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING

### A.  General Principles Of Insurance Contract Construction.

Because CSAA admittedly relied upon a policy exclusion to deny Plaintiffs' claim, it had the burden of proving that the exclusion applied.  *Pitman v. Blue Cross and Blue Shield of Okla.,* 217 F.3d 1291, 1298 (10th Cir. 2000).  Mr. Heckman acknowledges that

earthquakes are covered and that CSAA has the burden of proving an exclusion. That did not occur. Indeed, CSAA's hired engineers and consultant <u>never looked</u> at the damage to the living room floor and wall, <u>did not test</u> the soil claimed to have been improperly compacted, and <u>did not</u> even check to see if the condition of the home had previously been documented, as its own adjuster admitted it was required to do pursuant to Earthquake Bulletin No. PC 2015-02. *See* Ex. 13, Earthquake Bulletin No. PC 2015-02.

Merely hiring an engineer who will say what the insurer wants it to say does nothing to prove a lack of coverage, a proper investigation, or an absence of bad faith. Buying a predetermined opinion is indicative of bad faith, not good faith. Completely failing to investigate the existence of damage that the insured said she witnessed occur does not prove the existence of a reasonable investigation. Because the available evidence before the Court indicates that is precisely what occurred here, Plaintiffs respectfully submits that CSAA's Motion for Partial Summary Judgment should be denied.

In this case, CSAA had the burden to show that its claimed policy exclusion related to soil movement applied to preclude coverage for Plaintiffs' otherwise covered claim. Its current position, which is that the soil movement exclusion could "possibly" apply is insufficient to exclude coverage as a matter of law. CSAA is deemed to know the applicable law. *E.g., Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 612 (10th Cir. 1994) (citing *Timmons v. Royal Globe Ins. Co.*, 1982 OK 907, 653 P.2d 907, 913-914 in support of the proposition that "[t]he insurer is held to knowledge of the applicable Oklahoma law, and the reasonableness of its decision must be judged in light of that law."). CSAA is

deemed to know that it could not satisfy its burden of proving that an applicable policy exclusion **did** apply to preclude coverage merely by taking the position that an exclusion "could possibly" apply.  Its decision to deny this claim based upon a "possibly" applicable policy exclusion was not reasonable.  For that reason, its Motion for Partial Summary Judgment should be denied.

### B.  CSAA Failed To Properly Investigate This Claim.

Under Oklahoma law, it is axiomatic that an insurer has an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received."  *Newport v. USAA,* 2000 OK 59, 11 P.3d 190, 195 (citing *Christian v. American Home Assurance Co.,* 1977 OK 141, 577 P.2d 899, 901).  The essence of a bad faith action "is the insurer's unreasonable bad-faith conduct, including the unjustified withholding of payment due under the policy." *Id.*, 11 P.3d at 195 (citation omitted).

It is CSAA's responsibility to **properly** investigate its insured's claim.  *Brown v. Patel*, 2007 OK 16, 157 P.3d 117, 122 (noting that "a duty to *timely* and *properly* investigate an insurance claim is intrinsic to an insurer's duty to *timely* pay a valid claim") (emphasis in original). When presented with a claim by its insured, an insurer "must conduct an investigation reasonably appropriate under the circumstances" and "the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient."  *Newport v. USAA,* 2000 OK 59, 11 P.3d 190, 195 (citing *Buzzard v. Farmers Ins. Co.* ["*Buzzard II*"], 1991 OK 127, 824 P.2d 1105).  "The decisive question is whether the insurer had a 'good faith belief, **at the time its performance was requested**,

17

that it had a justifiable reason for withholding payment under the policy." *Buzzard II,* 824 P.2d at 1109 (citing *Buzzard v. McDanel,* 1987 OK 28, 736 P.2d 157 [*Buzzard I*]) (emphasis added). "The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Buzzard v. McDanel,* 1987 OK 28, 736 P.2d 157, 159 [*Buzzard I.*]. It is also axiomatic that an insurer's duty to pay claims immediately "recognizes that a substantial part of the right purchased by an insured is the right to receive the policy benefits promptly. Unwarranted delay precipitates the precise economic hardship the insured sought to avoid by purchase of the policy." *Christian v. American Home Assurance Co.,* 1977 OK 141, 577 P.2d 899, 903. As noted in *McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583:

> [T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and **if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case**. [637 P.2d at 587] [emphasis added].

CSAA's Motion for Partial Summary Judgment asks the Court to relive it from bad faith exposure because CSAA hired an engineer and then CSAA "reasonably relied" upon the conclusions of that engineer. However, the truth is that CSAA's entire earthquake claims handling practice is designed to set up this *faux* appearance of reasonableness. In fact, CSAA handled this earthquake claim like it has handled all of its earthquake claims since Oklahoma began having earthquakes.

18

CSAA hired its engineer from a one of four of favorable engineers; its engineer failed to investigate the claimed damage to Plaintiffs' home before reaching any of her conclusions.  Its engineer admittedly did not even look at the damage to the crawlspace, living room wall, or floor of Plaintiffs' home before rendering her identical report to CSAA about what caused that foundation damage; its engineer ignored everything Plaintiffs said about the circumstances surrounding their claim and the damage to their home; its engineer rendered a report which was devoid of any scientific evidence reasonably tending to support her pre-determined conclusions; and CSAA blessed everything its pre-approved engineer did.  Upon receipt of the engineering report it knew it would receive, CSAA denied Plaintiffs' claim. CSAA also completely ignored the existence of Earthquake Bulletin No. PC 2015-02 and the requirements it imposed when denying this claim.

CSAA adjuster Heckman now says he reasonably relied on his engineer's opinion that the ground under the home had shifted, settled or bulged when deciding to deny this claim.  However, Rimkus engineer Holliday admits that she did not perform necessary investigation tasks at Plaintiffs' home before reaching the conclusions in her report.  *See* Plaintiffs' Material Facts No. 11, 12, and 15.  Rather, she readily admits that she uses template engineering reports and admits that she has never found earthquake damage for an insurance company. *See* Ex. 8, Holliday depo., pp. 170:11-171:8.  CSAA, as previously planned, now tells this Court that it relied on its engineer's "reasonable" investigation before denying this claim.

CSAA cannot delegate the duty of good faith and fair dealing. *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162, 167 fn. 5 (stating "[w]e ruled over seventeen (17) years ago that an insurer could not avoid liability for breach of the duty of good faith and fair dealing by delegating its responsibility to an independent contractor. *Timmons v. Royal Globe Ins. Co.,* 1982 OK 97, 653 P.2d 907, 914.  In short, the duty owed to the insured is nondelegable.").  Consequently, CSAA is responsible if Tim France and Lisa Holliday, the Rimkus engineers it hired, did not perform a proper and thorough investigation.  If engineer Lisa Holliday copied and pasted the majority of her report after failing to investigate claimed damage at all, CSAA cannot claim it reasonably relied on her findings.  Indeed, when it denied this claim, CSAA had no evidence reasonably supporting the contention that a policy exclusion for "soil settling" applied.  Nor does its Motion for Partial Summary Judgment provide any such evidence.

In this claim, CSAA's engineer did not even try to fake attempting to investigate Plaintiffs' home.  Nor, admittedly, did she attempt to investigate to find any of the very evidence she claims that his conclusions are based upon.  This is because she already had her conclusions pre-determined and knew what they were.  CSAA's engineer determined the cause of loss to be "differential foundation movement," a common theme in all of the attached Rimkus reports.   Mrs. Holliday based her "conclusion" on main basis the possibility of moisture in the soil around the home, the soil type, and improper construction. *See* Ex. 1, Smith Rimkus Report (CSAA_SMITH 76-106). However, Mrs. Holliday does not know the type of soil beneath Plaintiffs' home because she deliberately chose not to

take soil samples.  *See* Ex. 9, Holliday depo., pp. 224:1-225:9.  Instead, utilized vicinity maps that are generalizations with disclaimers stating specific soils at the site can vary. *Id.* Mrs. Holliday also does not know if there is moisture in the soil surrounding the home because she did not measure soil moisture or *See* any evidence of moisture in the soil. *See* Ex. 9, Holliday depo., pp. 230:24–231:25.

Mrs. Holliday's report claims that the soil underneath the home caused the home pre-disposed settling.  However, she failed to take any soil samples and, to this day, she does not know what type of soil is under the home.  In fact, when she does earthquake "inspections," her report always says that the soil type beneath the home could possibly contribute to settling, but she never takes soil samples.  CSAA based its denial of Plaintiffs' claim, and the other earthquake claims, on soil survey maps generated by USGS which, on their face, have disclaimers warning that they are general vicinity maps, and are not a substitute for on-site soil samples.  *See* Ex. 9, Holliday depo., pp. 224:1-225:9.  These maps are used for general vicinities but are not an appropriate basis upon which to deny insurance claims.

Last, CSAA's engineer Lisa Holliday essentially denied Plaintiffs' claim on the possibility that there **could be** excess moisture in the soil that <u>could</u> cause the soil beneath the home to shift and cause foundation movement.  Of course, while on-site, she did not measure the moisture in the soil or check the rainfall in the area.  *See* Ex. 9, Holliday depo., pp. 230:24–231:25.   What CSAA "reasonably relied upon" was nothing, because nothing

was essentially the investigation performed by its engineer in order to justify its denial.
That does not entitle it to summary judgment.

### C. CSAA Disregarded Oklahoma Insurance Department Bulletins Regarding Proper Handling Of Earthquake Claims.

On March 3, 2015, well before Plaintiffs' claim made, Oklahoma Insurance Commissioner John Doak, on behalf of the Oklahoma Insurance Department, issued Oklahoma Earthquake Bulletin No. PC 2015-02 (Ex. 13) to all property and casualty insurers licensed in the State of Oklahoma. Among other things, the bulletin addressed "preexisting damage exclusions" in policies covering earthquake damages.

Earthquake Bulletin No. PC 2015-02 was issued pursuant to Insurance Commissioner Doak's obligation to enforce the insurance laws. *Id.* at p. 2. It addressed the situation existing here. Earthquake Bulletin No. PC 2015-02 informed property and casualty insurers providing earthquake coverage, including CSAA, that:

> In the case of frequent potential loss events, which may or may not result in loss, it is important that the insure know the condition of the insured property at the inception of the coverage and remain cognizant of any damage that may have occurred during the policy period. In addition, since earthquake policies have a "single covered event clause" maintaining current knowledge of the insured property is essential to the proper application of deductibles.
>
> **As Commissioner, I have an obligation to enforce the insurance laws. Part of that responsibility is monitoring claims practices to determine whether insurers are employing fair claims practices and otherwise acting in conformity with the terms of their policies. If an insurer intends to deny a claim asserting pre-existing damage, I expect that the insurer has inspected the property prior to inception of coverage and maintained reasonably current information as to the condition of the insured property, prior to loss.**

As in the case of denials based on "man-made" earthquakes, I am considering market conduct examinations to ascertain the facts surrounding the extraordinary denial rate of earthquake claims that the preliminary data *See*ms to indicate [emphasis added].

The Oklahoma Insurance Commissioner is charged with the duty of administration and enforcement of the provisions of the Oklahoma Insurance Code.  36 O.S. § 307.  The Insurance Commissioner also has the statutory authority to "formulate, adopt and promulgate rules for the implementation and administration of the Unfair Claims Settlement Practices Act [36 O.S. §§ 1250.1, *et seq.*]"  36 O.S. § 1250.16; OAC 365:15-3-1.  In that regard, a state agency's interpretation of its own rules is entitled to great deference from the Court.  *Estes v. ConocoPhillips Co.*, 2008 OK 21, 184 P.3d 518, 524 (stating that "[d]eference to an agency's interpretation is even more clearly in order when the construction is that of an administrative regulation rather than that of a statute).  *See also*, *French v. State ex rel. Okla. Dep't of Corrections*, 2010 OK CIV APP 68, 239 P.3d 195, 200 (stating that "[a]n agency's interpretation of its rules is controlling unless the interpretation is plainly erroneous, in conflict with constitutional or statutory law, or extends the agency's power beyond that granted by the enabling statute").  CSAA's denial of Plaintiffs' earthquake claim violated the Insurance Department's interpretation of its own rules and was patently unreasonable.  Consequently, Plaintiffs submits that judgment as a matter of law is inappropriate.

The type of claim practices used by CSAA in this case were what caused Commissioner Doak to issue Oklahoma Earthquake Bulletin No. PC 2015-02 (Ex. 13).  As

explicitly stated therein, the bulletin informed property and casualty insurers such as CSAA that they have a right to inspect the insured properties and told them to do so.  Indeed, as set forth in the bulletin, the Oklahoma Insurance Department's position regarding the matter was that insurers should have current knowledge of the condition their insured risks **before denying claims based on preexisting conditions**.[5]

In this claim, CSAA admits that the adjusters and engineers did not understand of the condition of the Plaintiffs' home prior to the loss. *See* Ex. 4, Heckman depo., p. 269:18-25.  Although CSAA adjuster Chad White-Heckman claims to have been properly trained to handle earthquake claims, he also purports to never have heard of Earthquake Bulletin No.  PC 2015-02 and is unaware of any changes in CSAA's earthquake claims handling practices.

To this day, in all of CSAA's earthquake claims, even as it faces heavy scrutiny, it deliberately ignores the requirements imposed by the Oklahoma Insurance Department.  Instead, it holds steadfast to the allegedly "reasonable" claims handling practices it used to deny Plaintiffs' claim.  Why would it make change when three thousand dollars will buy it a report it can rely on to deny the claim?  To ask that rhetorical question is to show the invalidity of CSAA's assertions herein.  Because CSAA has not shown entitlement to

---

[5] Indeed, Commissioner Doak has issued several bulletins, news releases and findings discussing the low loss-ratios and high profit insurers are now experiencing due to the disproportionate number of claims verses benefits paid.

judgment as a matter of law on the issue of bad faith, its Motion for Partial Summary Judgment should be denied.

### D. Evidence Demonstrating the Bias of Rimkus and its Engineers is Admissible.

CSAA next asserts that evidence regarding the fact that it routinely retains Rimkus and its engineers to render biased reports which assist it in denying its insureds' claims is inadmissible.  The Smiths respectfully submit that CSAA's claim is incorrect.

Evidence of bias is <u>always</u> admissible and is never collateral.  The term "bias" describes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."  *United States v. Abel,* 469 U.S. 45, 52 (1984).  Bias includes mere "employment or business relationships" with a party and it "is always relevant in assessing a witness's credibility." *Schledwitz v. United States,* 169 F.3d 1003, 1015 (6th Cir.1999).  "Certainly, a continuing relationship between the witness and a party in which a witness receives payment for generating an opinion that may be favorable to the interests of the party *See*king the opinion is a source of bias."  *Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.,* 2011 WL 4507417 at p. *5 (E.D. Mich. Sept. 29, 2011) (citation omitted).

Moreover, such evidence is not unfairly prejudicial, particularly given that this is a case involving damage caused by an earthquake.  Indeed, "[e]vidence should be excluded under Rule 403 only if the probative value of the evidence is substantially outweighed by unfair prejudice."  *Deters v. Equifax Credit Information Services, Inc.,* 202 F.3d 1262, 1274

25

(10th Cir. 2000).  Rule 403 "favors admissibility of relevant evidence and should be invoked very sparingly to bar its admission." *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1502 (11th Cir.1985) (citations omitted).  *See also*, *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1244 (8th Cir. 1983) ("Consistent with the requirement that the overbalance must be substantial, we have said: 'In weighing the probative value of evidence against the dangers and considerations enumerated in <u>Rule 403</u>, the general rule is that the balance should be struck in favor of admission'") (internal citations omitted).  In performing the 403 balancing, the Court should "'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Deters*, 202 F.3d at 1274 (quoting 1 J. Weinstein & M. Burger, *Weinstein's Evidence* ¶ 403[3], at 403-25 to 403-26 (1982)).

"[A]s has been stated many times, Rule 403 does not protect a party from all prejudice, only <u>unfair</u> prejudice." *Deters*, 202 F.3d at 1274.  *See also*, *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1550 (10th Cir. 1991) ("[t]he "unfair prejudice" stated in Rule 403 cannot be equated with testimony which is simply unfavorable to a party.  It must be unfair in the sense that it would be misleading and not aid and assist the jury in making a material determination in the case"); *Wagenmann v. Adams*, 829 F.2d 196, 217 (1st Cir.1987) ("[T]he ... prejudice against which the law guards [is] ... *unfair* prejudice - ... prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found") (emphasis added).  "[P]rejudice does not simply mean damage to the opponent's cause." *Goodman v. Pennsylvania Turnpike Commission*, 293 F.3d 655, 670 (3rd Cir. 2002) (citing 1

26

*McCormick on Evidence* § 185 at 645 (5th ed.1999)).  If it did, most relevant evidence would be deemed "prejudicial."  *Id.*  However, the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403.  *Id.*  Excluded evidence must be unfairly prejudicial, not just prejudicial.  *Id.*

There is an ancient Slavic proverb to the effect that "[w]hose bread I eat, his song I sing."  That is the situation here.  The fact of a continuing business relationship between Rimkus and its engineers and CSAA is directly relevant to the credibility of the very opinions upon which CSAA allegedly based its decision to deny this claim, to the veracity of those opinions themselves, and to the alleged "reasonableness" of CSAA's decision to "rely" upon them.  Indeed, it simply defies belief that CSAA actually insists that it "reasonably relied" on engineers it has pre-identified to produce favorable reports for $3,000 as a matter of law.  Nor has CSAA showing any **unfair** prejudice from evidence regarding the fact that it routinely hires an engineering firm that never finds earthquake damage when performing alleged earthquake "investigations."  Because CMIC has failed to demonstrate that such evidence is unfairly prejudicial, or that any such alleged unfair prejudice **substantially outweighs** the probative value of the evidence, the Smiths respectfully submit that its claims should be rejected.[6]

---

6 The fact that the reports are simply being used to show Rimkus' bias disposes of CSAA's "unrelated conduct" claim.  Since they are not being offered for their truth, CSAA's "hearsay" claim is also misplaced.

## II.   CSAA IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PUNITIVE DAMAGE CLAIM

Fed. R. Civ. P. 56(a) provides in pertinent part that "[a] party may move for summary judgment, identifying each claim ... on which summary judgment is sought." However, in Oklahoma "[a] plea for punitive damages is generally considered to be **an element of recovery** of the underlying cause of action; it does not constitute a separate cause of action." *Rodebush By & Through Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241, 1247 (emphasis added).  Indeed, a plea for punitive damages is redundant since a plea for general damages is sufficient to allow a plaintiff to recover both general and exemplary damages. *Acton v. Culbertson*, 1913 OK 160, 132 P. 812, 816. *Accord, Smith v. Warehouse Mkt., Inc.*, 1978 OK 125, 586 P.2d 724, 726 ("in this state a claim for punitive damages cannot be a separate and independent cause of action but is only incidental or collateral to the claim for actual damages").

Because a plea for punitive damages seeks a **remedy** and is **not a claim**, it is not subject to summary judgment under Rule 56.  *See, e.g.*, *Medcorp, Inc. v. Pinpoint Techs., Inc.*, 2009 WL 3158130 *5 (D.Colo. Sept. 24, 2009) (stating that "punitive damages are a remedy, not a claim, and therefore [are] not subject to summary judgment under [Fed. R. Civ. P.] 56."); *Evans v. Liberty Nat. Life Ins. Co.*, 2015 WL 1650192, *10 (N.D. Okla. Apr. 14, 2015) (denying insurer's motion for summary judgment on the Plaintiff's claim for punitive damages, because " 'punitive damages' are a type of damages—not an underlying claim for relief."… Thus, summary judgment is inappropriate.") (citations omitted);

28

*Powell v. Express Credit Auto, Inc.*, 2015 WL 1642137, at *3 (W.D. Okla. Apr. 13, 2015) (denying motion to dismiss request for punitive damages "[b]ecause punitive damages are a remedy, not a claim subject to dismissal) (citation omitted); *Sab One, Inc. v. Travelers Indem. Co. of Connecticut*, 2014 WL 6687310, at *1 (W.D. Okla. Nov. 26, 2014) (same). Consequently, CSAA's Motion for Partial Summary Judgment should be denied.

Oklahoma's punitive damage statute has separate subsections <u>specific to insurance bad faith actions</u> which make it clear that in cases alleging bad faith against an insurer, punitive damages are to be considered where **<u>the jury finds</u>** by clear and convincing evidence that an insurance company either recklessly disregarded its duty to deal fairly and in good faith with its insured, or intentionally and with malice breached its duty to deal fairly and in good faith with its insured.  23 O.S. §§ 9.1(B)(2), (C)(2).

The applicable standard in considering whether to submit punitive damages to the jury is the same as that which applies to the submission of bad faith to the jury, *i.e.*, whether there is any evidence upon which a reasonable juror could find in favor of the Plaintiff.  <u>In bad faith cases, 23 O.S. § 9.1, specifically mandates a **jury** finding on the fact issues of recklessness and intent</u>.  The Court's role is to make a threshold finding whether the evidence, construed most favorably to Plaintiff, shows that a prima facie case has been presented, which **could** support a jury verdict on those issues.  The Court does not weigh the evidence, but rather only looks to *See* if there is any competent evidence that could support a jury finding of reckless disregard or intentional conduct.  The Oklahoma Supreme Court has spoken directly on this issue:

**[In *Sides v. Cordes, Inc.*, 1999 OK 36, 981 P.2d OK 26], we … noted that previous cases provide that the trial court has a duty to submit a punitive damages question to the jury unless there is a complete lack of evidence to support an inference of the conduct required by § 9.**

Title 23 O.S. Supp.2002 § 9.1 is the current statutory vehicle that governs all claims for punitive damages. **The current version of the statute, § 9.1, expands the factors and it is directed at the jury, and not the reviewing court**.…

**Nothing in the current statutory framework changes the trial court's responsibility to determine whether** *any competent evidence* **exists which would warrant submission the question of punitive damages to the jury. Once this determination is made, the statute guides <u>the jury</u> as to the many factors of conduct to consider, the level of conduct, and the degree of proof necessary to make an award of punitive damages, if any.** [*Estrada v. Port City Properties, Inc*., 2011 OK 30, 258 P.3d 495, 502-04] [footnotes omitted; emphasis added].

Under our present statute, it is **the jury** which is charged with answering two questions at the close of the evidence to determine whether and at what level punitive damages should be awarded.  If evidence was presented sufficient to make out a prima facie case, the questions must be submitted to the jury.  Clearly, according to the current statute, the issue of punitive damages is for the jury to decide.

"Where there is evidence that would 'support an inference of gross negligence or reckless disregard/indifference for the safety of others ... the Trial Court [is] not free to refuse to submit and instruct on the issue of punitive damages.'" *Hightower v. Kansas City S. Ry. Co.*, 2003 OK 45, 70 P.3d 835, 850 fn. 28 (citing *Shuman v. Laverne Farmers Coop.*, 1991 OK CIV APP 2, 809 P.2d 76, 79).  Because that is the case here, CSAA's Motion for Partial Summary Judgment should be denied.

30

RESPECTFULLY SUBMITTED,

MANSELL ENGEL & COLE

By: M. Adam Engel
    Steven S. Mansell, OBA #10584
    Mark A. Engel, OBA #10796
    Kenneth G. Cole, OBA #11792
    M. Adam Engel, OBA #32384
    204 North Robinson Avenue, 21st Floor
    Oklahoma City, OK 73102-7001
    T: (405) 232-4100 ** F: (405) 232-4140
    Firm E-mail:  mec@meclaw.net

**ATTORNEYS FOR PLAINTIFFS**


**CERTIFICATE OF SERVICE**

    I hereby certify that on January 18, 2019, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following registrants:

    Gerard F. Pignato (jerry@pclaw.org)
    R. Greg Andrews (greg@andrews.law)
    Dixie A. Craven (dixie@pclaw.org)

**ATTORNEYS FOR DEFENDANT –
CSAA FIRE AND CASUALTY INSURANCE**

        s/Adam M. Engel