1

IN THE UNITED STATES DISTRICT COURT OF

FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL          )
SMITH,                          )
                                )
            Plaintiffs,          )
                                )
VS.                             )     Case No. 5:17-cv-1302D
                                )
CSAA FIRE & CASUALTY            )
INSURANCE COMPANY,              )
                                )
            Defendant.          )



DEPOSITION OF CHAD WHITE HECKMAN

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 23, 2018

REPORTED BY:  SUSAN J. FENIMORE, CSR, RPR

PLAINTIFF'S
EXHIBIT
4

Chad Heckman                                    October 23, 2018

1    there's an estimate that's created about what the

2    company's potential liability could be on the claim,

3    right?

4         A     Say that again.

5         Q     There's an estimate for what the potential

6    liability for the insurance company could be on that

7    particular claim, right?

8         A     You saying liability, I guess we're just --

9         Q     You have issues with the word liability.

10   Let me ask it again.  You're essentially writing an

11   estimate that is what the company could potentially

12   owe the insured on that specific claim.

13              MR. ANDREWS:  Object to the form.

14              THE WITNESS:  I'm not writing an estimate.

15        Q     (By Mr. Engel) Well, that's what a reserve

16   is.

17        A     I guess --

18              MR. ANDREWS:  Object to the form.

19              THE WITNESS:  -- we are opening up reserves

20   for I guess potential payments and just so that

21   they're available and set.

22        Q     (By Mr. Engel) Sure.  And if you have a --

23   if you have a claim where you look at and you're

24   like, well, this is a hundred thousand dollar roof,

25   you know, you've got to set the reserve at a hundred

Chad Heckman                                    October 23, 2018

Page 71

1    thousand dollars so the company understands that --

2    you know, even if you're not sure yet, this is --

3    potentially could be this much money, right?

4              MR. ANDREWS:  Object to the form.

5              THE WITNESS:  We would set that money if

6    there is the possibility of it being that much.

7         Q    (By Mr. Engel) Sure.  And in -- it keeps

8    an insurance company afloat, because the insurance

9    company's making money, but at the same time they

10   want to kind of keep track of what they could

11   possibly owe, right?

12        A    Again, I'm not in the financial part, but I

13   would assume that is correct.

14        Q    And when you -- do you set these reserves

15   automatically or do you set them manually?

16        A    Some are automatically, but then again, we

17   can manually change them.  And depending on the

18   severity, we can just estimate an amount just so that

19   we have that available.  And then once we get more

20   information about the loss, we can raise or lower

21   those.

22        Q    And so is the other thing is when you're

23   setting these reserve estimates, one of the things

24   that you're not only including the benefits that are

25   going to be paid out, but also any expenses you might

Chad Heckman                                      October 23, 2018

Page 80

1           Forgive me, I don't know the exact name of

2    the company, but it was back seven, eight years ago.

3      Q     That's fine.  I'd love to do stuff like

4    that, because I think it's interesting but I never

5    get invited.  I don't think they're going to have me

6    out there any time soon.

7           But I like to keep track of all that stuff.

8    The adjuster yesterday told me he went to the Vale

9    Adjusting School in Arlington, Texas.

10          Have you ever heard of that?

11     A     Uh-huh.

12     Q     It sounds kind of interesting.  I thought

13   that would be fun.

14          Anyway, in short, the duty of good faith

15   and fair dealing you've defined as treating the

16   insured fairly and reasonably, right?

17     A     Correct.

18     Q     And this isn't -- this is something that

19   you were taught in claims adjusting because it's kind

20   of claim adjusting 101, right?

21          MR. ANDREWS:  Object to the form.

22          THE WITNESS:  I mean, there's not like a

23   101.  Just from my training, they explained it to us.

24     Q     (By Mr. Engel) Right.  That's something

25   that in the insurance industry, it's -- people know

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

Chad Heckman                                    October 23, 2018

                                                        Page 92

1    that they're supposed to do is go to -- we're

2    reaching out to them to go out there to investigate

3    on our behalf for the damages and what's the cause of

4    it.

5         Q      (By Mr. Engel) Right.  And so it's not

6    fair for them to only look at one side of the

7    evidence, right?

8         A      They should look at all the evidence that

9    is provided to them.

10        Q      Right.  And all the evidence that's readily

11   available for them to gather, not just evidence that

12   supports one side, right?

13        A      Correct.

14        Q      When you hire these experts -- let's use

15   specifically engineers to stay on point, okay?

16        A      Uh-huh.

17        Q      When you hire these experts, do you think

18   it's important that you don't make determinations and

19   they don't make determinations until you've viewed

20   all the facts?

21        A      Correct.

22        Q      Have you ever heard that ambiguity is

23   construed in favor of the insured?

24               MR. ANDREWS:  Object to the form.

25               THE WITNESS:  Those exact words, no, I

Chad Heckman                                    October 23, 2018

Page 112

1   make.

2        Q    How do you know that you had to make

3   revisions then?

4        A    From reviewing the claim again, there is a

5   note from her indicating that she rejected my

6   original denial for adding -- or for additional

7   language.  And so after I made that revision, which

8   there's a note in there saying I made revisions and

9   resubmitted it to her, which then she approved.  And

10  this is the actual letter that went out.

11       Q    Okay.  So what was the basis for denying

12  this claim?

13       A    As it indicates in the letter, that it was

14  determined that the damage caused by settling and

15  improper construction to the foundation and per the

16  policy, those things are not covered.

17       Q    So you've got improper construction and are

18  you going to call it soil settling?

19            MR. ANDREWS:  Object to the form.

20            THE WITNESS:  We called it settling.

21       Q    (By Mr. Engel) Okay.  Settling.  I just

22  want to use your terminology as we work through this,

23  okay?  Whatever you feel comfortable with as opposed

24  to what I would normally say.

25       A    Okay.

Chad Heckman                                October 23, 2018

Page 118

1       Q    Okay.  And then if subsequently they do
2    that and you're going to deny something based on an
3    exclusion, then you have to essentially prove that it
4    was actually the excluded cause of loss that caused
5    the damage, not the covered cause of loss, right?
6       A    We have to show that -- yeah, that the
7    damage is or is not related to the loss.
8       Q    Right.  And so, you know, the insured
9    presents something that's covered, let's use hail,
10   okay?  You know, we had hail within the policy
11   period, looks like we've got some hits on the roof,
12   we had inch and a half hail.
13            Then the insured has, you know, put forth
14   and established their coverage, and if you all are
15   going to deny that based on an exclusion, then you
16   have to, perhaps through experts, prove that it's
17   actually something that's excluded if you're going to
18   deny it based on an exclusion, right?
19      A    Yes, by whoever we've assigned to go out
20   there, if it's an expert or a field adjuster or
21   independent adjuster.
22      Q    And in this -- in this claim, it's your
23   belief that -- well, in this claim, is there any
24   dispute that the home has suffered a direct physical
25   loss?

Chad Heckman                                    October 23, 2018

1    damages are not earthquake damage, which is not

2    covered on the policy.

3        Q    (By Mr. Engel) Uh-huh.  And it's --

4        A    Due to exclusion.

5        Q    Right.  And because it's an exclusion,

6    that's something that y'all have to prove, right?

7            MR. ANDREWS:  Object to the form.

8            THE WITNESS:  We have to show that from the

9    damages that they are not covered under there.

10            MR. ENGEL:  Okay.

11            MR. ANDREWS:  Can I interject real quick

12    just to make sure that we're on the same page.

13    Mr. White Heckman is here today individually.  He's

14    not noticed as a corporate rep.  So he's not speaking

15    for CSAA.

16            You keep referencing "you" and "your."  I

17    assume you're referring to him individually, as

18    opposed to the company.  I just want to make sure

19    we're clear when we interpret what this transcript

20    says that when you're referring to "you" and "your,"

21    you're referring to Mr. White Heckman directly, as

22    opposed to CSAA.

23            MR. ENGEL:  Has anything he's testified to

24    deviated from CSAA's practices?

25            MR. ANDREWS:  I don't know.  I'm just

Chad Heckman                                    October 23, 2018

Page 126

1    apologize.

2          Q      (By Mr. Engel) Let me ask it this way.

3    Let me shorten it up.

4          Do you think it would be fair and

5    reasonable to your insured to deny a claim without

6    proving the exclusion?

7          A      No.

8          Q      Do you see what I'm saying?  You can't just

9    say, well, you made a claim, we didn't go out there,

10   we didn't prove it, we didn't investigate it, we

11   didn't prove it at all, therefore, we don't care,

12   we're still going to deny the claim based on an

13   exclusion, that wouldn't be fair, would it?

14         MR. ANDREWS:  Object to the form.

15         THE WITNESS:  Correct.  And that's why we

16   sent an expert to go out to investigate that.

17         Q      (By Mr. Engel) Right.  And you testified

18   that you felt that she was able to prove that it was

19   the exclusion?

20         MR. ANDREWS:  Object to the form.

21         THE WITNESS:  She proved that it was

22   earthquake damage.

23         Q      (By Mr. Engel) Which -- settling, she

24   proved that it was settling?

25         A      Sorry, I apologize.  Yes, thank you, that

Chad Heckman                                    October 23, 2018

Page 127

1    it was not -- it was not earthquake damage, sorry.

2            MR. ENGEL:   That was my chance to end the

3    deposition and run.

4            MR. ANDREWS:   He's an honest attorney.

5            MR. ENGEL:   Yeah, that was my chance to go.

6    Be like no further questions, we're out of here.

7        Q    (By Mr. Engel) She proved, in your mind,

8    she proved that this was soil settling?

9        A    She -- that it was settling and that there

10   was improper construction workmanship.

11       Q    And you're satisfied with her ability to

12   prove that?

13       A    Yes, with her report that she provided with

14   her photos and -- yeah, from her photos in her

15   report.

16       Q    And kind of we've already kind of covered

17   that, and what I'm asking you is, do you think it's

18   the fair and reasonable thing to do is to be able to

19   prove these exclusions?

20       A    Yes.

21       Q    Let's talk about this.  If you have -- I'm

22   going to start with -- do you need anything?

23       A    I'm good, thank you.

24       Q    If you have a loss that is excluded, if

25   there's direct physical loss to a property that's

Chad Heckman                                   October 23, 2018

Page 150

1    there's not any nonrecoverable depreciation applied

2    to something.

3         Q    Okay.  Great.

4         A    Turnbull.  I was looking at the other

5    adjuster's last name.

6         Q    Do you want to -- how do you spell it?

7         A    T-u-r-n-b-u-l-l.  And it's Rich, R-i-c-h.

8         Q    What is this document?

9         A    This is all the notes from me or from the

10   claim on the file.

11        Q    Starting with -- will you turn to the first

12   claim file note?

13        A    Uh-huh.

14        Q    Who is that claim file note entered by?

15        A    Rich Turnbull.

16        Q    Okay.  So from the onset of this claim, it

17   was -- even Rich was putting into the claim file note

18   that they were going to send an engineer out on this

19   claim, right?

20        A    Correct.

21        Q    And that's pursuant to CSAA's policies that

22   they send out these engineers on every claim?

23        A    That's the process that we have for

24   adjusters to -- for earthquakes, to make sure that a

25   engineer is assigned out.

Chad Heckman                                    October 23, 2018

Page 151

1        Q      And there was a delay in Ms. Crystal
2    Smith's filing of this claim, do you recall that?
3        A      It was some time after the loss that she
4    did file a claim, yes.
5        Q      And do you remember her citing -- from the
6    very beginning, she told CSAA why there was a delay.
7    Do you recall that?
8        A      From looking at this or also her deposition
9    that she didn't think it was that much damage at
10   first.  And that -- then they found more additional
11   damage and decided to file a claim.
12       Q      Right.  So they -- initially they weren't
13   sure that they had enough to meet their deductible,
14   but then they realized that they've got more
15   extensive damage, so ultimately, they filed a claim,
16   right?
17           MR. ANDREWS:  Object to the form.
18           THE WITNESS:  I don't know about the
19   deductible, they just said that they couldn't -- the
20   damage, that they didn't see enough and then they saw
21   more damage.
22       Q      (By Mr. Engel) Okay.  Is there any -- are
23   you aware that you can deny a claim based on delay of
24   filing the claim?
25       A      Yeah.

Chad Heckman                                October 23, 2018

Page 152

1       Q       Have you ever done that?

2       A       No.

3       Q       It's not very common, is it?

4       A       No.  We want to do a full investigation.

5       Q       So was there anything about this delay that

6    was the basis for denial, ultimately?

7       A       No.  I mean, that was even in -- I believe

8    we didn't even include that in our denial, either,

9    so.

10      Q       Right.  You don't put it in your denial

11   letter because it wasn't one of the bases for denying

12   this claim, right?

13      A       On our part, no.  I mean, we could --

14   claims, theoretically -- you could add that language

15   in there, but we didn't on this.

16      Q       Right.  Because it wasn't one of your

17   reasons for denying the claim?

18      A       Correct.

19      Q       So was there anything in the handling of

20   this claim where the delay in filing the claim

21   somehow affected y'all's ability to investigate this

22   claim?

23              MR. ANDREWS:  Object to the form.

24              THE WITNESS:  I'm not the one that went out

25   to inspect the property.  I mean, that's the engineer

Chad Heckman                                    October 23, 2018

Page 153

1    that's doing that.

2         Q     (By Mr. Engel) Right.  But did the

3    engineer ever report back to you that because the

4    claim was filed later that it somehow affected her

5    ability to investigate?

6         A     In the engineer's report, they did not

7    indicate that that caused them not to be able to make

8    their determination.

9         Q     Did you ever talk to her on the phone?

10        A     When I -- she left a voice mail with me.

11        Q     Did she ever say anything about that?

12        A     Not that I can recall.

13        Q     Is it your understanding that Tim France

14   with Rimkus Engineering was out there as well?

15        A     I didn't know that he was out there.

16        Q     Do you know who Tim France is?

17        A     From the documentation, looks like it's a

18   counterpart to her.

19        Q     Okay.  So let's go up to claim file notes.

20   It says, "A CCQ was submitted for possible earthquake

21   damaging the insureds' home.  The member has an

22   earthquake endorsement.  The claims should be

23   referred to a senior."  Do you see that on 8/28?

24        A     Yes.

25        Q     Who is Daniel Holloway?

Chad Heckman                                    October 23, 2018

Page 157

1    adjuster.

2         Q     (By Mr. Engel) Right.  And what she

3    testified to in her deposition, right?

4              MR. ANDREWS:  Object to the form.

5         Q     (By Mr. Engel) When they found the

6    additional damage, that's when they made the claim?

7         A     Yes.

8         Q     Then when you go to the next page, on

9    Page 7, the other thing that you know, because we're

10   reading this, is that there was significant damage to

11   the living room, right?

12        A     Yes.

13             MR. ANDREWS:  Object to the form of the

14   question.

15             MR. ENGEL:  I'm sorry, he doesn't like that

16   question because it sucks and he's right.

17        Q     (By Mr. Engel) The other thing you know the

18   insured is claiming is that there was significant

19   damage to the living room, right?

20        A     Correct.

21        Q     Okay.  I appreciate the help, Mr. Andrews.

22   That's a better question.

23             Now, when you go to -- just above that is

24   when it gets referred to you, right, so 8-28-2017, do

25   you see that?

Chad Heckman                                    October 23, 2018

Page 160

1    bottom of that, you're just kind of reiterating some

2    of this stuff that someone else already touched on,

3    which is Rich, right?

4        A    Correct.

5        Q    Okay.  Now, moving up to the next one on

6    Page 6.  So it looks like you called Mr. and

7    Mrs. Smith to introduce yourself as the OA.  What's

8    OA?

9        A    Owning adjuster.

10       Q    And to go over the claims process, right?

11       A    Yes.

12       Q    You explained the claims process, which we

13   discussed earlier about getting out there and

14   investigating the claim and then making a

15   determination, right?

16       A    Correct.  And going over there, yes, yes.

17       Q    And the next thing you said is you're going

18   to set up with an engineer, right?

19       A    Yes.

20       Q    Which is what you guys always do on these

21   earthquake claims, right?

22       A    Correct.

23       Q    And you explained to them that they have a

24   deductible of $6,000 on earthquake claims, right?

25       A    Yes, $6,711.05.

Chad Heckman                                              October 23, 2018

Page 161

1        Q      Then they say that they've had ceiling

2    tiles that fell in the bathroom, the son's bedroom

3    and the living room, right?

4        A      Correct.

5        Q      She also says that there are cracks along

6    the wall in her son's bedroom and then her wall in

7    the living room is leaning, right?

8        A      Correct.

9        Q      Okay.  And then your next call, which looks

10   like it's immediately after this call is to Rimkus

11   Engineering?

12       A      Correct.

13       Q      So everything from this 8-28-2017 at 1:46

14   p.m. and earlier in the claim, when you were

15   referring to the claims of the insured as one of the

16   things that you had as evidence to -- in the claim,

17   that's what you're referring to?

18       A      Say that again, I'm sorry.

19       Q      I'm sorry, it's a bad question.  And I

20   appreciate you asking me to clarify.

21              Earlier we talked about you had the

22   engineering report and the statements from the

23   insured, right?

24       A      Correct.

25       Q      Okay.  And everything that I've just given

Chad Heckman                                    October 23, 2018

Page 164

1    can't remember, because I didn't have to use

2    engineers all the time, so.

3        Q    Okay.  Right.  So you've got -- I'm trying

4    to understand how this works.  You've got -- but

5    there's more engineering firms in Oklahoma than that,

6    right?  You've got 100, 200, however many engineering

7    firms in Oklahoma, but your list has four on it.

8            And so these four engineering firms are

9    firms that y'all have kind of preapproved to do this

10   type of work, right?

11           MR. ANDREWS:  Object to the form.

12           THE WITNESS:  Not preapproved to do that.

13   We just know that they are available in that -- this

14   state.  And again, we just have a list of, you know,

15   some that we know that aren't in this state or that

16   are available, so we just -- I don't have a full list

17   of every single engineer in the state.

18       Q    (By Mr. Engel) What qualifies them to get

19   on to the list of four?

20       A    There was no qualification on it.  I was --

21   when I was in that position, they -- I was shown that

22   there was just listed, here's some engineers that we

23   have names.  I'm not required to use them, but it was

24   just names that were on there because there are

25   states that maybe none of them were even are

Chad Heckman                                    October 23, 2018

Page 165

1   available, but they're not there, so then that's

2   where we'd have to, you know, search, you know, speak

3   with maybe a field adjuster that's in that state that

4   knows of an engineering group or that can state some

5   names so we can reach out to one of them to see.

6        Q    In Oklahoma, have you used anyone besides

7   the four?

8        A    For what?

9        Q    An investigation.

10            You know they're available in Oklahoma, so

11   you would never pick up the phone book and look one

12   up, would you, you would just use one of the four?

13       A    I mean, I don't recall or I don't know any

14   other names that I've used anyone else.

15       Q    What about this list that was compiled, I

16   was asking you if those were like -- they're approved

17   to investigate your claims, right?

18       A    It's just names of engineers that like,

19   again, that the -- it was just a piece of paper just

20   named some engineers.

21       Q    What's the criteria for how those firms got

22   on the list?

23       A    I don't know.

24       Q    Those -- when you moved to -- did you ever

25   see that list prior to working as a senior

Chad Heckman                                    October 23, 2018

                                                        Page 166

1    consultant?

2         A    No.

3         Q    Did you ever hire engineers prior to being

4    a senior consultant?  Have you ever thought about it?

5         A    I think maybe like one or two other claims

6    maybe.

7         Q    Okay.  Well, let me ask you this.  Is it

8    safe to say that when you moved to senior consultant,

9    you were hiring engineers more frequently; is that

10   accurate?

11        A    Yes.

12        Q    You're also dealing with more complex

13   claims, right?

14        A    Correct.

15        Q    You're dealing with claims with public

16   adjusters and attorneys, right?

17        A    Correct.

18        Q    This list of the four engineering companies

19   that CSAA will use is something that was provided to

20   you when you took your senior adjuster position; is

21   that accurate?

22        A    By the group of senior adjusters, and they

23   are just a list that they're like, hey, these are

24   some that we know are in these areas.  And then they

25   also -- then they had those marks on there, so that

Chad Heckman                                    October 23, 2018

Page 169

1    ahold of you about 30 minutes later at 1:49?

2        A    That says it's a voice mail.

3        Q    And her voice mail at that point in time

4    explained it would take her a week to write up the

5    report, right?

6        A    Correct.

7        Q    It looks like from -- at that point she

8    already knew that it was going to be her conclusion

9    that no earthquake damage had occurred at the home,

10   right?

11            MR. ANDREWS:  Object to the form.

12            THE WITNESS:  From her voice mail indicated

13   to me she said that there was -- from my notes saying

14   that no earthquake damage.

15       Q    (By Mr. Engel) She had already determined

16   that it was only settlement and construction defects,

17   right?

18       A    I can't assume with what -- on that here,

19   she just left me a voice mail indicating that she

20   said there was no earthquake damage.

21       Q    Okay.  Well, I don't want you to tell me

22   what she was thinking at the time.  That's what she

23   was telling you via voice mail at that time?

24       A    Yes.

25       Q    On the same day as the earthquake, right?

Chad Heckman                                    October 23, 2018

Page 175

1    Crystal Smith and she wanted to know who you sent

2    out, right?

3         A    Yes.

4         Q    And you told her that you sent out Lisa

5    Holiday with Rimkus Engineering?

6         A    Rimkus Consulting, yes.

7         Q    And then later you received a bill from

8    Rimkus for $3,173.16, right?

9         A    Correct.

10        Q    And that's this claim --

11        A    Correct.

12        Q    -- in a nutshell, we just covered it

13   beginning to end over the past 40 minutes, right?

14        A    Yes.

15        Q    Okay.  Is there anything in this claim file

16   that's missing?

17        A    No.

18        Q    Was there anything that you stood out with,

19   oh, man, we didn't put that in the claim file or

20   that's recently been removed from the claim file?

21        A    I can't remove from the notes or anything

22   once they're inputted in, but, no, nothing's missing.

23        Q    Do you think -- what is this claim software

24   that you're putting this stuff into?

25        A    CAS.

Chad Heckman                                    October 23, 2018

Page 176

1      Q    Nothing stands out, there weren't any

2  meetings or anything like that on this claim that

3  don't have -- that didn't occur in the claim file

4  notes?

5      A    No.

6      Q    These engineers that you were hiring, that

7  list of four, do you hire those same engineers for

8  hail losses if you have questions?

9      A    Well, I'm not in that position anymore, but

10  at that time, no, not -- we -- there's other people

11  that are on that list that we don't -- that are not

12  on that list that we would use.

13      Q    I mean, what I'm asking is like those list

14  of four engineering companies, are those just for

15  earthquakes?

16      A    No.

17      Q    Okay.  So you use those if you have fire

18  loss issues or if you have hail issues, too, right?

19      A    Yeah, anything that we would need an

20  engineer to go out on.

21          But like I said, there's other ones like

22  specific for hail that I know right off the top of my

23  head there's another one we use that's not on that

24  list.

25      Q    Who?

Chad Heckman                                    October 23, 2018

Page 199

1       Q    Do you believe that hiring competent

2  engineers is the fair thing to do to your insured?

3            MR. ANDREWS:  Object to the form.

4            THE WITNESS:  I assume that every engineer

5  company is competent.

6       Q    (By Mr. Engel) Really?  I mean, like what

7  if you hired an engineer that only dealt with fires

8  and you sent them to an earthquake loss?

9       A    Well, I would assume that when I tell them

10  it's for an earthquake and they say we don't handle

11  earthquake, then I'm not going to use -- that they're

12  telling me up front and I would not use them.

13            Again, that's why we go back to depending

14  on the scenario and the situation, we aren't using

15  the exact same engineer, either, we're trying -- it

16  depends on the type of loss and where it's at.

17       Q    Right, but the fair thing to do is to hire

18  engineers that are competent, right?

19       A    Yes.

20       Q    Do you believe that the reasonable and fair

21  thing to do is to hire engineers that are unbiased?

22       A    Yes.

23       Q    It wouldn't be fair to your insured if you

24  hired an engineer that produced reports in favor of

25  insurance companies, is it?

Chad Heckman                                    October 23, 2018

Page 200

1        A     It would not.

2        Q     So that would essentially be cheating the

3   insured, right?

4              MR. ANDREWS:  Object to the form.

5              THE WITNESS:  Yeah, we do not want to

6   use -- we want a fair and reasonable report and

7   investigating of the claim.  You know, we weren't --

8   if we see something that's inaccurate from the

9   documentation that they submitted to us, for example,

10  like not doing anything at all, like you explained,

11  if they said we don't handle earthquakes at all,

12  we're fire, then we're going to look -- we're not

13  going to say, tough luck, we want you to go out

14  there.  We're going to make sure we find someone

15  that's capable to investigate for us.

16       Q     (By Mr. Engel) Right.  And then they

17  perform a thorough investigation, right?

18       A     Correct.

19       Q     And that's the fair and reasonable thing to

20  do, right?

21       A     Yes.

22       Q     Did she provide you -- I'm sorry, did --

23  it's actually Dr. Holiday, did you know that?

24       A     No.

25       Q     Dr. Holiday has her PhD from the University

Chad Heckman                                    October 23, 2018

Page 201

1    of Oklahoma.

2              Did she provide you with any evidence from

3    the scene that was not in her earthquake report,

4    whether that was soil samples or moisture readings?

5        A    No, she provided me her -- what I received

6    from her was the report with the photos attached.

7        Q    Do you believe that she had enough evidence

8    to support her conclusions?

9              MR. ANDREWS:  Object to the form.

10             THE WITNESS:  I mean, I'm not an engineer

11   on that, but from the documentation she submitted to

12   me, her -- from her point of view on that, she

13   provided everything that made her confident in making

14   her decision.

15       Q    (By Mr. Engel) At the time, was CSAA

16   satisfied with her investigation?

17       A    Yes.

18       Q    You know, and to that extent, is there a

19   need for anyone to send out another engineer to

20   perform additional tasks?

21       A    If the insured doesn't agree with the

22   report, they're more than welcome to get their own

23   engineer out there and we're more than happy to

24   review it.

25       Q    Right.  But CSAA, does CSAA have a reason

Page 203

1    caused by it.  I thought it was a thorough

2    investigation.

3        Q    Is there any reason for CSAA to send

4    another engineer out there to perform additional

5    tasks?

6        A    No.

7        Q    Okay.  Let's look at the engineering

8    report.

9        A    Okay.

10            MR. ENGEL:  Mr. Andrews, will you provide

11   me that number, please?

12            MR. ANDREWS:  Exhibit 3.

13            (Exhibit Numbers 3 and 5 marked for

14            identification purposes and made part of

15            the record.)

16            MR. ENGEL:  What Bates stamps have you got

17   over there?

18            MR. ANDREWS:  0076 through 0092.  This was

19   actually your exhibit that you submitted early on, so

20   it should be the same.

21            MR. ENGEL:  92?

22            MR. ANDREWS:  76 through 92.

23            MR. ENGEL:  Was I showing that to Lisa

24   Holiday?

25            MR. ANDREWS:  Do what?

Chad Heckman                                    October 23, 2018

Page 216

1    21, 22 and 23 are the bathroom cracks, right?

2         A    Correct.

3         Q    Am I going too fast for you?

4         A    No, I'm seeing it.

5         Q    Okay.  She provides you with a floor

6    drawing on 101.  And a shape map.  Did she provide

7    you with any other documentation?

8         A    No, this would have been the full report.

9         Q    Okay.  She didn't provide you with any

10   other photographs?

11        A    There was the -- well, these back here

12   that -- this was provided to me as well, the shape

13   map.

14        Q    And her opinion is that the soil settled on

15   this house, but what evidence did she use to support

16   that?

17             MR. ANDREWS:  Object to the form.

18             THE WITNESS:  I don't know all of her

19   process that she did on that.  I wasn't there and I'm

20   not the engineer.

21        Q    (By Mr. Engel) Okay.  So -- and that's

22   what I'm getting at is she doesn't know what kind of

23   soil's under this house, does she?

24             MR. ANDREWS:  Object to the form.

25             THE WITNESS:  I don't know.

Chad Heckman                                October 23, 2018

Page 217

1      Q      (By Mr. Engel) Because she didn't put it

2   in her report.

3      A      As far as the specifics of the soil, I do

4   not have that, no.

5      Q      So, and you don't have how much moisture

6   was in the ground if the moisture was measured,

7   right?

8      A      I do not have that, no.

9      Q      Okay.  So you're kind of -- you're not

10  going to test her -- these aren't questions that you

11  considered, hey, I don't think you did a thorough

12  enough investigation, right?

13     A      No.

14     Q      If she's looking for damage to the

15  structure, right?

16     A      Yes.

17     Q      And when she's looking for structural

18  damage, don't you think she should be looking at the

19  components of the home?

20     A      Again, I'm not an engineer, so I don't know

21  all her process that needs to take place.  I can't

22  tell -- don't know her procedures.

23     Q      Well, you wouldn't look for electrical

24  under the kitchen sink, right?

25     A      You might, depending on the situation.

Chad Heckman                                    October 23, 2018

Page 222

1        A      Well, I mean, there is the floor, your

2   subfloor, there's your flooring, there's your pier

3   and beams.

4        Q      Those aren't structural components, though.

5        A      You just said flooring.

6        Q      Right.  But if you're going to look at the

7   floor structure or the foundation.

8        A      Yes, then you look -- like you ask the

9   pier, beam, you look at those, yes.

10       Q      You would have to look in the crawl space

11  of the piers and beams if you're going to look at the

12  foundation on this home?

13       A      If that's where they're at, yes, you look

14  at those to see them.

15       Q      So if you were going to structurally

16  investigate the floor foundation, you would have to

17  look in the crawl space?

18              MR. ANDREWS:  Object to the form.

19              THE WITNESS:  If there's a crawl space

20  available and that's where they're at, yes.

21       Q      (By Mr. Engel) The other thing is if

22  you're going to look at the wall structures, in order

23  to view wall structures, the drywall is not the

24  structure of the wall, right?

25       A      No.

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

Chad Heckman                                    October 23, 2018

Page 224

1      A     Not in the report, no.

2      Q     Does she have photographs of the attic?

3      A     No.

4      Q     Did she go into the crawl space?

5      A     The report -- I don't know from --

6      indicating from the report.

7      Q     In the report it doesn't say that she went

8      in the crawl space, does it?

9      A     No.

10     Q     Does she have photographs of the crawl

11     space?

12     A     No.

13     Q     So if she doesn't look at the roofing

14     structure, right?

15           MR. ANDREWS:  Object to the form.

16     Q     (By Mr. Engel) I'm sorry, according to the

17     report that she provided you, it doesn't appear that

18     she looked at the roofing structure, right?

19           MR. ANDREWS:  Object to the form.

20           THE WITNESS:  From the report does not

21     indicate that she did that, no.

22     Q     (By Mr. Engel) From the report that she

23     provided you, does it in anywhere indicate that she

24     looked at the floor structure?

25     A     In her notes I do not see where -- no.

Chad Heckman                                      October 23, 2018

Page 225

1     Q    What about the wall structure, did she have
2     any comments about the wall structure or the studs?
3     A    No.
4     Q    Did she have any photographs of structural
5     components of the wall?
6     A    No, not of the wall -- of the framing, no.
7     Q    Now, one of the other things that she said
8     is she says that the soil --
9     A    What page is this on?
10    Q    Oh, I'm sorry, Page 6, Page 6 of the
11    report.
12         On Page 6 of the report she's referring to
13    her USDA map.  It's at the bottom, sir.
14    A    Okay.
15    Q    At the USDA map, she's saying that she's
16    looking at the map and the map determined that, you
17    know, the soil that could potentially be under this
18    home could shrink or expand due to changes in the
19    moisture content, do you see that?
20    A    Yes.
21    Q    Do you know anything about soils?
22    A    No.
23    Q    Do you know anything about the USDA map?
24    A    No.
25    Q    Do you know if the USDA map is accurate?

Chad Heckman                                    October 23, 2018

Page 226

1       A    I do not know.

2       Q    Do you know if the USDA map has disclaimers

3    that say that if you're going to make an engineering

4    determination, you have to have disclaimers?

5       A    I do not know.

6       Q    Did she ever tell you what type of soil's

7    under the house, other than the use of this map?

8       A    I do not believe so, no.

9       Q    And it says that -- there seems to be some

10   sort of issue with changes in the moisture content,

11   but does this thing ever tell you how much moisture

12   is in the ground?

13      A    Does not.

14      Q    Okay.  The other thing I was going to tell

15   you is remember when we were talking about earlier

16   the things that you had to deny this claim, to make

17   that determination, do you remember that

18   conversation?

19      A    Yes.

20      Q    Okay.  One of the things that you had was

21   the statements by the insured, which are recorded in

22   the claim file notes, right?

23      A    Yes.

24      Q    And don't feel like you have to look at

25   them, but, you know, you can if you want.  I just

Chad Heckman                                    October 23, 2018

                                                      Page 227

1   want to go ahead and talk about what you knew.  The

2   first thing is that they discovered damage in the

3   son's room, right?

4        A    Yes.

5        Q    And that's on Page 8 of the claim file

6   notes.  In Page 7 it says and you testified to that

7   the insured was telling Rich there was significant

8   damage in the living room, right?

9        A    That was her statement -- or that's what

10  Rich put in the note, yes.

11       Q    Because that's what the insured told Rich?

12       A    I don't --

13            MR. ANDREWS:  Where are you at?

14            THE WITNESS:  I didn't have that

15  conversation, so I don't know.

16            MR. ENGEL:  I'm sorry, the bottom of Page

17  7.  Right there.

18            THE WITNESS:  I wasn't part of those

19  conversations, so I don't know what was said to one

20  another.  I could just go off of what was put in the

21  note.

22       Q    (By Mr. Engel) Well, did you know that the

23  insured was claiming there was damage in the --

24  significant damage in the living room?

25       A    Yes, from the note that she was claiming

Chad Heckman                                    October 23, 2018

Page 228

1    that, yes.

2        Q    Right.  But then again on Page 6, the next

3    page, the bottom one, she told you there was damage

4    in the living room.

5        A    Yes.

6        Q    Do you see that?

7        A    Yes.

8        Q    And there's a wall in her living room

9    that's leaning?

10       A    Yes.

11       Q    So what you knew is two things, initially

12   you knew what the insured told you.  And then at the

13   end, you had the engineering report, right?

14       A    Yes.

15       Q    Okay.  And then going back to the

16   engineering report, is the word -- at any point in

17   time, does Lisa Holiday address the living room?

18           MR. ENGEL:  How much time, ma'am?

19           COURT REPORTER:  5:12.

20           MR. ENGEL:  Let's go off the record for a

21   second.

22           (Discussion off the record.)

23           THE WITNESS:  It doesn't specifically say

24   the living room.

25       Q    (By Mr. Engel) Does it ever mention the

Chad Heckman                                    October 23, 2018

Page 229

1    living room?

2        A    No.

3        Q    You know the insured was claiming damage to

4    the living room, right?

5        A    Yes.

6        Q    And, in fact, one of the things that Rich

7    put in the claim file notes is that there was

8    significant damage to the home in the living room,

9    right?

10       A    Correct.

11       Q    But her report doesn't mention living room,

12   does it?

13       A    Specifically living room, no.

14       Q    Does it -- are there any photographs taken

15   in the 23 photographs that she provided you of the

16   living room?

17       A    No.

18       Q    Were you aware that two of the beams that

19   support the floor in the living room had collapsed?

20           MR. ANDREWS:  Object to the form.

21           THE WITNESS:  I've never been provided that

22   information.

23       Q    (By Mr. Engel) So, and I understand that

24   you were only provided what was in this report,

25   right?

Chad Heckman                                    October 23, 2018

Page 240

1    it's not something that they can then write a counter

2    letter to, right?

3         A    They could respond back and ask for

4    additional information, which the denial letter talks

5    about, if they either disagree, have questions,

6    they're more than welcome to reach out to us about

7    and then do follow up or provide additional

8    documentation that would go against with what our

9    reporting came back with.

10             And that was never done, all that happened

11   was she called in and asking who the engineer was.

12   There was nothing else that was brought up by her.

13        Q    Do you think it's fair that when you're

14   sending these denial letters based on the expert's

15   opinion that you provide the insured a copy of the

16   report?

17             MR. ANDREWS:  Object to the form.

18             THE WITNESS:  Can you say that -- is it my

19   opinion or say that -- your question again.

20             MR. ENGEL:  Can you read that, ma'am?

21             COURT REPORTER:  "Do you think it's fair

22   that when you're sending these denial letters based

23   on the expert's opinion that you provide the insured

24   a copy of the report?"

25             MR. ANDREWS:  Same objection.

Chad Heckman                                    October 23, 2018

Page 241

1           THE WITNESS:  I don't think it's -- it

2    matters of sending that as we did our investigation

3    on that, and they're requesting us to investigate to

4    see if there's coverage or not and that's what we

5    did.

6           Now, again, if they requested, we are more

7    than happy to provide that, but that's not our

8    standard practice to give them the full report.  We

9    did our investigation and we are giving them a

10   response back saying that this is not covered, the

11   policy states this.  If they have questions, reach

12   out to us.

13          And then if they did reach out to us and

14   ask for that documentation, we are more than happy to

15   provide them, for example, the copy of Lisa's report.

16      Q    (By Mr. Engel) But it is -- and I'm sorry,

17   I don't think I understood this at first, but it is

18   CSAA's policy to not provide copies of the

19   engineering reports unless requested?

20      A    It's not a policy to state -- give it or

21   not give it, we just don't provide it.  We provide --

22   what we are required to give the insured is a denial

23   letter explaining that what we're doing and that's

24   what we've done is we've explained we are not

25   covering this loss because of this reason, in the

Chad Heckman                                      October 23, 2018

Page 242

1   policy it states this and that's what we're providing

2   to them.

3          Now, if they request for additional

4   something else, such as if they wanted photos or if

5   they wanted the engineer report, we're more than

6   happy to provide that.  Some things we may not

7   provide them, but we would be more than happy to

8   provide them those documentation.

9      Q    But you're only going to provide the

10  engineering report like this one upon request, right?

11     A    Correct.

12     Q    Do you know where the Smiths were during

13  the earthquake?

14     A    I do not.

15     Q    What if I told you the Smiths were in their

16  living room when they saw the floor and wall

17  collapse, would that change your opinion on Lisa

18  Holiday's report?

19          MR. ANDREWS:  Object to the form.

20          THE WITNESS:  The wall did not collapse on

21  them.

22     Q    (By Mr. Engel) The wall bow and then lean.

23     A    Okay.

24          MR. ANDREWS:  Object to the form.

25          THE WITNESS:  I did not know that they were

Chad Heckman                                    October 23, 2018

Page 246

1       A    I don't know their process.

2       Q    I want to talk about destructive

3   investigation just briefly.  Do you know what

4   destructive investigation is?

5       A    No.

6       Q    The process of looking behind drywall and

7   that kind of thing to see structural members, are you

8   familiar with that?

9       A    Okay.  Yes.

10      Q    Have you done some of that in claims?

11      A    I haven't because I don't go out to the

12  property to do that work.

13      Q    Have you worked claims where that occurred?

14      A    Yes.

15      Q    Was that an engineer that requested to look

16  behind the walls?

17      A    I don't recall if it was the engineer or

18  the insured's contractor that requested that, as it

19  was not the engineer who did it, either, it was the

20  insured's contractor who actually disassembled it for

21  us to look at.  But I don't know -- I do not recall

22  if it was the engineer or the contractor that

23  requested that specifically.

24      Q    This isn't a foreign concept in insurance

25  claims, right?  You've got to access and view damage,

Chad Heckman                                    October 23, 2018

Page 247

1    right?

2         A    Sometimes, yes.

3         Q    And in order to access and view damage,

4    sometimes you have got to tear some stuff up, right?

5              MR. ANDREWS:  Object to the form.

6              THE WITNESS:  Potentially, yes.

7         Q    (By Mr. Engel) Whether you're going to cut

8    a hole in a ceiling, right?

9         A    Again, that depends on who's going out

10   there, if they need that to be done or not, because

11   I -- again, I'm not the one that goes out there.

12        Q    Right.  It's situational.  And I'm just

13   saying if you've got to look at damage, there are

14   instances in the insurance claim world where you've

15   got to, you know, tear off a wall, right?

16        A    Yes.

17        Q    Or you have to perform some sort of

18   destructive investigation, right?

19        A    Yes.

20        Q    You're not going to testify that, oh,

21   that's something I've never even heard of, insurance

22   companies never do that, we never do that in

23   insurance claims handling, it's just unheard of;

24   you're not going to testify to anything like that,

25   are you?

Chad Heckman                                          October 23, 2018

Page 248

1     A    No.

2          Q    Because that's something you've seen

3     before, right?

4     A    In photos, yes.

5          Q    Have you ever heard of someone cutting

6     holes in the floor to look into the crawl space?

7     A    Yes.

8          Q    You've had another claim where that

9     happened?

10    A    I can't recall any of my claims that

11    they've had to do that, no.

12         Q    But you've heard that before?

13    A    Yes.

14         Q    Do you know if anyone from CSAA has ever

15    set foot into the Smith house?

16    A    Not that I'm aware of.

17         Q    Do you know if anyone from CSAA has ever

18    shaken Mr. Smith's hand?

19    A    Not that I'm aware of.

20         Q    If Mr. and Mrs. Smith walked into this room

21    right now, would you know who they were?

22    A    No, I would not.

23         Q    Do you think anyone in the CSAA claims

24    department would?

25    A    I don't know.

Chad Heckman                                October 23, 2018

Page 251

1   have been there, yes.

2        Q    Right.  And same thing with the settling

3   damage that she -- the damage that she attributes to

4   settling, right, she's claiming that's a preexisting

5   condition?

6        A    Correct.

7        Q    Do you know when that specific damage

8   occurred?

9        A    No, I do not.

10       Q    Do you know if it occurred at the same time

11  as the earthquake?

12       A    I do not know.

13       Q    Do you know if it happened after the

14  earthquake?

15       A    I don't know.

16       Q    But in any event, it's a preexisting

17  condition, exclusion, denial, right?

18       A    Correct.  That, and we just don't cover

19  those type of -- we don't cover settling or improper

20  construction, no matter the time frame with that.

21       Q    Well, for example, the cracks in the back

22  bedroom, okay, she attributes those as caused by

23  construction defect, right?

24       A    The -- yes, yes, in the son's bedroom, yes.

25       Q    On the slab, right?

Chad Heckman                                    October 23, 2018

Page 252

1        A     Yes, due to the addition that was built.

2        Q     Okay.  Do you know whether those occurred

3   before the earthquake?

4        A     I don't know.

5        Q     Do you know if they occurred at the same

6   time as the earthquake?

7        A     I don't know.

8        Q     Do you know if it occurred after the

9   earthquake?

10       A     I don't know.

11       Q     Okay.  And I want to shift gears here.  Do

12   you feel that it's -- and we've already discussed

13   this, but as an adjuster, the Oklahoma Insurance

14   Department regulates your license, right?

15       A     Yeah, they review to make sure that I am

16   staying up with my continuing education, every two

17   years I have to follow up, I have to renew, make sure

18   that, you know, I meet the requirements to have a

19   license.

20       Q     And if you are a bad actor, then you can be

21   punished by the Oklahoma Insurance Department?

22       A     Yes, they can review my -- and essentially

23   revoke my license.

24       Q     Sure.  And it's the same thing with me,

25   Mr. Andrews, we're governed by the Oklahoma Bar

Chad Heckman                                October 23, 2018

Page 260

1        A        As long as they have the coverage, yes.

2        Q        Right.  If you've got frac'ing earthquakes,

3    it's covered, right?

4        A        Yes, because we do not know -- we cannot

5    determine if it was related to the frac'ing or not.

6        Q        Right.

7        A        We just know if it's an earthquake.

8        Q        Which makes me wish I could run into some

9    of these manmade exclusion denials.  Unfortunately, I

10    haven't seen any of those.  I don't think anyone is

11    gutsy enough to sell those types of policies.  If you

12    see any of that, will you let me know?  Probably not.

13        A        I'm staying quiet.

14        Q        If you go to Page 2 and it says

15    "preexisting damage."

16            Now, this does apply because as we

17    discussed earlier, the two denials that you denied

18    the Smith claim was based on preexisting damage; is

19    that correct?

20            MR. ANDREWS:  Object to the form.

21            THE WITNESS:  It was due to settling and

22    improper -- the proper language.  Improper

23    construction to the foundation.

24        Q        (By Mr. Engel) Right.  Which are

25    preexisting condition exclusions, right?

Chad Heckman                                    October 23, 2018

Page 261

1      A     Well, we're denying settlement, that's what
2   we're denying, settling.
3      Q     Right.  You're saying that that house had
4   settled prior to the earthquake?
5      A     As far as the time frame, I'm not aware, we
6   are denying the damage that we saw that was due to
7   settling.
8      Q     When do you think the house settled?
9      A     I do not know.
10     Q     I want to walk -- do you disagree that this
11  is a preexisting damage denial when you say --
12     A     I mean --
13           MR. ANDREWS:  Object to the form.
14     Q     (By Mr. Engel) Do you disagree that this
15  is a -- strike that.
16           Let me get a good question out for you.
17           Is it going to be your testimony to the
18  ladies and gentlemen of the jury that your denials,
19  both of them, are not preexisting condition denials?
20     A     Well, it's preexisting to our inspection
21  that we know that it was there prior, but we're
22  denying for settling, improper construction, we're
23  not denying for it being preexisting or not.  But we
24  know it was preexisting because it was there prior
25  our inspection.

Chad Heckman                                        October 23, 2018

Page 261

1       A    Well, we're denying settlement, that's what

2    we're denying, settling.

3       Q    Right.  You're saying that that house had

4    settled prior to the earthquake?

5       A    As far as the time frame, I'm not aware, we

6    are denying the damage that we saw that was due to

7    settling.

8       Q    When do you think the house settled?

9       A    I do not know.

10      Q    I want to walk -- do you disagree that this

11   is a preexisting damage denial when you say --

12      A    I mean --

13           MR. ANDREWS:  Object to the form.

14      Q    (By Mr. Engel) Do you disagree that this

15   is a -- strike that.

16           Let me get a good question out for you.

17           Is it going to be your testimony to the

18   ladies and gentlemen of the jury that your denials,

19   both of them, are not preexisting condition denials?

20      A    Well, it's preexisting to our inspection

21   that we know that it was there prior, but we're

22   denying for settling, improper construction, we're

23   not denying for it being preexisting or not.  But we

24   know it was preexisting because it was there prior

25   our inspection.

Chad Heckman                                    October 23, 2018

Page 262

1      Q      Right.  I want to walk you -- and what I

2   want to know is if you consider those a preexisting

3   condition?

4      A      These denials?

5      Q      The denials.  Are the denials based on a

6   preexisting condition?

7      A      I would say, yes, because there has to be

8   damage for us to see it to say, hey, this damage, if

9   there was nothing preexisting, there would be nothing

10  to deny on it.

11     Q      Right.  And that's what I was discussing

12  earlier that those two denials are preexisting damage

13  denials, right?

14            MR. ANDREWS:  Object to the form.

15     Q      (By Mr. Engel) What about wear and tear or

16  mechanical damage?  Wear and tear and mechanical

17  damage on a roof, those are preexisting conditions,

18  right?

19     A      Correct.

20     Q      And so just like that, this exclusion is a

21  preexisting condition denial?

22            MR. ANDREWS:  Object to the form.

23            THE WITNESS:  I would agree that it was

24  preexisting on that, I would agree the damage was

25  preexisting to us inspecting it.

Chad Heckman                                    October 23, 2018

Page 264

1    was it?

2        A    No.

3        Q    Okay.  Your denial is not based on policy

4    period, is it?

5        A    No.

6        Q    "To help protect themselves from fraudulent

7    claims, insureds have a right to inspect the property

8    as often as required to ascertain the condition of

9    the property."

10            Do you see that?

11       A    Yes, I do.

12       Q    Earlier we were talking about that is the

13   insurance company, whether it's at renewal,

14   application, can go through and take photographs or

15   inspect a home, they can fill out a report, they can

16   do any of that stuff, right?

17       A    Correct.

18       Q    And here -- do you know who John Doak is?

19       A    The commissioner -- what --

20       Q    The Oklahoma Insurance Commissioner.

21       A    Yes.  Yeah.

22       Q    Here John Doak is saying -- and by the way,

23   on the -- here, John Doak, which is who it says it's

24   from on the first page, Oklahoma Insurance

25   Commissioner John Doak is telling you that insurance

Chad Heckman                                    October 23, 2018

Page 265

1    companies have a right to inspect the property as

2    often as required to ascertain the property

3    condition, right?

4         A    Yes, that's what it says there.

5         Q    Not just at policy renewal, but any time

6    you want.  That's what John Doak's saying, right?

7         A    Yes.

8         Q    Okay.  Next part.  "In the case of frequent

9    potential loss events, which may or may not result in

10   a loss, it is important that the insurer know the

11   condition of the insured property at the inception of

12   coverage and remain cognizant of any damage that may

13   have occurred during the policy period.  In addition,

14   since earthquake policies have a 'single covered

15   event clause' maintaining current knowledge of the

16   insured property is essential to the proper

17   application of deductibles."

18             Did I read that accurately?

19        A    Yes.

20        Q    Did I try to read it accurately?

21        A    Yes.

22        Q    Okay.  If --

23             MR. ENGEL:  Can we go off the record one

24   sec?

25             MR. ANDREWS:  Yeah.

Page 266

```
 1              (Discussion off the record.)

 2      Q      (By Mr. Engel) Did I try to read it

 3   accurately?

 4      A      Yes.

 5      Q      Now, you understand the single covered

 6   event clause?

 7      A      That -- can't put multiple things together

 8   and it's just one event is one thing.

 9      Q      Right.

10      A      You can't put them all together.

11      Q      If your roof gets hailed on a few times or

12   you take damage from consecutive events, you've got

13   multiple deductibles, right?

14      A      Correct.

15      Q      Okay.  And what he's saying here is it's

16   important for insurance companies to understand the

17   condition of the insured property at the inception of

18   coverage, right?

19      A      Uh-huh.

20      Q      And remain cognizant of any damage that may

21   have occurred during the policy period.  Do you see

22   that's what he's trying to say?

23      A      Yes.

24      Q      Do you agree that it's important for

25   insurance companies to know the condition of the
```

Chad Heckman                                    October 23, 2018

Page 267

1    property at the inception of coverage and remain

2    cognizant of any damage that may have occurred during

3    the policy period?

4        A    Yes, but it's also important for the

5    insured to also notify us of anything, as well.

6        Q    Sure.

7        A    Because that helps with us knowing the

8    condition of the property, too.

9        Q    Right.  But you also agree that this is

10   stuff that you guys should maintain current knowledge

11   of the insured property is essentially for proper

12   application of deductibles, right?

13       A    Yes.

14       Q    You're not going to disagree with John Doak

15   on that, are you?

16       A    No.

17       Q    Because you're under oath and this is going

18   to be public record possibly, so I want to make sure

19   that you understand that, as well, but John Doak's

20   saying, listen, inspect -- the first paragraph says,

21   listen, you guys have a right to inspect it as much

22   as you want, you need to be inspecting the

23   properties, right?

24       A    Uh-huh.

25       Q    Do you agree that that's important?

Chad Heckman                                          October 23, 2018

Page 268

1      A    Yeah.

2      Q    And the second part he's saying it's

3  important that you know the condition at the issuance

4  of the policy or inception of the coverage, right?

5      A    Yes.

6      Q    Do you agree that that's important?

7      A    Yeah.

8      Q    And then he says it's also important you

9  remain cognizant of damage that may have occurred

10  within the policy period, right?

11      A    Uh-huh.

12      Q    Do you agree that that's important?

13      A    Yes.

14      Q    The next paragraph says, "As commissioner,

15  I have an obligation to enforce the insurance laws."

16  Do you agree with that statement?

17      A    Yes, since he's the commissioner, yeah,

18  uh-huh.

19      Q    "Part of that responsibility is monitoring

20  claims practices to determine whether insurers are

21  employing fair claims practices and otherwise acting

22  in conformity with the terms of their policies."

23          Do you agree that the insurance

24  commissioner ensures that you're employing fair

25  claims practices?

Chad Heckman                                        October 23, 2018

Page 269

1       A    He sets in place for that, yes.

2       Q    So he kind of governs these types of

3  things, doesn't he?

4       A    Yes.

5       Q    And he's able to provide directives to

6  insurance companies, isn't he?

7       A    Yes.

8       Q    And he's kind of doing that here, isn't he?

9       A    Yes.

10       Q    I'm going to continue reading.  "If an

11  insurer intends to deny a claim asserting preexisting

12  damage, I expect the insurer has inspected the

13  property prior to the inception of coverage and

14  maintained reasonably current information as to the

15  condition of the insured property prior to loss."

16            Did I read that accurately?

17       A    Uh-huh.

18       Q    My question is at any point in time did you

19  understand the condition of the insured property

20  prior to the earthquake date of loss?

21       A    I, myself, did not, no.

22       Q    Do you know if Lisa Holiday at any point in

23  time knew the condition of the home prior to the

24  earthquake?

25       A    I do not, no.

Chad Heckman                                    October 23, 2018

Page 270

1        Q    Do you -- that's not reflected anywhere in
2   her report, is it?

3        A    Not that I'm aware of, no.

4        Q    The other thing it says in here is that --
5   well, you said that you didn't understand the
6   condition prior to the loss, but do you even know if
7   the company has photographs or pictures or inspection
8   notes relating to this property?

9        A    I don't know, I would have to go into the
10  underwriting documents and see if it's there.  It's
11  not guaranteed.

12       Q    And if -- and I was asking you if you knew
13  those things, but my next question is different is at
14  the time you were handling this claim, did you look
15  into or investigate any of those things?

16       A    I did not, no.  Another reason why I
17  wouldn't have looked into that, either, because
18  sometimes we do look to see if there's anything
19  preexisting is because her report, she was able to
20  make a determination and she had no questions.

21            If she was questioning herself and even
22  reached out to us, said, hey, I need more -- I am not
23  sure, then I would have tried to find something, if
24  we had any photos or anything.

25            But because her report, she made a -- she