1

1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE WESTERN DISTRICT OF OKLAHOMA
3
4   SEAN SMITH and CRYSTAL SMITH,      )
                                       )
5            Plaintiffs,               )
                                       ) No.
6   vs.                                ) 5:17-cv-1302D
                                       )
7   CSAA FIRE & CASUALTY INSURANCE     )
    COMPANY,                           )
8                                      )
             Defendant.                )
9
10
11
12          VIDEOTAPED DEPOSITION OF TIM FRANCE
13         TAKEN ON BEHALF OF THE PLAINTIFFS
14             IN OKLAHOMA CITY, OKLAHOMA
15                 ON JANUARY 7, 2019
16
17
18
19        REPORTED BY:  KAREN B. JOHNSON, CSR
20
21
22
23
24
25



PLAINTIFF'S EXHIBIT 10

Timothy France                                      January 7, 2019

Page 24

1  When I took my PE exam, it was called civil
2  structural, they had the two together, it was not a
3  separate one.
4       Q    Prior to working at Rimkus, did you have
5  any exposure to earthquakes?
6       A    No.
7       Q    Did you have any training on earthquakes
8  prior to working at Rimkus?
9       A    No.
10      Q    At Rimkus, isn't it true that you're not
11 just hired to inspect earthquakes?
12      A    That would be true.
13      Q    What else are you hired to inspect?
14      A    Storm damages.
15      Q    Does that include hail and tornado events?
16      A    Yes, high wind, hurricanes.
17      Q    Flatline winds?
18      A    Whatever, yes.
19      Q    Do you do fire investigations?
20      A    In what regard?
21      Q    I think I've asked you this before, we
22 kind of had a -- a back and forth on that.
23      A    Uh-huh.
24      Q    Do they ever hire you for fire
25 investigations at all for Rimkus?

Timothy France                                           January 7, 2019

                                                              Page 40

1    variety of them.  Can I tell you which ones, sitting
2    here, no.
3         Q    You know you've done earthquake
4    inspections for Country Mutual; right?
5         A    Yes.
6         Q    And you know you've done earthquake
7    inspections for Chubb; right?
8         A    Yes.
9         Q    What about have you done earthquake
10   inspections for Farmers?
11        A    I don't recall.
12        Q    Can you think of any other insurance
13   companies that you performed earthquake inspections
14   for?
15             MR. FELTY:  Object to form.
16             THE WITNESS:  It was some kind of school,
17   conglomerative insurance was one, I don't know, it's
18   kind of a insurance co-op.
19        Q    (By Mr. Engel)  It's a self-funded state
20   plan?
21        A    Yes.
22        Q    Isn't it true when you were hired by
23   Rimkus, they didn't provide you with any training?
24             MR. FELTY:  Object to form.
25             THE WITNESS:  They didn't provide it, no.

Timothy France                                          January 7, 2019

Page 58

```
 1      A    No.
 2      Q    What about these cracks in the brick
 3  finishes is what you're referring to?
 4      A    For example, in the schools, those were
 5  almost exclusively veneers.
 6      Q    Okay.  So the --
 7      A    They're a non-structural load-bearing
 8  component.
 9      Q    So you're saying on the outside of these
10  schools, these schools are made of brick, but that
11  brick is a non-structural component; right?
12      A    That's the way I understood it.
13      Q    And so you saw cracking in the brick on
14  the schools; right?
15      A    In some instances, yes.
16      Q    And you attributed that cracking to
17  differential foundation movement?
18      A    Not so much so.
19      Q    What did you attribute it to?
20      A    That would be the thermal and moisture
21  variations that occur over time in the brick as they
22  go through life.
23      Q    Okay.  So you attribute it to moisture and
24  thermal variations?
25      A    That was one of the causes.
```

1     A    Yes.
2     Q    And these are some of the same conclusions
3  that you've come to while you're writing the --
4  these inspection reports; right?
5     A    Yes.
6          MR. FELTY:  Object to form.
7     Q    (By Mr. Engel)  Did you and Ms.
8  Holliday -- or did you or Ms. Holliday gather soil
9  samples for this inspection?
10    A    No.
11    Q    Did either of you test the soil to
12 determine the type of soil underneath the home?
13    A    No.
14    Q    Of the approximately 50 earthquake
15 inspections you've done for Rimkus, have you ever
16 tested the soil underneath the house?
17    A    No.
18    Q    Isn't it true the Rimkus reports always
19 reference the USDA?
20    A    I can't speak for all Rimkus reports, ones
21 I do, yes, unless I specifically need it, and then I
22 will get a geotech out there to do -- if it's
23 warranted.
24    Q    Sure.  But you've never done that, you've
25 never done a soil sample for an earthquake-related

```
 1   inspection, have you?
 2        A    No.
 3        Q    Are you aware the USDA site has
 4   generalizations for what type of soil is under a
 5   home?
 6        A    Yes.
 7        Q    And you're aware that the soil that can be
 8   under a particular home can be completely different
 9   than what's on the USDA map?
10             MR. FELTY:  Object to form.
11             THE WITNESS:  It can, but highly unlikely.
12        Q    (By Mr. Engel)  Have you ever previously
13   testified that it can vary?
14        A    Pardon?
15        Q    Well, have you ever given your -- have
16   you -- is it possible that the soil underneath the
17   home can be completely different than what's on the
18   USDA map?
19             MR. FELTY:  Object to form; asked and
20   answered.
21             THE WITNESS:  It can be, but highly
22   unlikely.
23        Q    (By Mr. Engel)  Isn't it true when you're
24   doing design work, as an engineer, that you always
25   get soil samples?
```

Timothy France                                         January 7, 2019

Page 79

```
1        A    It's -- it's part of it.
2        Q    Yeah.  Okay.  When you were at the Smith
3   residence, did Ms. Holliday or you measure the
4   ground moisture?
5        A    No.
6        Q    At Rimkus, did they ever train you on
7   measuring the moisture underneath homes during the
8   earthquake inspections?
9        A    That doesn't -- okay, rephrase that.
10       Q    Sure.  At Rimkus, did they ever train you
11  on measuring the moisture in soil during your
12  earthquake inspections?
13       A    No.
14       Q    Do you ever consult rainfall maps when
15  you're doing earthquake inspections?
16       A    No.
17       Q    Do you ever consult flood maps when you're
18  doing earthquake inspections?
19       A    No.
20       Q    Do you ever measure moisture when you're
21  performing earthquake inspections?
22       A    Moisture of what?
23       Q    The soil.
24       A    Oh, no.
25       Q    Do you ever measure thermal variation when
```

Timothy France                                         January 7, 2019

Page 80

```
 1   you're performing these earthquake inspections?
 2        A    No.
 3        Q    During the -- did you do any of the things
 4   that we've talked about on the Smith residence?
 5             MR. FELTY:  Object to form.
 6             MR. ANDREWS:  Same objection.
 7        Q    (By Mr. Engel)  They don't like the
 8   question because I'm trying to tie in the other
 9   questions.  Did -- let me ask it this way, did you
10   measure the moisture in the soil around the Smith
11   residence?
12        A    No.
13        Q    Did you go into the attic?
14        A    No.
15        Q    Did you go into the crawl space underneath
16   the home?
17        A    No.
18        Q    Isn't it true that you and Ms. Holliday --
19   well, you didn't come to any conclusions in this,
20   did you?
21        A    No.
22        Q    Okay.  So isn't it true Ms. Holliday based
23   her conclusions without viewing the crawl space?
24        A    That would be a fair assumption.
25        Q    Is it going to be your testimony you
```

Timothy France                                       January 7, 2019

Page 81

1  believe it's not necessary to go into the crawl
2  space?
3      A    Yes.
4      Q    Why?
5      A    There was nothing there that I saw that
6  would justify going into it, and, too, if I remember
7  correctly, there was no direct access to the crawl
8  space.
9      Q    Did you ever consider destructive
10 investigation to get into there?
11     A    No.
12     Q    But that's something you could have done
13 to access if there was no access point; right?
14     A    We could propose it, have to get approval
15 from the property owner then and the client to pay
16 for the repairs.
17     Q    And that's something you guys could have
18 done; right?
19     A    Could have.
20     Q    I want to talk about the size of
21 earthquakes, all right?
22     A    Okay.
23     Q    How do you measure the size of an
24 earthquake?
25     A    There's -- when you say "measure," by

Timothy France                                          January 7, 2019

Page 124

```
 1      A    There's almost no way I could pull that
 2  out, I would have to go look.
 3      Q    Why?
 4      A    There's too many, I don't know.  Like I
 5  said, when we do these, I don't -- I don't
 6  necessarily keep track of who -- which carrier I do,
 7  I just do the assignment, turn it in, go to the next
 8  one.
 9      Q    Okay.  Of the ones that I've handed you
10  right there, how many do you have, half dozen?
11      A    Probably.  There's six plus my --
12      Q    Six plus the Smith?
13      A    Smith one, yes.
14      Q    Okay.  Of the six that you authored for
15  AAA, is that seven right there?
16      A    That would be seven.
17      Q    Okay.  Of the seven that you authored for
18  AAA, none of your engineering reports concluded that
19  there was damage caused by an earthquake; correct?
20      A    Yes.
21      Q    In fact, your conclusions on all of those
22  reports were, one, differential soil or differential
23  foundation movement caused by moisture or improper
24  construction; is that accurate?
25      A    Yes.
```

Timothy France                                          January 7, 2019

Page 126

1           MR. FELTY:  And to recap our objection as
2    to form would apply to any and all questions
3    touching or concerning Exhibit 23, Exhibit 24,
4    Exhibit 25, Exhibit 26, Exhibit 27 and/or Exhibit
5    28.
6           MR. ANDREWS:  CSAA joins that objection.
7       Q   (By Mr. Engel)  Is it accurate to say that
8    these reports look extremely similar?
9           MR. FELTY:  Object to form.
10          THE WITNESS:  Yes.
11      Q   (By Mr. Engel)  You can set all those
12   aside, sir.  What number are we on?  29.  Okay.
13   Thank you.  I'm wrapping it up, Mr. France.
14              (Exhibit Number 29 marked for
15               identification and made part of the
16               record)
17      Q   (By Mr. Engel)  I'm going to hand you what
18   I'm marking as 29.  Is this an engineering report
19   that you wrote for Chubb Insurance Company?
20          MR. ENGEL:  Y'all are going to maintain
21   the same objections; right?
22          MR. FELTY:  Correct.
23          MR. ANDREWS:  That's correct.
24          THE WITNESS:  Yes, it is.
25      Q   (By Mr. Engel)  Do you recall this

Timothy France                                              January 7, 2019

Page 147

1  space, do you recall Mrs. Smith telling Dr. Holliday
2  that?
3          MR. ENGEL:  Objection to the form.
4          THE WITNESS:  I don't, but I also don't
5  recall finding access to the crawl space.
6       Q    (By Mr. Andrews)  Do you recall looking
7  for access to the crawl space?
8       A    Yes, particularly around the outside.
9       Q    And do you recall ever asking Mrs. Smith
10 for access to the crawl space?
11      A    I don't recall if we did or didn't.
12      Q    Is it possible that Dr. Holliday had asked
13 Mrs. Smith for access to the crawl space without you
14 being present?
15      A    Oh, yes.
16          MR. ENGEL:  Asked and answered.
17          THE WITNESS:  Yes.
18      Q    (By Mr. Andrews)  Do you recall Dr.
19 Holliday ever mentioning to you or indicating to you
20 that there was not access to the crawl space at the
21 Smith residence?
22      A    Don't recall that.
23      Q    Had there been access to the crawl space,
24 do you believe that it was necessary to enter the
25 crawl space to investigate the Smith home?