# EXHIBIT 2

LISA M. HOLLIDAY, Ph.D. - APRIL 13, 2018

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


SEAN SMITH and CRYSTAL SMITH, )
                              )
        Plaintiffs,           )
                              )
VS.                           )No. 5:17-CV-1302D
                              )
CSAA FIRE AND CASUALTY        )
INSURANCE COMPANY,            )
                              )
        Defendant.            )


* * * * *

DEPOSITION OF LISA M. HOLLIDAY, PH.D.,

TAKEN ON BEHALF OF THE PLAINTIFFS

ON APRIL 13, 2018

IN OKLAHOMA CITY, OKLAHOMA

COMMENCING AT 9:53 A.M.

* * * * *


REPORTED BY: KORTNEY V. HOUTS, CSR

1          A      Correct.

2          Q      What are those conditions?

3          A      It has -- the main part of the house has a

4    crawlspace, and then there was an addition built on

5    that had a slab on grade.

6          Q      And what would you call the crawlspace

7    foundation?

8          A      A crawlspace foundation.

9          Q      Conventional?

10         A      No.  It's probably nonconventional now.

11         Q      Based on when it was built?

12         A      It was the norm when it was built.  Yes.

13         Q      And it's your understanding that's in the

14   1920s, '30s?

15         A      Something like that.

16         Q      Okay.  When you're investigating these claims

17   and you're making a determination of cause of damage,

18   as a structural engineer, one of the things you want to

19   look at is the structure.  Is that correct?

20         A      Important pieces of the structure for sure.

21         Q      Yeah.  And those --

22         A      Not -- I mean, you can -- you can't look at

23   the entire structure, but you want to look at certain

24   important pieces.

25         Q      You want to make sure that you don't -- and

1    like you said, you want to make sure that you're

2    thorough, because these are important investigations.

3    Correct?

4        **A**    Correct.

5        **Q**    And you -- you wouldn't want to intentionally

6    not gather data or leave data out, would you?

7        **A**    Well, you certainly can't -- I mean, you

8    could document all kinds of crazy stuff that -- but you

9    have to look at what's important first.

10        **Q**    And what's important is the structural

11    components of --

12        **A**    Is the places where -- yeah.  I mean, if

13    you're looking for earthquake damage, you want to look

14    at the places where earthquake damage happens.

15        **Q**    Okay.

16        **A**    So yeah.  The scope is not to thoroughly

17    examine the structure and do a thorough structural

18    examination, because that would be beyond the scope.

19        **Q**    What is the scope?

20        **A**    The scope was to see if there was earthquake

21    damage to the house.

22        **Q**    Did you look at any of -- did you go in the

23    attic in this home?

24        **A**    We did not.

25        **Q**    Do you know where the attic space is?

1    A    I saw the opening.

2    Q    Where is the opening at?

3    A    It was inside the laundry room.

4    Q    Okay.  What about the crawlspace?  You didn't

5    go in the crawlspace, did you?

6    A    No, we didn't.

7    Q    Have you been?

8    A    We couldn't, actually.

9    Q    Why do you say that?

10    A    They didn't have an opening.

11    Q    Really?

12    A    (Witness nods head affirmatively.)

13    Q    If you saw something that was damaged -- for

14    example, on the roof, if you saw bowing or waving and

15    they said that was caused by the earthquake, would you

16    have gone in the attic?

17    A    Yeah.

18    Q    What if you had seen cracks on the walls and

19    there's all of these splintering cracks on the walls?

20    Wouldn't that be something to look at, is maybe we want

21    to look behind there to determine whether or not those

22    studs are split?  Is that something you would do?

23    A    I can't imagine studs being split in your

24    particular example.  But I would say if there was

25    something that led me to go in the attic, I would go in

1    the attic.

2         Q      What about behind the walls?

3         A      I generally don't tear up people's houses.

4         Q      But, I mean, if you've got -- if you have to

5    make a determination --

6         A      We would -- we would probably leave, have a

7    meeting, you know, talk to the client about we're going

8    to have to do some destructive testing.   Our

9    investigations are generally limited to nondestructive

10   testing.   But on occasion, we have had to do

11   destructive testing, and we -- that's not a call we

12   make on the spot.

13        Q      Is that -- but that's something that -- if

14   you have to gather that type of data, is that something

15   that you'd be willing to do to make sure you got the

16   right conclusion?

17        A      Yes.

18        Q      Because you --

19        A      And have.

20        Q      And so for Rimkus, you have done that.

21   You've opened walls and that kind of thing?

22        A      I have.

23        Q      Do you recall that in the living room one of

24   the joists had fell and you had to walk over a hump?

25        A      In the living room, the joist had failed?

1      **A**     We were not doing a full, thorough structural

2  evaluation of the house.

3      **Q**     If you were walking through the -- well, if

4  you're walking through the living room and you walked

5  over a fallen floor joist and there was a trough in the

6  floor, is that something that you would have wanted to

7  investigate?

8      **A**     Probably just -- yes.  But it seems like --

9  if there would have been something that dramatic, yeah,

10  it seems like they would have called an engineer

11  themselves.

12     **Q**     If there was something --

13     **A**     If there was -- if I was a homeowner and

14  there was a gaping hole in my floor, I would call an

15  engineer.

16     **Q**     If there was a -- if there was something like

17  that when you arrived at the Smiths', is that something

18  you would have investigated in the crawlspace?

19     **A**     Yeah.

20     **Q**     Would that be -- would that be indicative of

21  earthquake damage in that home?

22     **A**     No.

23     **Q**     You don't think so?

24     **A**     Not -- not the first signs of damage.

25     **Q**     Again, this would be something where you'd

1      Q      Sure.   And when you're looking at these USDA

2    maps, is it your understanding that these maps have

3    disclaimers stating that they're no substitute for

4    site-specific tests?

5      A      I believe they do have statements like that.

6      Q      And that's because the soil can vary from

7    site to site, even though the overall area has one type

8    of soil.   Correct?

9      A      Correct.

10     Q      And that's not uncommon anywhere in the

11   world.   Right?

12     A      Correct.

13     Q      And so your understanding is that -- you

14   deemed this soil to be this silty clay with this

15   plasticity based on the USDA map, but not based on a

16   test that you did determining the type of soil?

17     A      Correct.

18     Q      And because the USDA cites that these are

19   just kind of generalizations, without a soil test, we

20   don't know exactly what type of soil is under that

21   house, do we?

22     A      Correct.

23     Q      Did you all discuss doing a soil --

24     A      We did not.

25     Q      -- sample?   Is that something that you have

1    ever done?

2      **A**    It's generally not done on residentials.

3      **Q**    But on commercial claims you do?

4      **A**    No.  On residential construction.  In

5    general, for residential construction, it's not the

6    norm.

7      **Q**    What about in Rimkus investigations?  Have

8    you ever tested the soil?

9      **A**    I have not.

10      **Q**    Do you know if Rimkus would allow you to test

11    the soil if you requested it?

12      **A**    I -- I don't see why not, if it was

13    necessary.

14      **Q**    Do you know if -- is that a tool that you

15    consider in your tool belt if you deem it necessary, is

16    to test the soil?

17      **A**    I don't think it's out of the realm of

18    possibility, yeah, if it's -- if it's warranted.

19      **Q**    Okay.  No one's ever told you, don't ever

20    test the soil?

21      **A**    Right.  No one's ever told me that.

22      **Q**    Okay.  And going forward -- well, if a home

23    is sitting on soil that's likely to shift naturally,

24    does that make it more likely to shift as a result of

25    an earthquake?

1    A    No.

2    Q    Okay.  Has anyone ever told you at Rimkus

3 that you should test the soil?

4    A    No.

5    Q    Is there a reason you didn't test the soil?

6    A    Generally, you don't test the soil for

7 residential construction projects.  It's just not the

8 norm.

9    Q    What if you're doing forensic investigations

10 where you base your conclusion on the type of soil?  In

11 that instance, do you feel it's necessary to site test

12 the soil?

13    A    I don't think so.  No.

14    Q    What conversations did you have with

15 Mr. France when you were on-site?

16    A    We had conversations about whether we thought

17 this was earthquake damage.

18    Q    Can you think of anything specifically?

19    A    No.  Not specifically.  You know, at first,

20 when we first got to the site, we didn't talk at all,

21 and we kind of independently looked at things and then

22 came together and said, you know, what do you think.

23    Q    At some point in time, Tim left you, and

24 you --

25    A    No.

1    **Q**    -- guys separated?

2    **A**    No.  We were there together the whole time.

3    **Q**    Did Tim go into the attic?

4    **A**    No.

5    **Q**    Did Tim go into the crawlspace?

6    **A**    No one could go into the crawlspace.

7    **Q**    If I told you I had been in the crawlspace,

8    do you have any reason to believe that's impossible?

9    **A**    Then I believe you took something apart to

10   get there.

11   **Q**    Do you --

12   **A**    Because the homeowner told us -- based on

13   what the homeowner told us, there was no way to get

14   into the crawlspace.

15   **Q**    But, regardless, you didn't feel like it was

16   necessary to go in there for you to come to a

17   conclusion that this was not earthquake damage?

18   **A**    Correct.  If I had felt it was necessary to

19   go in the crawlspace, we would have done something to

20   get in the crawlspace.

21   **Q**    Why did you pull the carpet back in the back

22   bedroom?

23   **A**    Because we felt the -- there was a big hump

24   in the floor there.  There was a big discontinuity.

25   **Q**    In the son's bedroom?