# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL SMITH,           )
                                        )
            Plaintiffs,                 )
                                        ) No.
vs.                                     ) 5:17-cv-1302D
                                        )
CSAA FIRE & CASUALTY INSURANCE          )
COMPANY,                                )
                                        )
            Defendant.                  )

VIDEOTAPED DEPOSITION OF TIM FRANCE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 7, 2019

REPORTED BY:   KAREN B. JOHNSON, CSR

Page 9

1  Q   Yeah. I think it's confusing, too, I
2  don't know why they do that. But for all intents
3  and purposes, if I refer to CSAA, I'm talking about
4  AAA; right?
5  A   Okay.
6  Q   Or a/k/a the defendant in this case, okay?
7  But what I was getting at is in preparation for your
8  deposition, did you review anything else besides the
9  photographs and that report?
10 A   No, sir.
11 Q   And I wrote down all the questions I'm
12 going to ask, so hopefully we can just cut through
13 these and get out of here, all right?
14     Now, this is -- this report that you have
15 in front of you, which is Exhibit Number 3, is not a
16 report that you wrote; right?
17 A   I did not write it.
18 Q   How would you describe your role in this
19 Smith investigation?
20 A   Kind of a -- an assistant, kind of a
21 colleague type of relationship.
22 Q   You understand that this was -- do you
23 understand that this was Ms. Lisa Holliday's first
24 inspection for Rimkus?
25 A   Yes.

Page 10

1   Q   Did you go and act as maybe a guide for
2   her?
3   A   It's another word you could put on it.
4   Q   And, again, this is kind of to figure out
5   what your role is, but I want to understand if you
6   were there just for support or if you were there
7   to -- for her to shadow you.
8   A   You could call it a mutual, because she --
9   she had done seismic or earthquake stuff before.
10  Q   Okay.
11  A   It was just because it was first time with
12  Rimkus.
13  Q   Okay. Is it your understanding the
14  engineer conclusions in this report were Lisa
15  Holliday's conclusions?
16  A   I understand that they are her -- they are
17  her conclusions.
18  Q   You weren't hired by the defendant in this
19  litigation to provide an expert opinion in this
20  litigation, were you?
21  A   I'm not sure I understand that.
22  Q   Have you been hired by the defendant to
23  provide expert testimony?
24  A   No, at least not to my knowledge.
25  Q   You don't have any expert opinions in this

Page 76

```
 1      A     Yes.
 2      Q     And these are some of the same conclusions
 3   that you've come to while you're writing the --
 4   these inspection reports; right?
 5      A     Yes.
 6            MR. FELTY:  Object to form.
 7      Q     (By Mr. Engel)  Did you and Ms.
 8   Holliday -- or did you or Ms. Holliday gather soil
 9   samples for this inspection?
10      A     No.
11      Q     Did either of you test the soil to
12   determine the type of soil underneath the home?
13      A     No.
14      Q     Of the approximately 50 earthquake
15   inspections you've done for Rimkus, have you ever
16   tested the soil underneath the house?
17      A     No.
18      Q     Isn't it true the Rimkus reports always
19   reference the USDA?
20      A     I can't speak for all Rimkus reports, ones
21   I do, yes, unless I specifically need it, and then I
22   will get a geotech out there to do -- if it's
23   warranted.
24      Q     Sure.  But you've never done that, you've
25   never done a soil sample for an earthquake-related
```

Page 81

1  believe it's not necessary to go into the crawl
2  space?
3       A    Yes.
4       Q    Why?
5       A    There was nothing there that I saw that
6  would justify going into it, and, too, if I remember
7  correctly, there was no direct access to the crawl
8  space.
9       Q    Did you ever consider destructive
10 investigation to get into there?
11      A    No.
12      Q    But that's something you could have done
13 to access if there was no access point; right?
14      A    We could propose it, have to get approval
15 from the property owner then and the client to pay
16 for the repairs.
17      Q    And that's something you guys could have
18 done; right?
19      A    Could have.
20      Q    I want to talk about the size of
21 earthquakes, all right?
22      A    Okay.
23      Q    How do you measure the size of an
24 earthquake?
25      A    There's -- when you say "measure," by

Page 145

1   A   Yes.

2   Q   Do you recall Crystal Smith ever asking

3   either you or Dr. Holliday to look at anything as

4   you all were leaving concluding the investigation?

5         MR. ENGEL:  Asked and answered.

6         THE WITNESS:  I don't recall that.

7   Q   (By Mr. Andrews)  Did Dr. Holliday ever do

8   anything during the investigation that you feel

9   degraded the Smiths or their home?

10  A   No, she was very polite and nice if that's

11  what you're getting at.

12  Q   Did you ever do anything during the

13  investigation that you feel degraded the Smiths or

14  their home?

15  A   No, sir.

16  Q   The manager that you spoke of earlier,

17  what was her last name?

18  A   It's hard to pronounce, I'm not sure, it's

19  M-A-U-G -- Maughan, something like that.

20  Q   Maughan.  Did Mrs. Maughan ever do

21  anything during the investigation that you feel

22  degraded the Smiths or their home?

23  A   I do not.

24  Q   You testified that you did not go into the

25  attic and that Dr. Holliday did not go in the attic;

1    correct?
2        A    Yes.
3        Q    Why not?
4        A    Didn't see the need for it.
5            MR. ENGEL:  Asked and answered.
6        Q    (By Mr. Andrews)  Repeat that, please.
7        A    Did not see the need for it.
8        Q    Did you agree with the assessment of Dr.
9    Holliday that there was no need to go up into the
10   attic?
11       A    Yes.
12       Q    Were you aware that there was access to
13   the attic?
14       A    Don't recall that.
15       Q    Do you believe that there was a -- a need
16   to go up into the attic or to ask for access to the
17   attic?
18       A    No.
19       Q    You testified that you did not look into
20   the crawl space and that Dr. Holliday didn't look
21   into the crawl space; correct?
22       A    Correct.
23       Q    I'll represent to you that Dr. Holliday
24   testified during her deposition that she was told by
25   Mrs. Smith that there was not access to the crawl

Page 147

1  space, do you recall Mrs. Smith telling Dr. Holliday
2  that?
3              MR. ENGEL:  Objection to the form.
4              THE WITNESS:  I don't, but I also don't
5  recall finding access to the crawl space.
6         Q    (By Mr. Andrews)  Do you recall looking
7  for access to the crawl space?
8         A    Yes, particularly around the outside.
9         Q    And do you recall ever asking Mrs. Smith
10 for access to the crawl space?
11        A    I don't recall if we did or didn't.
12        Q    Is it possible that Dr. Holliday had asked
13 Mrs. Smith for access to the crawl space without you
14 being present?
15        A    Oh, yes.
16             MR. ENGEL:  Asked and answered.
17             THE WITNESS:  Yes.
18        Q    (By Mr. Andrews)  Do you recall Dr.
19 Holliday ever mentioning to you or indicating to you
20 that there was not access to the crawl space at the
21 Smith residence?
22        A    Don't recall that.
23        Q    Had there been access to the crawl space,
24 do you believe that it was necessary to enter the
25 crawl space to investigate the Smith home?

```
 1      A    No.
 2           MR. ENGEL:  Asked and answered and form.
 3      Q    (By Mr. Andrews)  Will you repeat your
 4   answer, please?
 5      A    No.
 6           MR. ENGEL:  If you give me a little bit of
 7   time to object and then answer, it will be a little
 8   bit cleaner, all right?
 9           THE WITNESS:  Okay.
10      Q    (By Mr. Andrews)  You testified that there
11   was no destructive testing at the Smith house, why
12   was that not done?
13      A    Didn't feel it was necessary.
14      Q    You didn't take any soil samples at the
15   Smith house, why was that not done?
16      A    Typically do not.
17      Q    Do you recall the condition of the soil
18   while you were out at the house doing your
19   investigation?
20      A    It's covered with vegetation.
21      Q    If you would, look at Exhibit 3A, which is
22   Dr. Holliday's report.
23           MR. ENGEL:  Should be the bottom.
24           MR. FELTY:  Put the rest of that over
25   there.  Get this out of your way.
```

```
 1              THE WITNESS:  That's why I didn't
 2   recognize it.  Okay.  Yes.
 3        Q     (By Mr. Andrews)  On Page 3, which is
 4   Bates stamped CSAA_Smith 0503, under the interview,
 5   could you please turn to that?
 6        A     Yes.
 7        Q     Do you recall Mrs. Smith ever raising any
 8   concern about a sag in the floor?
 9              MR. ENGEL:  Asked and answered.
10              THE WITNESS:  No, I don't recall that.
11        Q     (By Mr. Andrews)  And it's not identified
12   by Dr. Holliday in her notes regarding the initial
13   interview with Crystal Smith; correct?
14        A     Correct.
15        Q     Is that something that normally would be
16   placed in that intersection if Crystal Smith had
17   raised concern about a sag in the floor of the
18   living room?
19        A     Yes.
20              MR. ENGEL:  Form.
21        Q     (By Mr. Andrews)  Also, there is nothing
22   in the interview section which raises concerns about
23   Crystal Smith with the living room wall -- living
24   room wall leaning; is that correct?
25        A     Correct.
```

1   Q   Do you recall Crystal Smith ever raising a
2   concern to either you or Dr. Holliday regarding the
3   living room wall leaning?
4   A   No.
5   Q   And do you recall Crystal Smith ever
6   raising any type of concern that she feared that the
7   wall might fall in the living room because it was
8   leaning?
9   A   No.
10  Q   Now, obviously that would be something
11  that would be written down in this report by Dr.
12  Holliday if that was something that was raised by
13  Crystal Smith as -- as a concern for her home;
14  correct?
15          MR. ENGEL:   Form.
16          THE WITNESS:   Yes.
17  Q   (By Mr. Andrews)   You never told Dr.
18  Holliday how to conduct her investigation at the
19  Smith house; correct?
20  A   No.
21  Q   And you never told Dr. Holliday what the
22  cause of damage was at the Smith house; correct?
23  A   No.
24  Q   You testified briefly earlier on about
25  the -- doing soil samples for construction, but you

1    haven't done any soil samples for investigation, do
2    you recall that?
3         A    Yes.
4         Q    There's a difference between the need for
5    soil samples for a construction project versus soil
6    samples for an investigation; correct?
7         A    Yes.
8              MR. ENGEL:  Form.
9         Q    (By Mr. Andrews)  And I believe you
10   testified you didn't believe the soil samples were
11   needed for the investigation of the Smith home;
12   correct?
13        A    Correct.
14        Q    Now, you also testified about floor
15   elevation at houses and you said that a reasonable
16   deviation of a floor was about an inch, I believe,
17   do you recall that?
18        A    Yes.
19             MR. ENGEL:  Form.
20        Q    (By Mr. Andrews)  Is it common in older
21   houses such as the Smith home that was built in 1920
22   to have a greater deviation of floor levels?
23             MR. ENGEL:  Objection to the form.
24             THE WITNESS:  Can you restate that?
25        Q    (By Mr. Andrews)  Homes today are built