# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL SMITH,

                    Plaintiffs,

v.                                                    Case No: CIV-17-1302-D

CSAA FIRE AND CASUALTY
INSURANCE COMPANY and LISA
HOLLIDAY,

                    Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANT CSAA'S
## MOTION TO STRIKE DAVID BATTLE AND SEAN WILEY
## FROM PLAINTIFFS' WITNESS LIST

**MANSELL ENGEL & COLE**
Steven S. Mansell, OBA #10584
Mark A. Engel, OBA #10796
Kenneth G. Cole, OBA #11792
M. Adam Engel, OBA #32384
204 North Robinson Avenue, 21st Floor
Oklahoma City, OK 73102-7001
T: (405) 232-4100 **        F: (405) 232-4140
E-mail:  mec@meclaw.net

**ATTORNEYS FOR PLAINTIFFS**

February 15, 2019

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ................................................................................. 1

ARGUMENT AND AUTHORITY ................................................................. 8

   I.   THE SMITHS ARE ENTITLED TO CALL MR. BATTLE AS  A WITNESS ..... 8

   II.  SEAN WILEY SHOULD BE ALLOWED TO TESTIFY .................................... 15

## TABLE OF AUTHORITIES

**Cases:**

*Agron v. Trustees of Columbia Univ. in City of New York*,
  176 F.R.D. 445 (S.D.N.Y. 1997) ..................................................................... 9

*Benham v. Ozark Materials River Rock, LLC*,
  885 F.3d 1267 (10th Cir. 2018) ..................................................................... 15

*Bliss v. BNSF Ry. Co.*,
  2013 WL 5570231 (D. Neb. Oct. 9, 2013) ............................................... 14, 15

*Bone Care Int'l, LLC v. Pentech Pharm., Inc.*,
  2010 WL 3894444 (N.D. Ill. Sept. 30, 2010)............................................ 11, 14

*Buzzard v. Farmers Ins. Co.*,
  1991 OK 127, 824 P.2d 1105 ........................................................................ 16

*Doe v. Eli Lilly & Co.*,
  99 F.R.D. 126 (D.D.C.1983) .......................................................................... 10

*Dovel v. Walker Mfg.*,
  1996 WL 910027 (D. Neb. Oct.18, 1996) ...................................................... 11

*Glendale Fed. Bank, FSB v. U.S.*,
  39 Fed. Cl. 422 (1997)............................................................................. 10, 11

*Guinn v. CRST Van Expedited, Inc.*,
  2011 WL 2414393 (W.D. Okla. June 10, 2011) .......................................... 8, 9

*Hill v. Kaiser-Francis Oil Co.*,
  2012 WL 528280 (W.D. Okla. Feb. 17, 2012)............................................. 9, 10

*House v. Combined Ins. Co. of Am.*,
  168 F.R.D. 236 (N.D. Iowa 1996) ............................................................... 8, 9

*In re Hanford Nuclear Reservation Litig.*,
  534 F.3d 986 (9th Cir. 2008) ........................................................................ 11

*Kaufman v. Edelstein*,
  539 F.2d 811 (2d Cir.1976) ........................................................................... 10

*Kerns v. Pro-Foam of S. Alabama, Inc.*,
  572 F. Supp. 2d 1303 (S.D. Ala. 2007) ......................................................... 10, 11, 12, 15

*Minebea Co., Ltd. v. Papst,*
  2005 WL 6271045 (D.D.C. Aug.2, 2005) ....................................................... 11

*Penn Nat. Ins. v. HNI Corp.*,
  245 F.R.D. 190 (M.D. Pa. 2007) .................................................................... 10

*S.E.C. v. Koenig*,
  557 F.3d 736 (7th Cir. 2009) ......................................................................... 13, 14

*Thomas v. Mitsubishi Motors Corp.*,
  2014 WL 988785 (D. Utah Mar. 13, 2014) .................................................... 9

*United States v. Schaudt*,
  2009 WL 1218605 (N.D. Ill. Apr. 30, 2009) .................................................. 14

**Rules:**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ......................................................................... 5

Fed. R. Civ. P. 26(b)(2) .................................................................................. 10

Fed. R. Evid. 801(d)(2)(C) .............................................................................. 10

## <u>EXHIBITS</u>

1. Smith Rimkus Report (CSAA 76-106)

2. Smith Cracked Floor Joists Photo

3. Excerpts from Deposition of David M. Battle

4. David Battle Expert Report

5. Excerpts from Deposition of J. Stephen Ford

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SEAN SMITH and CRYSTAL SMITH,<br><br>                                  Plaintiffs,<br><br>v.<br><br>CSAA FIRE AND CASUALTY<br>INSURANCE COMPANY and LISA<br>HOLLIDAY,<br><br>                                  Defendants. | Case No: CIV-17-1302-D |

### PLAINTIFFS' RESPONSE TO DEFENDANT CSAA'S
### MOTION TO STRIKE DAVID BATTLE AND SEAN WILEY
### FROM PLAINTIFFS' WITNESS LIST

Plaintiffs Sean Smith and Crystal Smith ("the Smiths") respectfully submit the following Response to the Motion to Strike David Battle and Sean Wiley from Plaintiffs' Witness List filed herein by Defendant CSAA Fire and Casualty Insurance Company ("CSAA").  For the reasons which follow, the Smiths respectfully submit that CSAA's Motion to Strike should be denied.

### STATEMENT OF FACTS

On November 9, 2016, a 5.0 earthquake violently shook the City of Cushing. Several of the buildings downtown fell over and collapsed into the street.  After the earthquake, the City of Cushing lost power for over 24 hours.

Mrs. Smith was in her living room when the earthquake occurred.  As her living room shook, she jumped off the sofa and placed her hands on the living room wall.  The wall shook and bowed as the earthquake rocked her home.  She feared it would fall on her.

After it stopped, she turned and found that the middle of her living room floor had collapsed and that there was a large new depression in the floor. The wall upon which she had placed her hands was out plumb and was now leaning towards the living room

Mr. Smith works construction and framing and the Smiths initially thought he could repair the damage.  However, as they discovered further damage, they realized that the damage was far more serious than they had originally thought and it extended throughout their home.  They then made a claim with their homeowners' insurer, CSAA.

CSAA's initial claim file notes show that, in her first communication with adjuster Heckman, Mrs. Smith informed CSAA of "substantial damage" to the living room.  The Smiths' claim was assigned to adjuster Chad Heckman ("Mr. Heckman").  CSAA's claim file notes show that during his first call to Mrs. Smith with the adjuster, Mr. Heckman was aware the living room floor had collapsed and that, after the earthquake, the living room door would not close.  Mr. Heckman has testified he knew from the onset of the claim the insured was claiming damage to the living room.

CSAA's claim handling earthquake policy is to hire an engineer from one of the four approved engineering firms on CSAA's engineering list.  Mr. Heckman hired Rimkus Engineering ("Rimkus").  Rimkus has already conducted dozens of earthquake inspections for CSAA on other insureds' earthquake claims.  Initially, Rimkus Engineer Tim France was assigned to the claim.  Later, the claim was reassigned to Rimkus Engineer Lisa Holliday.  Mr. France and Lisa Holliday inspected the property together.  Mr. France acted as a "guide" to new hire Lisa Holliday during the inspection of the Smiths' home.

During their "inspection," Lisa Holliday, Tim France, and their Rimkus assistant walked through the front door and into the living room.  At no time did they inspect the crawlspace under the living room to look at or photograph the floor joists that the earthquake had caused to break.  Although they examined areas where ceiling tiles had fallen, they did not bother to inspect the attic above the fallen ceiling tiles.  In fact, Lisa Holliday's CSAA engineering report is totally silent as to the damage in the living room. *See* Ex. 1, Smith Rimkus Report (CSAA 76-106).  Her report neither mentions the living room, the leaning interior structural wall nor the collapsed living room floor.  *Id.*  Not one of the three Rimkus representatives bothered to take even one photograph of the collapsed living room floor.  Nor did they measure the out-of-plumb wall.  Later, the Smiths accessed the crawlspace via holes cut in the living room floor.  That view revealed cracked floor joists.   *See* Ex. 2, Smith Cracked Floor Joists Photograph.  Measurements of the living room wall similarly indicated that the wall had significantly shifted.

Predictably, like nearly every other Rimkus earthquake "inspection," the "inspection" concluded that the damage to the home was caused by long-term soil settling due to soil type and moisture content in the soil.  Not a single Rimkus photograph supports that claim.  Nonetheless, as has occurred in many other earthquake claims, CSAA issued a denial letter to Plaintiffs stating that due to the Rimkus engineer's report, the damage to their home was not attributable to earthquake, but rather to non-covered soil settling.

The damage that Mrs. Smith personally saw occur was never addressed by the Rimkus report.  The moisture in the soil was *never* tested and the level of soil moisture is unknown.  The type of soil beneath the home was also *never* tested and remains unknown.

The Smiths were not paid one dollar in benefits and, to this day, no adjuster or anyone else from CSAA has ever seen the Smiths' home.  The only people who went to the Smith home to investigate this claim were the three Rimkus employees CSAA hired to help it deny the claim.

### CSAA'S USE OF EXPERTS TO DENY THE SMITH FAMILY BENEFITS

Throughout the handling of the Smiths' claim, there were never any discussions as to the extent of the damage to their home.  Rather, the issue was always the <u>cause</u> of the extensive damage.  Indeed, because the damage was so extensive, there was never much question that the cost to repair the Smiths' home exceeded their policy limits.  The home is small, and the damage is significant. For that very reason, at no point in time did either party hire an estimator to calculate the cost of repair.

After CSAA had denied this claim and the Smiths had filed this lawsuit, CSAA changed its position.  It hired two new experts, Steve Ford, to determine appropriate repairs, and David Battle, a construction estimator,  to determine what it would cost to perform those repairs.  After Dr. Ford and Mr. Battle jointly inspected the Smiths' home in April 2018, CSAA for the first time <u>agreed</u> that some of the damage to the home was caused by the earthquake, although it predictably also asserted that the amount of the earthquake-related damage was only a few hundred dollars over the Smiths' deductible. CSAA listed Dr. Ford and Mr. Battle as expert witnesses to provide support for CSAA's completely new position regarding the cost to repair the Smiths' home.

It was not until CSAA produced its expert reports that the issue of how much it would cost to repair the home even arise.  Mr. Ford's report recommended the types of

repairs necessary. Mr. Battle's report opined that only a small amount of the extensive damage to the Smith's home was earthquake-related, probably in part because Mr. Battle never looked at areas of damage in the home, such as the crawl-space located beneath the floor, to observe the collapsed areas in the home.[1]  Nor did he view the attic.  Once CSAA listed their experts, and provided the reports, and raised the new issue regarding the cost to repair the earthquake damage to their home, the Smiths hired Sean Wiley as a rebuttal expert on that issue and provided CSAA an expert report containing Mr. Wiley's opinions regarding the necessary repairs and the cost of repairs.

CSAA moved to strike Mr. Wiley and the Smiths responded.  On November 9, 2018, the Court entered an Order denying CSAA's Motion to Strike (Doc. 40).  The Court determined that Mr. Wiley was timely disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii); that Mr. Wiley was a proper rebuttal witness and that, even if the disclosure were untimely as argued by CSAA, it was harmless because CSAA had ample time to prepare for the Smiths' use of Mr. Wiley's report at trial.  As the Court's Order concluded, "Defendant is not prejudiced by allowing the witness, the testimony will not disrupt the trial as it has not yet been set, Defendant has sufficient time to prepare, and there is no evidence of bad faith or willfulness on the part of Plaintiffs."  Order (Doc. 40) at p. 6.  Since that time, the Smiths have consistently offered to produce Mr. Wiley for deposition and CSAA has consistently rejected that offer. And as of today, the trial of this case has not been set.

---

[1] Dr. Ford allegedly stuck his head into the crawl space but his view was blocked by a retaining wall.

CSAA produced Mr. Battle for deposition on November 2, 2018.  During his deposition, consistent with what he had said in his expert report, Mr. Battle testified that he had been told by Dr. Ford, the professional engineer with whom he had inspected the home, that some of the damage in the Smiths' home was caused by the earthquake.  In that regard, according to Mr. Battle, Mr. Ford stated that the damage he could observe consisted of four (4) to six (6) brick column supports, supporting the floor structure under the house, which had been partially dislodged due to the earthquake, and Mr. Ford did not see "any other" earthquake damage.  *See* Ex. 3, Battle depo., pp. 31:24 - 34:2 and p. 36:5-15.[2]  Based upon the findings in the Rimkus report, Mr. Battle also estimated for damage to the front of the house.  *See* Ex. 4, Battle Expert Report, p. 2; Ex. 3, Battle depo., p. 30:6-18.  Mr. Battle wrote his "Earthquake Repair Estimate" based on what Dr. Ford told him was damaged during the telephone conversation.  *See* Ex. 3, Battle depo., pp. 36:20 - 37:22; 41:7 - 42:4.; 68:1-15.

However, after a break, Mr. Battle changed his testimony to say that: 1) Dr. Ford never told him that there was damage caused by an earthquake; and 2) that his report, which specifically stated that Dr. Ford had concluded a portion of the home had sustained "earthquake damage" was "poor choice of words."  *See* Ex. 3, Battle depo., pp. 69:17 – 70:18.  At a minimum, there appears to be a rather large discrepancy between what Mr.

---

[2] Mr. Battle did not read Mr. Ford's report.  Instead, he called Mr. Ford and spoke to him over the phone.  Mr. Battle then based the repair estimates in his report upon what Mr. Ford had told him was earthquake damage.  *See* Ex. 3, Battle depo., pp. 31:24 - 32:6.  As Mr. Battle stated, his estimate "follow[s] what – the direction of the structural engineer and what his recommendations are." *See* Ex. 3, Battle depo., p. 24:16-19.

Ford said over the phone, as set forth in Mr. Battle's report and in his original deposition testimony, and Mr. Ford's final conclusions as set forth in his expert report. *See* Ex. 4, Battle Expert Report at p. 2; Ex. 3, Battle depo., p. 70:5-25.

After deposing Mr. Battle, the Smiths listed him as a witness on their Final Witness List (Doc. 41), filed on November 21, 2018.  CSAA then made the tactical decision to omit Mr. Battle from its Final Witness List (Doc. 43).  Now it seeks to preclude the Smiths from calling him as well, presumably at least in part in an effort to prevent the Smiths from being able to call Sean Wiley on the very issue that CSAA itself first raised in this litigation – the necessary repairs and the amount it would cost to repair the Smiths' home.

When CSAA listed Mr. Battle as a testifying expert and provided his expert report, it lost any claim it might otherwise have had to the confidentiality of his testimony.  Nor does CSAA "own" Mr. Battle's testimony in any event.  Moreover, the purpose of a Rule 26 expert report is to provide the <u>adverse</u> party (here, the Smiths) notice of the substance of the experts' opinions, the reasons for the opinions, and the facts upon which the opinions are based.  Here, CSAA has had unfettered access to Mr. Battle's testimony from and since it retained him.  It knows what his opinions consist of, the reasons for those opinions, and the facts upon which they are based.  CSAA has <u>always</u> had the ability to scrutinize the findings of its own expert.  It has also had months to prepare for his testimony (as well as that of Mr. Wiley).  This motion is simply an exercise in gamesmanship.  For the reasons which follow, the Smiths respectfully submit that CSAA's Motion to Strike David Battle and Sean Wiley from the Plaintiffs' Witness List should be denied.

## ARGUMENT AND AUTHORITY

## I.   THE SMITHS ARE ENTITLED TO CALL MR. BATTLE AS A WITNESS

As was previously discussed in Plaintiffs' Response to Defendant's Motion to Strike Plaintiffs' "Rebuttal Expert List" [Doc. 38], the Smiths did not list an expert witness to testify regarding the cost to repair their home because that was never an issue during the pendency of the claim.  Indeed, while the claim was pending, neither party hired a cost estimator because at that time, both sides agreed that the damage to the home exceeded the Smiths' available policy benefits.  However, at that time, CSAA's position was that <u>none</u> of extensive damage to the home had been caused by an earthquake.  While the claim was pending, the issue was what had caused that damage, not how much it would cost to repair.

It was not until the deadline for the Smiths to list expert witnesses had passed that CSAA, for the first time ever, raised an issue about the "cheap" cost to repair the Smiths' home.  Only then, after that deadline had expired, did CSAA: 1) first agree that some of the damage to the Smiths' home (a relatively nominal amount) was caused by earthquake; and 2) list Mr. Battle to testify about the cost to repair that damage.  That is very reason why the Smiths were then forced to list Sean Wiley as a rebuttal expert on the cost of repair issue.

There is no question that CSAA disclosed Mr. Battle as an expert witness who it expected to testify at trial on the cost of repair issue.  CSAA listed Mr. Battle as a testifying expert, provided Mr. Battle's Rule 26 report, and provided Mr. Battle for a deposition.  By designating him as a testifying expert, Mr. Battle became "recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony

available to all parties." *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245 (N.D. Iowa 1996). *See also Guinn v. CRST Van Expedited, Inc.*, 2011 WL 2414393, at *2 (W.D. Okla. June 10, 2011) (same statement, citing *House*, 168 F.R.D. at 245).

Once a party designates an expert, "the party will have to live with the consequence that the opposing party will likely be given the opportunity to depose the expert or even to call the expert at trial on their own behalf." *House*, 168 F.R.D. at 245; *Guinn*, 2011 WL 2414393, at *2. In that regard, allowing parties to de-designate experts after they testify to an unfavorable opinion could potentially undermine the court's interest in the proper resolution of issues. *E.g.*, *Thomas v. Mitsubishi Motors Corp.*, 2014 WL 988785, at *2 (D. Utah Mar. 13, 2014) (citing *Brigham Young University v. Pfizer, Inc*, 2012 WL 1029304 (D. Utah Mar. 26, 2012).[3] Moreover, the Federal Rules of Civil Procedure "contain no provision allowing a party to render a previously disclosed expert ineligible to testify by dedisclosing." *Hill v. Kaiser-Francis Oil Co.*, 2012 WL 528280, at *2 (W.D. Okla. Feb. 17, 2012) (citing Easton, *"Red Rover, Red Rover, Send that Expert Right Over": Clearing the Way for Parties to Introduce the Testimony of Their Opponent' Expert Witnesses,* 55 SMU L. Rev. 1427, 1469–71 (2002)) (internal quotations omitted). As further discussed in *Hill,* one treatise notes that "[o]nce a party has designated an expert witness as someone who will testify at trial, the later withdrawal of that designation may neither prevent the

---

[3]*See also Agron v. Trustees of Columbia Univ. in City of New York*, 176 F.R.D. 445, 450 (S.D.N.Y. 1997) (noting that "[o]ne of the primary concerns of any trial court is the desire for probative information and the search for truth. Naturally, such a truth-finding mission favors the admission of testimony by an expert who could assist the trier of fact in determining complex issues.").

deposition of that witness by the opposing party nor the expert's testimony at trial." *Id.* (citing 6 Moore's Federal Practice § 26.80 [1][a](3d ed.)).

"Federal law has rejected the notion that experts are privileged from compulsory testimony or that a party "owns" the opinions of its expert." *Penn Nat. Ins. v. HNI Corp.*, 245 F.R.D. 190, 194 (M.D. Pa. 2007). *See also Kaufman v. Edelstein,* 539 F.2d 811, 818 (2d Cir. 1976) (Friendly, J.) ("Although the framers of the [Federal Rules of Evidence] must have been well aware of the frequently made contention that experts enjoy some kind of privilege, neither this chapter [Rules 701–706] nor the proposed rules on privilege which the framers proposed but Congress rejected contain any suggestion that an expert enjoys either an absolute or a qualified privilege against being called by a party against his will."); *Kerns v. Pro-Foam of S. Alabama, Inc.*, 572 F. Supp. 2d 1303, 1311 (S.D. Ala. 2007) ("Courts have repeatedly observed that once a party has given testimony through deposition or expert reports, those opinions do not 'belong' to one party or another, but rather are available for all parties to use at trial...."); *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C.1983) ("[N]o party to litigation has anything resembling a proprietary right to any witness's evidence."). CSAA's experts are not protected from testifying by any privilege or proprietary interest that CSAA might try to claim. Rather, as stated in *Penn Nat. Ins. v. HNI Corp.*, 245 F.R.D. 190, 193 (M.D. Pa. 2007), by designating Mr. Battle as an expert pursuant to Rule 26(b)(2) and allowing discovery of his expert report [and deposition] without objection, CSAA "subjected [his] opinions to the scrutiny of trial."[4]

---

[4] Mr. Battle's deposition testimony is a party admission. *See* Fed. R. Evid. 801(d)(2)(C). *See also Glendale Fed. Bank, FSB v. U.S.,* 39 Fed. Cl. 422, 425 (1997) (holding that prior

Mr. Battle has already provided his expert report and testified by way of deposition. Consequently, there can be no legitimate concern that the Smiths are "leaching" from CSAA's trial preparation.  *E.g.*, *Dovel v. Walker Mfg.*, 1996 WL 910027, at *2 (D. Neb. Oct.18, 1996) (holding that, where defendant withdrew testifying expert after discovery, expert's opinions are not secret and there is no concern "of the plaintiff 'leaching' case preparation information from her adversary."); *Kerns v. Pro-Foam of S. Alabama, Inc.*, 572 F. Supp. 2d 1303, 1309–10 (S.D. Ala. 2007) (rejecting "piggybacking" claim and noting that "courts have repeatedly observed that once a party has given testimony through deposition or expert reports, those opinions do not "belong" to one party or another, but rather are available for all parties to use at trial.  Defendant's argument is essentially that defendant has some proprietary, exclusive, inviolate right to Creel's testimony on which plaintiffs cannot infringe.  Merely because defendant retained Creel and designated him as a testifying expert before plaintiffs did does not somehow imbue defendant with absolute, exclusive dominion to control the circumstances and manner through which his testimony reaches the jury.").  No "piggybacking" concern exists.

---

deposition testimony of an expert witness put forward as a testifying expert at trial is an admission against the party that retained the expert); *Minebea Co., Ltd. v. Papst,* 2005 WL 6271045, at *1 (D.D.C. Aug.2, 2005) (endorsing as "persuasive the analysis of Chief Judge Smith in *Glendale"*); *In re Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1016 (9th Cir. 2008) (explaining that party could not exclude prior expert testimony that she herself proffered but later determined "was more harmful than helpful" because expert's prior testimony "was an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(C)," citing *Glendale*); *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, 2010 WL 3894444, at *10 (N.D. Ill. Sept. 30, 2010), *order clarified sub nom. Bone Care v. Pentech,* 2010 WL 3909509 (N.D. Ill. Oct. 4, 2010) (stating that deposition testimony of adverse party's testifying expert "likely would be considered a party admission, and therefore would not constitute hearsay.").

CSAA's primary argument against the Smiths' calling Mr. Battle to testify is that, although Mr. Battle was <u>CSAA's</u> testifying expert, they should not be allowed to present his testimony because they did not timely "list" him as an expert or provide an expert report detailing his opinions – a completely unnecessary requirement since CSAA already knew what its opinions were because it had solicited those opinions in the first place.  Given that CSAA already knew what Mr. Battle's opinions were, at best, CSAA's current complaint is a matter of form over substance and a classic case of no harm, no foul.

The argument raised by CSAA here has been considered and rejected by several other courts.  For example, in *Kerns v. Pro-Foam of S. Alabama, Inc.*, 572 F. Supp. 2d 1303, 1309–10 (S.D. Ala. 2007), homeowners brought action against a subcontractor to recover for damage to their home as result of a fire allegedly caused by the subcontractor's negligent application of spray-on polyurethane foam insulation.  The defendant's expert, Larry Creel, opined among other things that the foam insulation had been applied to the plaintiffs' house in accordance with industry standards and that such application did not cause the fire.  The defendant filed a motion in limine to prevent the plaintiffs from calling its expert.  Like CSAA here, the defendant in *Kerns* alleged in part that the plaintiffs had not designated him as an expert.  The court rejected the defendant's claim stating:

> [P]ro–Foam proffers a series of objections to plaintiffs' attempted use of Creel in their case-in-chief.  First, Pro–Foam maintains, plaintiffs should be barred from calling Creel because they never designated him as an expert witness in their Rule 26 disclosures.  This contention is wholly unpersuasive.  Pro–Foam has long known Creel's identity and his expert opinions in this case, as well it should, given that Pro–Foam is the party that selected, retained and first designated Creel. Pro–Foam and its attorneys have presumably been working with Creel on this case for many months, and are intimately familiar with his expertise, knowledge and opinions as they relate to the particular material issues

joined herein.  As this Court has explained in a previous ruling in this litigation, <u>"The rules governing expert disclosures are intended to shield litigants from unfair surprise, not to be used by opportunistic litigants as a sword to strike down witnesses whose identities and proposed testimony have been known to them from the outset of the lawsuit."</u>  Order (doc. 74) dated July 16, 2007, at 2.  <u>The risk of unfair surprise to defendant here is exactly nil</u>; therefore, the Court finds that <u>defendant is once again leaning on the Rule 26 disclosure requirements to secure a tactical advantage that these rules were never intended to confer</u>.  [*Kern*, 572 F. Supp. 2d at 1309–10] [emphasis added].

Similarly, in *S.E.C. v. Koenig*, 557 F.3d 736 (7th Cir. 2009), the Securities and Exchange Commission brought a civil action against Koenig, the former chief financial officer of Waste Management, Inc., alleging he had violated various securities laws. Koenig hired Dunbar as an expert.  Dunbar prepared a report and was deposed, but Koenig did not present his report or testimony at trial.  The SEC introduced Dunbar's testimony via his video deposition.  Koenig was found liable and appealed, asserting among other things that the district court should not have let the SEC introduce the testimony of his expert because it had not included him on its list of potential witnesses.  The Seventh Circuit rejected Koenig's argument, stating:

Rule 26(a)(2)(A) requires litigants to alert the other side to their intended expert witnesses, and Rule 37(c)(1) provides that failure to identify a witness as Rule 26 requires means that "the party is not allowed to use that ... witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless." What Rule 26(a)(2)(A) says is that "a party must disclose to the other parties the identity of any witness it may use at trial to present" expert testimony. Disclosure of a potential witness's "identity" differs from disclosure of a plan to call that witness.  <u>Koenig did not need to know the identity of Frederick C. Dunbar; he was Koenig's own expert, after all, and appeared on the list of expert witnesses that Koenig sent to the SEC</u>.  <u>Whether the adverse party wants to question an expert whose identity has already been revealed is not a subject within the scope of Rule 26(a)(2)</u>.  A district judge may call for disclosure of each party's plans about who to put on the stand, but Koenig does not contend that the SEC violated its obligations under the pretrial order.  (The SEC included Dunbar in its witness list for the pretrial order; Koenig's objection is not to a

mid-trial surprise but to the fact that the notice did not come before discovery closed, a year or more before the witness lists of the pretrial order were exchanged.).

Rule 26(a)(2)(A) facilitates preparation for expert testimony.  Disclosure of experts' identities, and their conclusions (reflected in their reports), is essential if lawyers (who are not themselves experts in accounting, economics, or other bodies of specialized knowledge) are to prepare intelligently for trial.  Disclosure also permits lawyers to ask for other experts' views on the soundness of the conclusions reached by the testimonial experts.  None of these considerations calls for notice from the SEC of a desire to call Dunbar.  <u>Koenig's legal team had his report, had been at the deposition, and for all we know had a platoon of non-testimonial experts analyze everything Dunbar wrote and said, which may be why Koenig did not present Dunbar's views at the liability portion of the trial</u>. (The trial was bifurcated, and Koenig did use Dunbar in his remedial portion.)

Suppose this is wrong, however, and that the SEC should have identified Dunbar during discovery as its own witness.  Rule 37(c)(1) says that a harmless lack of notice may be overlooked.  *See also* 28 U.S.C. § 2111; Fed. R. Civ. P. 61.  <u>Delay in alerting Koenig that Dunbar might testify was as harmless as they come, given Dunbar's status as Koenig's expert</u>.  The Committee Note accompanying the 1993 amendment to Rule 37 (when Rule 37(c)(1) took its current form) gives, as an example of a harmless violation, "the failure to list as a trial witness a person so listed by another party"; that fits this case**.**  Koenig maintains that with more advance notice from the SEC he would have withdrawn Dunbar as an expert.  But how could that have helped?  <u>A witness identified as a testimonial expert is available to either side; such a person can't be transformed after the report has been disclosed, and a deposition conducted, to the status of a trial-preparation expert whose identity and views may be concealed</u>.  *See* Fed. R. Civ. P.  26(b)(4)(B).  <u>Disclosure of the report ends the opportunity to invoke confidentiality.  So if the SEC had identified Dunbar as an expert it might call, nothing Koenig could have done would have blocked the SEC from using Dunbar's conclusions. Any delay was harmless</u>.  [557 F.3d at 743-744] [emphasis added].[5]

---

[5] Accord *United States v. Schaudt,* 2009 WL 1218605, at *3 (N.D. Ill. Apr. 30, 2009) (Rule 26(a)(2) "does not require that a party disclose the witnesses of its adversary, though it may ultimately use the expert's testimony."); *Bone Care,* 2010 WL 3894444, at *10 (relying on *Koenig* in finding that "defense testimonial experts whom Defendants do not call are nonetheless available to Plaintiffs"); *Bliss v. BNSF Ry. Co.*, 2013 WL 5570231, at *3 (D. Neb. Oct. 9, 2013) ("The defendant does not cite, and the court has not located, any law stating that a party who wants to present the opinions of the adverse party's expert must separately disclose that expert or be barred from calling the witness at trial…. Irrespective

Nowhere in the Federal Rules of Civil Procedure is there any requirement that Plaintiff provide Defendant with a report from Defendant's own testifying expert. CSAA has known what Mr. Battle's opinions were before the Smiths did, yet it chose to designate him as a testifying expert, provide his expert report, and present him for a discovery deposition.  As was the case in *Kerns*, "[t]he risk of unfair surprise to [CSAA] here [if the Smiths call Mr. Battle] is exactly nil," 572 F. Supp. 2d at 1310.  Rather, "[CSAA] is once again leaning on the Rule 26 disclosure requirements to secure a tactical advantage that these rules were never intended to confer."  *Id*.  For these reasons, the Smiths respectfully submit that CSAA's Motion to Strike Mr. Battle should be denied.

## II.    SEAN WILEY SHOULD BE ALLOWED TO TESTIFY

Although CSAA' Motion carefully refrains from mentioning Steve Ford's testimony, there has been no indication that it has abandoned its plan to call him to testify as an expert at the trial of this matter if it is allowed to do so.[6]  That is important for at least

---

of which party discloses an expert report, once that disclosure is made, the purpose of requiring expert disclosures is met.  Requiring both parties to disclose the expert and the expert's report if both parties intend to offer that expert's testimony would sacrifice "just, speedy, and inexpensive" case progression in favor of redundancy.") (citations omitted). The Tenth Circuit employed very similar reasoning in determining that materials which had previously been disclosed by an expert witness that the defendant no longer planned to call at trial were nonetheless admissible at trial.  *See Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1276 (10th Cir. 2018), *cert. denied, Ozark Materials River Rock, LLC v. Benham*, 139 S. Ct. 174, 202 L. Ed. 2d 38 (2018) (Fed. R. Civ. P. 26(b)(4) "provides no protection against admitting the [previously produced] documents as evidence at trial—even if Ozark no longer planned to call its expert as a witness.").

[6] As the Smiths have previously asserted, CSAA never asserted that their home sustained "light damage amounting to slightly more than the deductible" at any time before it denied

two reasons.   First, as previously discussed, although Mr. Ford's expert report and deposition testimony are to the effect the damage to the Smiths' home is not related to the earthquake during which the middle of the living room floor collapsed in Mrs. Smith's presence, Mr. Battle's expert report and his initial deposition testimony both indicate that Mr. Ford told him that the Smith's home <u>had</u> sustained earthquake damage.   In fact, Mr. Battle based the repair estimates in his expert report upon what Mr. Ford had told him was earthquake damage.   *See* Ex. 3, Battle depo., pp. 31:24 - 32:6.[7]   The minute Dr. Ford testifies that he found no earthquake damage at the home, Mr. Battle's testimony becomes relevant to contradict Dr. Ford's testimony.   So too does the repair estimate that he prepared

---

their claim.   Instead, CSAA's position was always that the earthquake <u>did not cause any damage their home at all</u>.   Nor, of course, did it ever rely upon the findings of Dr. Ford or Mr. Battle while it was investigating the claim.   They both were retained and inspected the home only after the claim was denied and suit had been filed.   Because CSAA's newly-concocted defense was never cited as the reason for the denial of the Smith's claim, it is irrelevant and should not be allowed at all.   *E.g.*, *Buzzard v. Farmers Ins. Co.*, 1991 OK 127, 824 P.2d 1105, 1114 (noting that "[t]he information relevant at trial [of a bad faith action] was that upon which [insurer] relied in refusing payment").   *See also, Id.* at 1109, stating:

> The decisive question is whether the insurer had a "good faith belief, *at the time its performance was requested,* that it had justifiable reason for withholding payment under the policy." *Buzzard v. McDanel,* 736 P.2d 157, 159 (Okla.1987). To determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances. **The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim**. *Id.*  [bold added; other emphasis in original].

However, if evidence regarding CSAA's newly concocted cost of repair defense is allowed, the Smiths respectfully submit that they have a right to rebut it with the testimony of their own expert upon the same subject.

[7] As Mr. Battle stated, his estimate "follow[s] what – the direction of the structural engineer and what his recommendations are."  *See* Ex. 3, Battle depo., p. 24:16-19.

at Dr. Ford's direction, as well as all of the inaccuracies that it contains, as discussed by Mr. Wiley and as set forth in his report.  It is no understatement to say that the testimony of Dr. Ford and Mr. Battle are interrelated, and that Mr. Wiley's proposed testimony rebuts both of their opinions.

Second, Dr. Ford's expert report and proposed testimony themselves set forth a proposed "scope of repair" regarding the Smiths' home which he variously described as "relatively simple, relatively standard types of techniques" that did not need "Herculean or unusual processes or procedures."  *See* Ex. 5, Ford deposition, pp. 12:19 - 14:25.  However, based upon his inspection of the home, Mr. Wiley disagrees with Dr. Ford's assessment. For example, with respect to the large depression in the living room, Dr. Ford proposes to simply cut holes in the subflooring large enough to allow the insertion of jacks, jack up the floor joists, and replace the brick column supports beneath the home that everyone agrees are currently dislodged.  *See* Ex. 5, Ford depo., pp. 14:16-20; 110:17 - 112:1.  However, Mr. Wiley's inspection of the home has established that at some of the floor joists are broken.  As a result, they will need to be replaced before Dr. Ford's recommendations are possible.  Those floor joists run the full length of the room and cannot be taken through the holes that Dr. Ford has proposed be cut in the floor.[8]  Rather, most, if not all, of the subfloor will have to be removed in order to place the new floor joists beneath the floor.

_____

[8] Dr. Ford did not consider those issues in his proposed scope of repair.  *See* Ex. 5, Ford depo., pp. 115:9 - 116:24.

Similarly, Dr. Ford's proposed scope of repairs does not address the effect of jacking up the floor on the out-of-plumb wall.[9]  In its current state, the top of the wall leans toward and into the living room, which is how Mrs. Smith described feeling it shift during the earthquake.  Because the wall is currently out-of-plumb, the living room floor cannot be jacked up to replace either the broken floor joists or the dislodged brick column supports.  If the out of plumb wall (which is also a load-bearing wall) is not first addressed, it will lean further into the living room during that process and could easily collapse.  In essence, contrary to Dr. Ford's testimony, Mr. Wiley's testimony indicates that the techniques necessary to repair to the Smiths' home are not "simple" or even necessarily "standard," and that they will involve construction techniques that are much more extensive than Mr. Ford's report or testimony has indicated.  Once again, that is proper rebuttal testimony.

Last, as the Court has previously determined, CSAA is not prejudiced in any respect by Mr. Wiley's testimony.  *See* Order denying CSAA's Motion to Strike Mr. Wiley's testimony entered November 9, 2018 (Doc. 40).  There, the Court's Order concluded that "Defendant is not prejudiced by allowing the witness, the testimony will not disrupt the trial as it has not yet been set, Defendant has sufficient time to prepare, and there is no evidence of bad faith or willfulness on the part of Plaintiffs."  *Id.* at p. 6.  Nothing has

---

[9] Dr. Ford did not recall if he measured whether the wall was plumb but testified that if he did, he did not record the results.  *See* Ex. 5, Ford depo., pp. 125:2 - 126:3.  Incidentally, that is the same wall where the front door to the Smiths' home is located.  The testimony has been that after the earthquake, the Smiths could not even close their front door and had to replace it.  That problem was likely caused at least in part by the out-of-plumb wall.

changed since that time except for CSAA's persistent rejection of the Smiths' offer to produce Mr. Wiley for deposition, which offer remains outstanding.

For these reasons, Plaintiffs Sean Smith and Crystal Smith respectfully submit that the Motion to Strike David Battle and Sean Wiley from Plaintiffs' Witness List filed herein by Defendant CSAA Fire and Casualty Insurance Company should be denied.

**MANSELL ENGEL & COLE**

By: M. Adam Engel
    Steven S. Mansell, OBA #10584
    Mark A. Engel, OBA #10796
    Kenneth G. Cole, OBA #11792
    M. Adam Engel, OBA #32384
    204 North Robinson Avenue, 21st Floor
    Oklahoma City, OK 73102-7001
    T: (405) 232-4100 ** F: (405) 232-4140
    Firm E-mail:  mec@meclaw.net

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2019, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Gerard F. Pignato (jerry@pclaw.org)
R. Greg Andrews (greg@andrews.law)
Dixie A. Craven (dixie@pclaw.org)

**ATTORNEYS FOR DEFENDANT –
CSAA FIRE AND CASUALTY INSURANCE**

    s/Adam M. Engel