Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL SMITH,   )
                                )
          Plaintiff,            )
                                )
-vs-                            )   CASE NO. 5:17-cv-1302 D
                                )
CSAA FIRE AND CASUALTY          )
INSURANCE COMPANY,              )
                                )
          Defendant.            )

DEPOSITION OF

DAVID M. BATTLE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON NOVEMBER 2, 2018

REPORTED BY:   TRENA K. BLOYE, CSR

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

PLAINTIFF'S EXHIBIT 3

David Battle                                           November 2, 2018

Page 24

```
 1   line item after this.  But I want you to give me a
 2   general overview of this project.  If you could describe
 3   it in four or five sentences, I'd like for you to do
 4   that.
 5              MR. ANDREWS:  I'll object to the form.
 6        Q    (By Mr. Engel) Let me --
 7        A    And as -- go ahead.
 8        Q    As far as this project.  And let me ask a
 9   question so I don't get my objection.
10        A    Sure.
11        Q    Will you briefly describe the project that you
12   have laid out in this case?
13              MR. ANDREWS:  Object to the form.
14        A    Okay.  For what I have costed only or what I
15   see that's going on or --
16        Q    (By Mr. Engel) What you have estimated for.
17        A    Okay.  All right.  And we follow what -- the
18   direction of the structural engineer and what his
19   recommendations are.
20        Q    Okay.
21        A    So the first part -- and I -- going back
22   through the report, my report is dated August 23rd.
23        Q    Sure.
24        A    And then Steve Ford with ZFI, his is dated the
25   23rd as well.
```

David Battle                                           November 2, 2018

Page 30

1    Q    Okay.
2    A    He was uncertain about what was going on with
3    the pilings under the house, so that's why he said go
4    ahead and make a cost on that part.
5    Q    Okay.
6    A    And then the other item that I put in there was
7    the front door, and I received that from the Rimkus
8    report, and that was based on their findings of
9    discussion with the owner that there was -- I think the
10   owner replaced the front door of the house.  That's why
11   I put that cost in there.  Steve did not recommend
12   either way on that.
13   Q    Okay.
14   A    That was something I did from the other report.
15   Q    And so by August 23rd you had reviewed the
16   Rimkus report?
17   A    Yes.  In fact, I think I had that report before
18   I actually went to the site.
19   Q    Okay.
20   A    So I --
21   Q    You reviewed the Rimkus report prior to going
22   out there?
23   A    Yes, I did, and that kind of gave me a little
24   bit of history what was going on there.
25   Q    Have you reviewed Sean Wiley's report?

David Battle                                                          November 2, 2018

Page 31

1     A    I only just glanced at it.

2     Q    Did you --

3     A    I did not study it or did not analyze it.

4     Q    You didn't dive into the details of that

5    report?

6     A    Yeah.  There was kind of a holdup.  I think

7    there were some issues about that report, doing any work

8    on that.  So it was on hold to do any -- make any

9    decisive information.  I had to go back on anything I

10   would have to dig into it, analyze it.  Like I said, it

11   was sent to me as a matter of record, but I was told

12   just to hold it.

13    Q    But your report or your findings or -- I'm

14   sorry.  Let me start over.

15         Your conclusions for your testimony in this

16   case weren't in any way affected by the Sean Wiley

17   report?

18    A    No.  I did not have the Wiley report before I

19   made my report.

20    Q    Okay.  But to this day there is no changes to

21   your report based on the Wiley report?

22         MR. ANDREWS:  Object to the form.

23    A    That's correct.

24    Q    (By Mr. Engel) Okay.  Now, I want to talk about

25   more in-depth what you and Mr. Ford talked about on

David Battle                                                November 2, 2018

Page 32

1   August 23rd. Okay? And I will tell you the crux, it's
2   difficult for me to understand what you were looking at
3   or what Steve Ford's recommendations were, because you
4   didn't have Steve Ford's report when you prepared your
5   estimate; right?
6       A   That's correct.
7       Q   So I need to understand what he was telling you
8   at the time. Okay?
9       A   Okay.
10      Q   And during that phone call he was telling you
11  that -- well, I think it's in your report.
12      A   On page 2. What I remember we discussed, he
13  said there were some shifting or something -- or not
14  shifting, but there was actually some bricks that were
15  loose and some of the pilasters were laying over.
16      Q   Yeah. I want to draw your attention to the
17  second paragraph on page 2, the first complete paragraph
18  on page 2.
19      A   Correct.
20      Q   It says, Based on Mr. Ford's findings, the
21  earthquake damage he could visibly observe, was four by
22  six brick column supports supporting the floor structure
23  under the house were partially dislodged. Did I read
24  that accurately?
25      A   Okay.

David Battle                                                November 2, 2018

Page 33

1        MR. ANDREWS: Object to the form.
2     A   Okay. It's four each. Four each or six each.
3  He wasn't sure how many, because he could only stick his
4  head down and take pictures. He couldn't get his whole
5  body down underneath there.
6     Q   That's why he objected is because I did read it
7  wrong; right?
8     A   Right.
9     Q   It's four to six brick column supports.
10    A   Right. They are not two by six.
11    Q   And this is something he would have told you
12 over that phone call; right?
13    A   That's correct.
14    Q   Okay. So he says -- first he says I can't see
15 how many brick supports there are under there; right?
16    A   Right. He said there was four to six was his
17 estimate of what he could see.
18    Q   And that's because he doesn't know because
19 there was visibility issues?
20    A   Right. There was kind of a main beam going
21 underneath the house that he could maybe stick his
22 camera underneath there, I guess, to take a picture.
23    Q   And he's guessing that you've got brick column
24 supports supporting the floor structure of the house and
25 four to six of them are damaged by the earthquake; is

David Battle                                      November 2, 2018

Page 34

1  that right?
2       A    Yes.
3       Q    And you mentioned that he could barely see
4  under there; right?
5       A    Right.  He's -- in fact, one of my photos shows
6  him down there, but he could only get, you know, part of
7  his head down there, or I guess his upper part of his
8  body.
9       Q    And that's one of the things I want to talk to
10 you about is you never looked underneath the house;
11 right?
12      A    I did not.
13      Q    Did you go into the attic?
14      A    No.
15      Q    But all of your knowledge of what is underneath
16 that house or in the attic is going to be based on
17 Mr. Ford's pictures; right?
18      A    Yes, and what he -- comments he made about it.
19      Q    Sure.  You can't testify as to what's
20 underneath that house unless it's through Mr. Ford;
21 right?
22      A    I did walk up to the hole and look down in the
23 hole, but I did not go as far as what he did.  I just
24 looked down from above.  I didn't stick my head
25 underneath there.

David Battle                                                November 2, 2018

Page 36

1  overview of the work you're going to perform.  But I've
2  got to get back to the phone conversation that you had
3  with Mr. Ford.  Okay?
4      A    Okay.
5      Q    And as I have discussed, it's difficult for me
6  to understand -- I have to understand what he was
7  telling you at the time.  So we've already talked about
8  he's telling you about the four to six brick columns
9  that were damaged; right?
10     A    That's correct.
11     Q    What else did he tell you?
12     A    He said he didn't see any other earthquake
13 damage.  In fact, I think his report, reading it later,
14 I think he said he didn't see, really, any earthquake
15 damage.
16     Q    And we'll get to Mr. Ford's report, too.  But
17 Mr. Ford's report actually says he didn't see any
18 earthquake damage; right?
19     A    That's correct.
20     Q    What else did he tell you as far as repairing
21 the house?  Well, let me rephrase that question.
22          He tells you what he's observed; right?
23     A    Right.
24     Q    And then does he provide you with instructions
25 for what you're supposed to estimate for?

David Battle                                    November 2, 2018

Page 37

1    A    Well, I just -- in my discussions with him,
2  like he mentioned those pilasters, he didn't see any
3  other earthquake damage.  There was a lot of deferred
4  maintenance items and being an older structure, just
5  over time settling, that kind of thing.  And plus the
6  foundations, he mentioned that those were not the proper
7  depth of -- the footings.
8    Q    Everything that you just said, you don't have
9  any -- are you going to provide testimony on any of
10 that?  Let me start over.
11        Are you going to provide testimony that the
12 home was built improperly?
13   A    I'm not saying it was built improperly.  That
14 was just what he was saying, that there was deferred
15 maintenance in there.
16   Q    Let me get back to that.  My original question
17 was:  Did he tell you the work that needed to be
18 performed over the phone?
19   A    Yes.
20   Q    Okay.  And what did he tell you about that?
21   A    It was those brick pilasters underneath the
22 house.
23   Q    Did he tell --
24   A    And he told me that you would have to have
25 access through the floor above, take part of the floor

David Battle                                    November 2, 2018

Page 41

```
 1      Q   If you have any questions about where I'm
 2   trying to do, I'm very open about it.  All right?
 3      A   You're leading the show here.  I'm just
 4   following you.
 5      Q   Just collecting a check.
 6      A   I'm just answering the questions.
 7      Q   Sure.  I asked you just an overview of the
 8   project and you said, Well, I have to follow the
 9   recommendations of the structural engineer; right?
10      A   Correct.
11      Q   Now, walk me through.  You have received the
12   structural recommendations over the phone from the
13   engineer at this point; right?
14      A   That's correct.
15      Q   What was -- after you received the structural
16   engineer's recommendations, please give me an overview
17   of what this project is and the repairs you're going to
18   recommend for the home.
19      A   Okay.  Basically what it is is removing the
20   floor in areas to have access.  It's in a couple of
21   areas because of that beam that goes down the middle of
22   the house, so to have access to both sides of that beam.
23   The main thing, it was so restricted to get under there
24   it would be difficult for a workman to do a decent job
25   or access to do his work, get his materials in there
```

David Battle                                                November 2, 2018

Page 42

1  without bringing them in, you know, from above.
2      Q   Okay.  So --
3      A   Create a larger access to get and closer to
4  where the work to be done was.
5      Q   So you're going to cut two 4x6 holes?
6      A   I --
7      Q   Well, I don't want to get into the details.
8  You're going to cut two holes; right?
9      A   Correct.
10     Q   One in the living room.  One in the bedroom.
11     A   Correct.
12     Q   And from there you're going to use a column to
13 jack up the floors; right?
14     A   It would have to be a jack to get it up close,
15 maybe, to where it needs to be.  It needs to be higher
16 so you can lay your bricks and then lay it down.  I'm
17 not sure totally the detail how far they would go up
18 with it.  You know, that's part of the field process.
19 But I did include, you know, the jacks or shoring and
20 then also the -- give enough room to get the bricks laid
21 back in place.
22     Q   Again, what you're going to do is you're going
23 to destroy the brick columns?
24         MR. ANDREWS:  Object to the form.
25     Q   (By Mr. Engel) Are you going to destroy the

David Battle                                            November 2, 2018

Page 68

```
 1      Q    (By Mr. Engel) You know, then he makes the
 2   recommendation to you to do these repairs; right?
 3      A    Yes.
 4      Q    And you're relying on his inspection of the
 5   floor foundation in order to write those repairs; right?
 6      A    Yes.
 7      Q    Do you think it would be a prudent thing to do
 8   for you to make recommendations without having anyone to
 9   rely on --
10           MR. ANDREWS:  Object to the form.
11      Q    (By Mr. Engel) -- that looked in there?
12      A    In this particular case where you have a
13   structural engineer that has his opinions of what's
14   going on, and my -- I was retained just to put a cost to
15   what he recommends on there.
16      Q    Well, but it wouldn't be good estimating for
17   you to make -- to estimate the cost without having
18   someone that looked in there; right?
19           MR. ANDREWS:  Object to the form.
20      A    If there was not a structural engineer involved
21   I would have to do something.  But I have to follow what
22   his recommendations are in order to not to have to make
23   opinions that are in his jurisdiction.
24      Q    (By Mr. Engel) Sure.  And I don't want you to
25   make any engineering determinations.
```

David Battle                                          November 2, 2018

Page 69

1    A    Right.
2    Q    It's going to be your testimony now that you're
3    not going to make any determinations that are
4    engineering determinations; right?
5    A    Exactly.
6    Q    But you have an understanding of how structural
7    components in homes work because you have built homes;
8    right?
9    A    Right.
10        MR. ANDREWS:  Object to the form.
11   Q    (By Mr. Engel) And you're not going to make any
12   determinations as to cause of loss, are you?
13   A    No.
14   Q    So you're not going to say this was earthquake
15   damage; right?
16   A    Right.  There's going to be no causation.
17   Q    Okay.  So you're not going to testify to
18   anything about causation?
19   A    Yeah.  And where I put that in my report where
20   I said, you know, "earthquake damage," that is just a
21   poor choice of words that I put in there.
22   Q    What do you mean it's a poor choice of words?
23   A    Because when I look back on Steve's report he
24   didn't say that there was earthquake damage.
25   Q    Right.  But you didn't make the determination

David Battle                                          November 2, 2018

Page 70

1  as to what caused this damage, did you?
2      A   I only wrote that down because of my
3  discussions where his findings said, you know, these
4  columns, we need to get a price to repair those.
5      Q   It's going to be your testimony that Steve Ford
6  never told you there was earthquake damage to this home?
7      A   That's correct.
8      Q   Even though you put it into your report?
9      A   Yeah.  It's a poor choice of words on my part
10 there.
11     Q   You understand this entire litigation is about
12 whether or not this home was damaged by an earthquake;
13 right?
14     A   That's what I understand, yes.
15     Q   And now your report says that Steve Ford told
16 you there was earthquake damage?
17     A   It says that, but I wrote that down just, you
18 know, verbally what he told me.  But he never said
19 anything that was in writing that I could rely on that.
20     Q   Okay.  Because you didn't have his report at
21 the time.
22     A   That's correct.
23     Q   So you are writing this report just relying on
24 what he told you?
25     A   Right, just across the phone.