1

IN THE UNITED STATES DISTRICT COURT OF

FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL          )
SMITH,                          )
                                )
          Plaintiffs,           )
                                )
VS.                             )   Case No. 5:17-cv-1302D
                                )
CSAA FIRE & CASUALTY            )
INSURANCE COMPANY,              )
                                )
          Defendant.            )



DEPOSITION OF CHAD WHITE HECKMAN

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 23, 2018

REPORTED BY:  SUSAN J. FENIMORE, CSR, RPR

PLAINTIFF'S EXHIBIT

1

Exhibit

Chad Heckman                                    October 23, 2018

Page 157

1    adjuster.

2        Q      (By Mr. Engel) Right.   And what she

3    testified to in her deposition, right?

4              MR. ANDREWS:  Object to the form.

5        Q      (By Mr. Engel) When they found the

6    additional damage, that's when they made the claim?

7        A     Yes.

8        Q      Then when you go to the next page, on

9    Page 7, the other thing that you know, because we're

10   reading this, is that there was significant damage to

11   the living room, right?

12       A     Yes.

13             MR. ANDREWS:  Object to the form of the

14   question.

15             MR. ENGEL:  I'm sorry, he doesn't like that

16   question because it sucks and he's right.

17       Q     (By Mr. Engel) The other thing you know the

18   insured is claiming is that there was significant

19   damage to the living room, right?

20       A     Correct.

21       Q     Okay.  I appreciate the help, Mr. Andrews.

22   That's a better question.

23             Now, when you go to -- just above that is

24   when it gets referred to you, right, so 8-28-2017, do

25   you see that?

Chad Heckman                                    October 23, 2018

Page 158

1       A     Yes.

2       Q     That's when it gets moved to Mr. Chad White

3   Heckman?

4       A     Correct.

5       Q     Heckman, sorry.  So that's when it gets

6   moved to you, right?

7       A     Yes.

8       Q     And it says "Due to earth movement," but

9   like you said, these claims that are earth movement

10  or earthquake all get sent to senior adjusters,

11  right?

12      A     Correct.

13      Q     So moving up, you tell me if you see any

14  new information as you move up this claim file, see

15  where it says "senior referral acknowledgment"?

16      A     Uh-huh.

17      Q     Is this you right here?

18      A     Yes, I put in that note.

19      Q     It says, "I've been assigned to handle this

20  claim due to earthquake.  Make sure to reassign XA

21  assignments to my name."  What is XA?

22      A     XactAnalysis assignments.

23      Q     What's an XactAnalysis assignment?

24      A     It works with Xactimate.

25      Q     Oh, yeah, I know what you're referring to.

Chad Heckman                                          October 23, 2018

Page 227

1   want to go ahead and talk about what you knew.  The

2   first thing is that they discovered damage in the

3   son's room, right?

4          A    Yes.

5          Q    And that's on Page 8 of the claim file

6   notes.  In Page 7 it says and you testified to that

7   the insured was telling Rich there was significant

8   damage in the living room, right?

9          A    That was her statement -- or that's what

10  Rich put in the note, yes.

11         Q    Because that's what the insured told Rich?

12         A    I don't --

13              MR. ANDREWS:  Where are you at?

14              THE WITNESS:  I didn't have that

15  conversation, so I don't know.

16              MR. ENGEL:  I'm sorry, the bottom of Page

17  7.  Right there.

18              THE WITNESS:  I wasn't part of those

19  conversations, so I don't know what was said to one

20  another.  I could just go off of what was put in the

21  note.

22         Q    (By Mr. Engel) Well, did you know that the

23  insured was claiming there was damage in the --

24  significant damage in the living room?

25         A    Yes, from the note that she was claiming

Page 228

1  that, yes.

2      Q    Right.  But then again on Page 6, the next

3  page, the bottom one, she told you there was damage

4  in the living room.

5      A    Yes.

6      Q    Do you see that?

7      A    Yes.

8      Q    And there's a wall in her living room

9  that's leaning?

10      A    Yes.

11      Q    So what you knew is two things, initially

12  you knew what the insured told you.  And then at the

13  end, you had the engineering report, right?

14      A    Yes.

15      Q    Okay.  And then going back to the

16  engineering report, is the word -- at any point in

17  time, does Lisa Holiday address the living room?

18          MR. ENGEL:  How much time, ma'am?

19          COURT REPORTER:  5:12.

20          MR. ENGEL:  Let's go off the record for a

21  second.

22          (Discussion off the record.)

23          THE WITNESS:  It doesn't specifically say

24  the living room.

25      Q    (By Mr. Engel) Does it ever mention the

Chad Heckman                                    October 23, 2018

Page 229

1    living room?

2         A    No.

3         Q    You know the insured was claiming damage to

4    the living room, right?

5         A    Yes.

6         Q    And, in fact, one of the things that Rich

7    put in the claim file notes is that there was

8    significant damage to the home in the living room,

9    right?

10        A    Correct.

11        Q    But her report doesn't mention living room,

12   does it?

13        A    Specifically living room, no.

14        Q    Does it -- are there any photographs taken

15   in the 23 photographs that she provided you of the

16   living room?

17        A    No.

18        Q    Were you aware that two of the beams that

19   support the floor in the living room had collapsed?

20             MR. ANDREWS:  Object to the form.

21             THE WITNESS:  I've never been provided that

22   information.

23        Q    (By Mr. Engel) So, and I understand that

24   you were only provided what was in this report,

25   right?

Chad Heckman                                    October 23, 2018

Page 230

1      A    Correct.

2      Q    I'm talking about when you walk across the

3   Smith -- I'm sorry, the Smith living room right now,

4   it actually dips, and so when you're walking, you dip

5   down and then you come back up.  Does that make sense

6   or do you want me to demonstrate?

7      A    The ceiling does that or the floor does

8   that?

9      Q    The floor does that.

10     A    Okay.

11     Q    When you're walking across the floor --

12     A    There's a dip in the floor.

13     Q    -- beams busted and there's a dip in the

14  floor.

15          MR. ANDREWS:  Object to the form.

16          THE WITNESS:  So the floor joists, you are

17  saying the floor joists broke?

18          MR. ENGEL:  A floor joist broke.

19          THE WITNESS:  Okay.

20          MR. ANDREWS:  Object to the form.

21     Q    (By Mr. Engel) If an engineer -- and he's

22  objecting because he doesn't think that that's

23  admissible for me to tell you what you don't know,

24  but let's put this into a hypothetical house that's

25  identical to this house, okay?  And you're sending an

Chad Heckman                                    October 23, 2018

Page 231

1    engineer to investigate it.  And while the engineer's

2    walking across the floor, she goes into a dip and

3    then comes back out.

4              Do you think that's something that should

5    be mentioned or photographed in the report?

6              MR. ANDREWS:  Object to the form.

7              THE WITNESS:  In the file itself, it

8    doesn't say anything about dipping in the floor,

9    either, so I was never provided anything about

10   dipping to the floor.

11      Q    (By Mr. Engel) Except for there was

12   significant damage in the living room, right?

13      A    Just stated that, yes.

14      Q    Do you know anything about damage in the

15   living room?

16      A    No.

17      Q    Well, we know that there was a wall leaning

18   in the living room, right?

19             MR. ANDREWS:  Object to the form.

20             THE WITNESS:  Yes.

21      Q    (By Mr. Engel) Are there any photographs

22   of a leaning wall in this report?

23      A    No.

24      Q    Are there any mentions of a leaning wall in

25   the report?

Chad Heckman                                October 23, 2018

                                                    Page 246

1        A    I don't know their process.

2        Q    I want to talk about destructive

3   investigation just briefly.  Do you know what

4   destructive investigation is?

5        A    No.

6        Q    The process of looking behind drywall and

7   that kind of thing to see structural members, are you

8   familiar with that?

9        A    Okay.  Yes.

10        Q    Have you done some of that in claims?

11        A    I haven't because I don't go out to the

12   property to do that work.

13        Q    Have you worked claims where that occurred?

14        A    Yes.

15        Q    Was that an engineer that requested to look

16   behind the walls?

17        A    I don't recall if it was the engineer or

18   the insured's contractor that requested that, as it

19   was not the engineer who did it, either, it was the

20   insured's contractor who actually disassembled it for

21   us to look at.  But I don't know -- I do not recall

22   if it was the engineer or the contractor that

23   requested that specifically.

24        Q    This isn't a foreign concept in insurance

25   claims, right?  You've got to access and view damage,

Chad Heckman                                October 23, 2018

Page 247

1    right?

2        A    Sometimes, yes.

3        Q    And in order to access and view damage,

4    sometimes you have got to tear some stuff up, right?

5             MR. ANDREWS:  Object to the form.

6             THE WITNESS:  Potentially, yes.

7        Q    (By Mr. Engel) Whether you're going to cut

8    a hole in a ceiling, right?

9        A    Again, that depends on who's going out

10   there, if they need that to be done or not, because

11   I -- again, I'm not the one that goes out there.

12       Q    Right.  It's situational.  And I'm just

13   saying if you've got to look at damage, there are

14   instances in the insurance claim world where you've

15   got to, you know, tear off a wall, right?

16       A    Yes.

17       Q    Or you have to perform some sort of

18   destructive investigation, right?

19       A    Yes.

20       Q    You're not going to testify that, oh,

21   that's something I've never even heard of, insurance

22   companies never do that, we never do that in

23   insurance claims handling, it's just unheard of;

24   you're not going to testify to anything like that,

25   are you?

Chad Heckman                                October 23, 2018

Page 248

1        A    No.

2        Q    Because that's something you've seen

3   before, right?

4        A    In photos, yes.

5        Q    Have you ever heard of someone cutting

6   holes in the floor to look into the crawl space?

7        A    Yes.

8        Q    You've had another claim where that

9   happened?

10       A    I can't recall any of my claims that

11  they've had to do that, no.

12       Q    But you've heard that before?

13       A    Yes.

14       Q    Do you know if anyone from CSAA has ever

15  set foot into the Smith house?

16       A    Not that I'm aware of.

17       Q    Do you know if anyone from CSAA has ever

18  shaken Mr. Smith's hand?

19       A    Not that I'm aware of.

20       Q    If Mr. and Mrs. Smith walked into this room

21  right now, would you know who they were?

22       A    No, I would not.

23       Q    Do you think anyone in the CSAA claims

24  department would?

25       A    I don't know.