IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

SEAN SMITH and CRYSTAL SMITH,    )
                                 )
      Plaintiffs,                )
                                 )
                                 )
-vs-                             )  No. CIV-17-1302-D
                                 )
CSAA FIRE AND CASUALTY           )
INSURANCE COMPANY and LISA       )
HOLLIDAY,                        )
                                 )
      Defendants.                )



\* \* \* \* \*

VIDEO DEPOSITION OF ALANA HARE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 24, 2019

COMMENCING AT 10:08 A.M.

\* \* \* \* \*

REPORTED BY: BETH A. McGINLEY, CSR, RPR

instaScript
101 Park Avenue, Suite 910
Oklahoma City, OK 73102
Phone: 405-605-6880 Fax: 405-605-6881



PLAINTIFF'S
EXHIBIT
4

Alana Hare
10/24/2019

1    whenever the engineers are -- went out, or if we had a

2    confirmed earthquake, then field adjusters go out, that we

3    would need to know the -- the overall condition of the

4    home, as well.

5         Q    Okay.  So is it accurate to say that when the

6    earthquake bulletin came out, there were changes to the

7    expectations of adjusters at CSAA for how to adjust the

8    earthquake claims?

9         A    Yes, specific to -- to earthquake claims, yes.

10        Q    And one of those changes is, we were going to

11   start to look for pre-loss condition items during the

12   adjustment of the claim, right?

13        A    Yes, but that's really kind of an expectation on

14   most claims.

15        Q    Right.  Understanding the pre-loss condition of

16   a home could help you determine cause of loss, right?

17        A    Correct.

18        Q    So this -- this earthquake bulletin, it -- it

19   provides -- it does -- it's something you all get together

20   and talk about and it changes things, but, at the same

21   time, everyone is saying, "Well, heck, we were supposed to

22   do this, anyway," right?

23        A    Yeah, correct.

24        Q    It was inherent, in good claims handling, to

25   consider pre-loss condition of a structure when adjusting

```
 1    a claim or determining cause of loss, right?

 2         A    Correct.

 3         Q    Other than that training and those discussions

 4    about the earthquake bulletin, is -- is there any other

 5    training associated with these earthquake claims?

 6         A    No.

 7         Q    Was the bulletin provided to all the adjusters?

 8         A    I don't know all of the adjusters, but I know

 9    the senior adjusters specifically.

10         Q    Okay.  So the senior adjusters were provided the

11    bulletin and, like, this is something to consider when

12    you're adjusting claims, right?

13         A    Correct.

14         Q    This -- is this bulletin something that's

15    available to adjusters?

16         A    Yes.

17         Q    Okay.  And let me kind of break this down a

18    little bit.  Y'all have online resources, right?

19         A    Yes.

20         Q    We've talked about this previously, so I don't

21    want to get into a lot of, like, the intranet and -- and

22    all the different types of stuff we talked about last

23    time, but CSAA offers their adjusters resources, right?

24         A    Correct.

25         Q    They offer them claims handling guidelines,
```

```
 1    right?

 2         A     Correct.

 3         Q     There's memos in there, right?

 4         A     Yes.

 5         Q     There's stuff that CSAA adjusters can reference

 6    when they're adjusting claims, correct?

 7         A     Yes.

 8         Q     And one of those things that's contained in

 9    there is the earthquake bulletin, right?

10         A     Yes.

11         Q     Okay.  So... And, again, just to clarify:  The

12    adjusters can log in online to access these resources to

13    guide them in the adjustment of the claim, right?

14         A     Yes.

15         Q     These are documents that y'all keep, just in the

16    regular course of business, for your adjusters, right?

17         A     Yes.

18         Q     Do you guys expect your adjusters to follow the

19    guidelines that you -- and the resources that you have

20    available to them?

21         A     Yes.

22         Q     It's -- this is -- this seems like an odd

23    question, but I actually -- I talked to an adjuster one

24    time and she said, "Well, those are just resources,

25    they're just there, like nobody ever reads those."  Is
```

1    that going to be CSAA's testimony?

2         A    No.

3              MR. ANDREWS:  Object to the form.

4         Q    (By Mr. Engel) You guys actually have those

5    resources available and you expect people to reference

6    them or to look at them if they need help in the

7    adjustment of a claim, right?

8         A    Correct.

9         Q    Can you think of any other training that CSAA

10   adjusters went through?

11        A    No.

12        Q    I want to be fair, too, because I understand the

13   State of Oklahoma requires CE hours, right?

14        A    Oh, yeah.  Yeah, correct.

15        Q    So besides the state-required CE hours, is there

16   any other -- besides what we've already discussed, any

17   other training that was provided to CSAA adjusters?

18        A    Not that I'm aware of.

19        Q    Do you know who Cindy Miles is?

20        A    I don't know her personally, but I did read her

21   report.

22        Q    Have you ever spoken to Cindy Miles?

23        A    No.

24        Q    Was Cindy Miles an expert witness in the Graham

25   versus CSAA case?

1        A     Uh-huh.

2        Q     Essentially, you have your wear-and-tear

3   exclusion, your settling exclusion and your -- what I

4   would call the faulty construction exclusion, right?

5        A     Yes.

6        Q     And I know I've kind of summarized those, but is

7   there -- are there other exclusions that were applicable

8   in this claim that were not cited here?

9        A     I don't believe so.

10       Q     In your review of this file, you didn't see

11  anything else, right?

12       A     No.

13       Q     Set that aside.

14             Okay.  I'm going to hand you what's marked

15  Exhibit 13.

16             MR. ANDREWS:  Thank you.

17             MR. ENGEL:  You know, do we have to put the

18  stickers on it, even if it's already marked?

19             MR. ANDREWS:  Huh-uh.

20             MR. ENGEL:  Okay.

21             MR. ANDREWS:  Unless you just want to.

22       Q     (By Mr. Engel) This is Exhibit 13, okay?

23       A     Okay.

24       Q     Do you know what this document is?

25       A     Yes.

1        **Q**      What is it?

2        **A**      It's the Oklahoma Insurance Commissioner's

3    Earthquake Bulletin.

4        **Q**      How do you know?

5        **A**      Because it says "Earthquake Insurance Bulletin,"

6    and it's from John Doak.

7        **Q**      And you recognize this document, right?

8        **A**      Yes.

9        **Q**      In fact, this is a document that CSAA held

10   meetings over when it was sent out, right?

11       **A**      Yes.

12       **Q**      And we've already talked about the effect of

13   that at CSAA, right?

14       **A**      Yes.

15       **Q**      Okay.   You see where it says, "To all property

16   and casualty insurers licensed in the state of Oklahoma,"

17   right?

18       **A**      Yes.

19       **Q**      That applies to CSAA, right?

20       **A**      Correct.

21       **Q**      It's regarding earthquake insurance, excluded

22   loss, inspection of insured property, and adjuster

23   training, right?

24       **A**      Yes.

25       **Q**      This is the document you were referencing

1      Q      Of all these reports you read, those -- that

2    would be the only covered damage you saw in all these

3    conclusions, right --

4      A      Yes.

5      Q      -- is from that one report?

6             And Mr. Cantu, is he still with the company?

7      A      No.

8      Q      What does he do now?

9      A      I'm not sure.

10     Q      Why did he leave CSAA?

11     A      I don't know.

12            MR. ENGEL:  Okay, let's take a break, all right?

13            THE WITNESS:  All right.

14            THE VIDEOGRAPHER:  Going off the record, 1:39.

15            (Recess was had from 1:39 p.m. to 1:51 p.m.)

16            THE VIDEOGRAPHER:  We're back on the record,

17   1:51.

18     Q      (By Mr. Engel) Just as an overall claims

19   handling practice, you said that you send engineers to

20   every earthquake inspection, right?

21     A      Yes.

22     Q      Is it common to have claims where CSAA never

23   went to the house for an earthquake?

24     A      Yes.

25     Q      So in -- I was just looking at, you know, the

1    whole stack of Rimkus reports, right?

2        A    Yes.

3        Q    And in the Smith case, no one from CSAA went to

4    the home, right?

5        A    Correct.

6        Q    The -- is that common?  Is -- is -- and there's

7    two possibilities here, is:  No, that's kind of an

8    outlier, Chad didn't go, that's extremely uncommon, we

9    always go to the house; or, that's not uncommon, that's

10   generally how it goes, right?

11       A    Correct.

12       Q    Well, which one is it?

13       A    It -- it's not uncommon that we don't go.  If

14   they're not finding damage from an earthquake, we won't go

15   back to the house.

16       Q    This is kind of a -- this is how you train your

17   adjusters, is if the engineer says, "Well, we don't have

18   any earthquake damage here," then y'all don't send an

19   adjuster?

20       A    Correct.

21       Q    Okay.  So on the -- in the -- those reports

22   represent the past five years of Rimkus reports to CSAA,

23   okay?

24       A    Okay.

25       Q    Of the past five years, every time Rimkus was